Receipt number AUSFCC-8903804

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **CHRISTOPHER HARKINS, CARRIE LEE GAGNON, SHANE NOLAN, MARK BYRD, AARON GUTIERREZ, DAN MORRISSEY, and MATTHEW POWERS, individually and on behalf of all others similarly situated,** | **23-1238 C** |
| *Plaintiffs*, | **Case No. 23-XXX** |
| v. | |
| **THE UNITED STATES OF AMERICA,** | |
| *Defendant*. | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Christopher Harkins, *et al.*, on behalf of themselves and a class of similarly situated persons, bring this class action against Defendant United States of America (the "Government") and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon reasonable information and belief, including investigation conducted by their attorneys.

## NATURE OF THE CASE

1.      This is a military class action for backpay and other ancillary relief for all members of the United States Coast Guard ("Coast Guard"), in the regular or reserve components, who were wrongfully denied pay by virtue of being discharged, constructively discharged, and/or separated, had orders curtailed, or dropped to inactive status, as a consequence of not being "fully vaccinated" pursuant to Department of Defense ("DoD") Secretary Lloyd Austin, III's unlawful August 24, 2021 COVID-19 vaccine mandate, *see* Ex. 1, and the Coast Guard's August 26, 2021 ALCOAST Message 305/21 implementing the mandate, *see* Ex. 2 (collectively, the "Mandate").

2.      On December 23, 2022, the Mandate was "rescind[ed]" by act of Congress by Section 525 of the Fiscal Year 2023 National Defense Authorization Act (the "2023

NDAA"), which was enacted into law by veto-proof majorities in the House of Representatives (350-80) and the Senate (83-11).

3.      Congress expressly chose the term "rescind", rather than more customary language such as "repeal", "amend", or "clarify", to direct the DoD and the courts that the rescission should be applied retroactively to render the Mandate null and void *ab initio*; to eliminate any legal basis or authority for discharge, constructive discharge, involuntary separations and retirement, denials of re-enlistment, curtailment of orders, transfer to inactive status, and/or the denial of pay and benefits; and to restore all adversely affected Coast Guard members to the position in which they would have been in the absence of the unlawful Mandate and the unlawful denial of pay and benefits.

4.      On January 10, 2023, Secretary Austin issued a memorandum rescinding the August 24, 2021 Mandate. *See* Ex. 3, Jan. 10, 2023 Rescission Memo. In the Rescission Memo, Secretary Austin acknowledged the Congressional directive to apply the Rescission retroactively by, among other things, committing to correct military records and adverse personnel actions resulting from non-compliance with the now voided Mandate and orders issued pursuant to it.

5.      On January 11, 2023, the Coast Guard rescinded the Coast Guard Mandate "[i]n alignment with the DoD." Ex. 4, ALCOAST 012/23, ¶ 1.

6.      The Class consists of all Coast Guard members who were discharged, constructively discharged, involuntarily separated or retired, transferred to inactive status due to their unvaccinated status, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments ("Backpay") to which they are entitled under the 2023 NDAA, the Military Pay Act, 37 U.S.C. §§ 201, et seq., the 2023

NDAA, § 204 & § 206, and the other money-mandating sources of federal law enumerated herein. *See infra* ¶ 12.

7.    Each member of the Class also has a claim to Backpay either under 37 U.S.C. § 204 or § 206 for wrongful discharge, constructive discharge, separation, curtailment of orders, involuntary transfer to inactive status, and/or denial of pay and benefits, because the DoD and Coast Guard unlawfully mandated Emergency Use Authorization ("EUA") only products in violation of Congress' explicit statutory prohibition in 10 U.S.C §1107a. Further, compliance with the Mandate was impossible because the DoD and Coast Guard did not have any products licensed by the Food and Drug Administration ("FDA") (*i.e.*, COMIRNATY® and SPIKEVAX®) while the Mandate was in effect. *See infra* Section III.

8.    The Class also includes Coast Guard members whose request for religious accommodation for the Mandate was unlawfully denied in violation of the Religious Freedom Restoration Act ("RFRA"), the First Amendment's Free Exercise Clause, DoD Instruction 1300.17, and the Coast Guard's implementing regulation, COMDTINST 1000.15. *See infra* Section IV.

9.    The rescission of the Mandate in Section 525 of the 2023 NDAA, either standing alone or in conjunction with the Military Pay Act and the other money-mandating federal laws and regulations enumerated below, *see infra* ¶ 12, makes the 2023 NDAA a money-mandating statute within the meaning of the Tucker Act and provides Plaintiffs and Class Members a substantive right to backpay, and other monetary damages and compensation. The Court also has ancillary equitable powers to correct records and provide other ancillary relief under 10 U.S.C. § 1552.

10.   The Government also turned some of these Coast Guard Members into debtors by virtue of its own illegal actions, including recoupment of enlistment bonuses,

post-9/11 GI Bill benefits, the costs of training and tuition at military schools or academies and public and private universities, and other allowances or special pays, such as separation pay or travel allowances, to which they were entitled by law. All of these actions constituted illegal exactions for which Class Members have a separate claim under the Tucker Act, the U.S. Constitution, and the federal statutes and regulations governing these various allowances, pays, and benefits as enumerated below.

## **JURISDICTION AND VENUE**

11.    This Court has jurisdiction under the Tucker Act, 28 U.S.C. §1491(a). The Tucker Act provides, in relevant part, as follows:

> (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

> (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

12.    Plaintiffs' and Class Members' claims against Defendant are founded upon the following money-mandating sources of federal law, whether standing alone or read in conjunction with one or more of the following:

> a.  the 2023 NDAA, H.R. 7776, Pub. L. No. 117-263 (Dec. 23, 2022), 136 Stat. 2395, including Section 525 and Division K thereof, the Don Young Coast Guard Authorization Act of 2022;

> b.  the Consolidated Appropriations Act, 2023, Pub. L. 117-328 (Dec. 27, 2022), 136 Stat. 4459 ("FY2023 Appropriations Act");

> c.  the Military Pay Act, 37 U.S.C. §§ 201, *et seq.*;

d.  entitlements for military members set forth in Title 37, Chapter 5, Special and Incentive pays, 37 U.S.C. §§ 301, *et seq.*;

e.  allowances under Title 37, Chapter 7, such as Basic Allowance for Subsistence ("BAS"), Basic Allowance for Housing ("BAH"), Housing treatment for dependents undergoing a permanent change of station, etc., 37 U.S.C. §§ 402, *et seq.*;

f.  allowances under Title 37, Chapter 8, Travel and Transportation Allowances, 37 U.S.C. §§ 451, *et seq.*; *See also* 14 U.S.C. § 2764 "Monetary Allowances for Transportation of Household Goods."

g.  the Military Retirement Pay statutes, including 10 U.S.C. § 1370 ("Regular Commissioned Officers"), § 1371 ("Warrant Officer"), and § 12731 *et seq* ("Non-Regular Service");

h.  the Involuntary Separation Pay statute, 10 U.S.C. § 1174;

i.  10 U.S.C. § 1552; and

j.  the applicable service regulations where agency discretion has been exercised through the publication of rules and regulations governing such entitlements, such as the DoD Financial Management Regulation 7000.14-R, Vol. 07a, and the Joint Federal Travel Regulations, Vols. 1 and 2.

13.  Plaintiffs invoke this Court's ancillary equitable powers and 10 U.S.C. § 1552 to have their records appropriately corrected. Coast Guard members were removed from promotion lists after being selected, some were prohibited from competing on selection boards, and almost all have some form of "bad paper" in their records that must in equity be removed.

14.  This Court also has independent Tucker Act jurisdiction for the Government's illegal exactions from Plaintiffs and Class Members through the recoupment of enlistment bonuses under Entitlements for military members Title 37, Chapter 5, Special and Incentive pays, 37 U.S.C. §§ 301 *et seq.*; post-9/11 GI Bill benefits either used or transferred under the educational assistance eligibility statute, 38 U.S.C. §§ 3311, *et seq.*; costs of training and tuition at military schools or academies and public and private universities; and other benefits to which they were entitled by law.

15.     The 2023 NDAA, the Military Pay Act, and the other aforementioned federal statutes and regulations constitute an express waiver of the sovereign immunity of the United States of America and mandate compensation by the Government for damages sustained that create a cause of action and/or a substantive right to recover money damages against the Government.

16.     Venue is proper in this Court pursuant to 28 U.S.C. §1491(a)(1).

## **PARTIES**

17.     Plaintiff Christopher Harkins was an E-6 in the Coast Guard with 19 years of Active Duty service. As an Operations Specialist First Class (OS1), OS1 Harkins was contracted for approximately another sixteen months. On December 1, 2022, OS1 Harkins was discharged from the Coast Guard on his 19-year service mark, losing all his pay, benefits, and retirement. Plaintiff Harkins seeks damages in excess of $700,000.00 in backpay, lost retirement wages and allowances, health insurance, and other associated benefits to which he was and is legally entitled.

18.     Plaintiff Carrie Lee Gagnon was an E-7 with 11 years of Active Duty service and 9 years of (active) Selected Reserve Service in the Coast Guard. Serving as a Chief Marine Science Technician, Gagnon had requested an extension to her contract because it expired on August 22, 2022, with her 20-year anniversary 12 days later. The intent of the extension request was to reach retirement. It was denied because she was unvaccinated. On August 22, 2022, twelve days prior to her eligibility for retirement, the Coast Guard separated Gagnon, resulting in the loss of pay, benefits, and retirement benefits. Plaintiff Gagnon seeks damages in excess of $750,0000.00 in backpay and allowances, lost retirement wages, health insurance, and other benefits to which she was and is legally entitled.

19.     Plaintiff Shane Nolan was an E-6 in the Coast Guard with 17 years of Active Duty service. Plaintiff OS1 Nolan was slated to advance to E-7, having been selected, but was "frocked"—or given the rank without the pay—for two months, before the Coast Guard moved him to Alaska, where his anchors were then removed. Plaintiff Nolan was told to perform his E-7 duties without actually being promoted or paid as an E-7. On November 15, 2022, OS1 Nolan was discharged from the Coast Guard losing all his pay, benefits, and retirement benefits. As an Operations Specialist First Class, OS1 Nolan was contracted to serve for another four years when he was separated. On May 26, 2023, Operations Specialist Chief (E-7/OSC) Nolan was sworn back into the Coast Guard as an E-7 without any back pay or compensation during his lost time. Plaintiff Nolan seeks damages in excess of $ 45,000.00 in backpay, allowances, and other benefits to which he was and is legally entitled.

20.     Plaintiff Mark Byrd was an E-6 in the Coast Guard with 16 years, 11 days of Active Duty service at the time of discharge. As a Marine Science Technician First Class, PO1 Byrd was contracted for another 7 months and expecting to re-enlist as he had done every few years over the course of his entire career. Plaintiff Byrd would have re-enlisted for another four years in order to reach 20 years of service, but on October 28, 2022, PO1 Byrd was discharged from the Coast Guard, losing all pay and benefits until swearing back in on June 15, 2023. In addition to loss of pay and benefits and time toward retirement, this gap in service prevented his promotion to E-7 due to not being allowed to take the annual Service Wide Exam in May 2023. Plaintiff Byrd seeks damages in excess of $50,000.00 in lost pay and allowances, promotion, and other benefits to which he was and is legally entitled.

21.    Plaintiff Aaron Gutierrez was an E-6 in the Coast Guard with 16 years of Active Duty service. As an Electronics Technician, PO1 Gutierrez was contracted until September 2023, but because of his vaccination status was deemed ineligible to reenlist. PO1 Guttierrez had every intention of re-enlisting, as he had done many times before, in order to reach at least 20 years of service and retirement. On July 29, 2022, however, PO1 Gutierrez was discharged from the Coast Guard because he was unvaccinated. Plaintiff Gutierrez seeks damages in excess of $750,0000.00 in backpay and allowances, lost retirement wages, health insurance, and other benefits to which he was and is legally entitled.

22.    Plaintiff Dan Morrissey was an E-6 in the Coast Guard Reserve on Active Duty orders for 180 days starting Jan 8, 2021 through July 7, 2021. Plaintiff was put on orders specifically to help sector medical with its Covid-19 response. Plaintiff completed his orders and then returned to the Selected Reserve and continued to drill for a year. On August 28, 2022, the Coast Guard dropped Plaintiff Morrissey to the inactive status list (ISL) without warning, notice, or even an email. Indeed, Plaintiff Morrissey did not know what had happened when he lost access to emails and databases used in routine performance of his duties, and then found out he had no health insurance after he was billed for a number of medical appointments he had without knowing that he no longer had health insurance and the other benefits of being an active, drilling member of the Coast Guard Reserve. Plaintiff Morrissey was unable to drill from September 2022 through March 2023. He should be over 18 years of service, but his records show 17 years. Plaintiff Morrissey seeks damages in excess of $25,000.00 in backpay and allowances, health insurance, and other benefits to which he was and is legally entitled.

23.    Plaintiff Matthew Powers was an E-6 (PO1) in the Coast Guard with 11.5 years of honorable and faithful service. PO1 Powers was discharged on November 14, 2022, for being unvaccinated. The Coast Guard withheld his last paycheck because of his unvaccinated status. Plaintiff Powers has been the recipient of the Commendation Ribbon, Special Operations Ribbon, a Coast Guard Achievement Medal, three Meritorious Team Commendation Ribbons, and more, but was discharged three years before the end of his contract and 7.5 years before he intended to retire. Additionally, the Coast Guard has sought recoupment of Plaintiff Powers $13,000 reenlistment bonus since his discharge via a letter of indebtedness. Plaintiff Powers filed an Equal Employment Opportunity complaint, which was dismissed without explanation. Plaintiff Powers seeks damages in excess of $75,000.00 in backpay and allowances, health insurance, cancellation of indebtedness, and other benefits to which he was and is legally entitled.

24.    Defendant is the United States of America (the "Government"), a sovereign entity and body politic. Defendant is responsible for the actions of its various agencies, including the DoD, the Department of Homeland Security ("DHS"), and the Coast Guard (collectively, "Defendant Agencies").

## STATEMENT OF FACTS

### I.    THE PRESIDENT'S ACTIONS

#### A.    The August 24, 2021 COVID-19 Vaccine Mandate

25.    On August 24, 2021, Secretary of Defense Lloyd Austin, III directed the "Secretaries of the Military Departments" "to immediately begin full vaccination of all members of the Armed Forces … or in the Ready Reserve …, who are not fully vaccinated against COVID-19." Ex. 1, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1.

26.     Secretary Austin directed that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA labeling and guidance." *Id.*

27.     Under the Uniform Code of Military Justice ("UCMJ"), a service member who disobeys "any lawful general order or regulation" faces sanctions up to a court-martial. UCMJ Art. 92(2), 10 U.S.C. § 892(2).   This punishment may include "dishonorable discharge, forfeiture of all pay and allowances, and confinement for 2 years."  UCMJ Art. 92, 10 U.S.C. § 892. The statute of limitations for violations of UCMJ Article 92 is five years. 10 U.S.C. § 843.

28.     Dishonorable discharges are typically given for the most serious offenses such as murder, fraud, desertion, treason, espionage, and sexual assault. *See Manual for Courts-Martial, United States* (2019 ed.), R.C.M. 1003(a)(8). A dishonorably discharged veteran may also lose all retirement and veterans' benefits and is ineligible for a wide array of other governmental benefits. *Id.* Those with a dishonorable discharge lose important civil and constitutional rights, including the right to bear arms protected by the Second Amendment of the United States Constitution. *Id.*; U.S. CONST. AMEND. II.

### B.    The Coast Guard Mandate

29.     On August 26, 2021, the Coast Guard Commandant implemented Secretary Austin's August 24, 2021 directive in ALCOAST Message 305/21. *See* Ex. 2, ALCOAST 305/21, *MANDATING COVID-19 VACCINATION FOR MILITARY MEMBERS* (Aug. 26, 2021).

30.     Secretary Austin's August 24, 2021 Mandate Memo does not mention or expressly apply to the Coast Guard.  "Secretaries of the Military Departments" does not include DHS Secretary Mayorkas or the Coast Guard Commandant.

31.     Nevertheless, the Coast Guard interpreted Secretary Austin's Mandate Memo to apply to the Coast Guard and to require all active-duty and reserve Coast Guard members.

**C.     Congressional Action to Limit Punishment of Service Members**

32.     In Section 736 of the National Defense Authorization Act for Fiscal Year 2022 ("FY2022 NDAA"), Congress prohibited the military from dishonorably discharging, or imposing anything less than a general discharge under honorable conditions, for non-compliance with the Mandate. Pub. L. 117-81 (Dec. 27, 2021), § 736, 135 Stat. 1541.

33.     The White House vigorously opposed Congressional efforts to limit the military's authority to punish unvaccinated service members. *See* Executive Office, *Statement of Administrative Policy: H.R. 4350 – National Defense Authorization Act for Fiscal Year 2022* at 4 (Sept. 21, 2021), available at: https://www.whitehouse.gov/wp-content/uploads/2021/09/SAP-HR-4350.pdf.

34.     Coast Guard members with a general discharge under honorable conditions are subject to significant adverse consequences including loss or reduction of, or ineligibility for, earned retirement benefits, the post-9/11 GI Bill, Veterans Administration benefits, healthcare benefits, and other governmental benefits to which they were or otherwise would have been entitled by law.

35.     A general discharge under honorable conditions may also render a service member ineligible for re-enlistment in the military and for future employment with federal civilian agencies; other public employers, such as state and local government, law enforcement, correctional institutions, schools, universities, hospitals and healthcare

providers; and federal contractors or non-governmental organizations that receive federal funding.

36.    The federal government, federal contractors, and public sector employers are the primary source of employment for former service members.

37.    A general discharge under honorable conditions is also a significant barrier for future private employment with employers who are familiar with the military's discharge system and may presume that a general discharge is for substance abuse, criminal actions, or other misconduct, even in the absence of a misconduct code.

38.    These adverse consequences are exacerbated where the service member's discharge paperwork, Form DD-214, includes a misconduct code.

39.    The general discharges for Coast Guard members for non-compliance with the now-rescinded Mandate have been characterized as misconduct discharges.

### D.    Punishment of Unvaccinated Coast Guard Members

40.    Defendant has punished unvaccinated Coast Guard members through the systematic violations of their rights to informed consent protected by 10 U.S.C. § 1107a. *See infra* Section III.

41.    Defendant has punished unvaccinated Coast Guard members through the systematic violations of the religious liberties protected by the First Amendment Free Exercise Clause and the Religious Freedom Restoration Act. *See infra* Section IV.

42.    Defendant has punished unvaccinated Coast Guard members through the creation of a hostile environment; singling out unvaccinated service members for ridicule and ostracization; and imposing arbitrary, discriminatory and punitive measures such as oppressive and unnecessary masking and testing requirements.

43.     Defendant has punished unvaccinated Coast Guard members through a wide range of adverse and punitive personnel actions, including letters of reprimand, adverse fitness evaluations, punitive reassignments, and removals from command or leadership positions, and denials of promotion.

44.     Defendant has punished unvaccinated Coast Guard members through wrongful discharges that are categorized as "misconduct" that prevent reenlistment and significantly harm their ability to seek future employment in the private or public sectors.

45.     The President and Defendant Agencies have punished unvaccinated Coast Guard members through the foregoing actions that, among other things, resulted in the loss or reduction of, or ineligibility for, earned retirement benefits, the post-9/11 GI Bill, Veterans Administration benefits, healthcare benefits, and other governmental benefits to which they were or otherwise would have been entitled by law.

### E.     Illegal Exactions from Service Members

46.     Defendant has used the above enumerated illegal punishments as the basis for additional, collateral consequences. For example, service members who were discharged or dropped to an inactive status, were then subject to recoupment and indebtedness to the government for their "failure" (*i.e.*, inability due to unlawful discharge or transfer to inactive status) to complete the terms of their service obligation.

47.     Defendant has sought recoupment of enlistment bonuses; denial of or recoupment of already paid or transferred post-9/11 GI Bill benefits, including the costs of training and tuition at military schools or academies and public and private universities; denial of Separations Pay for members involuntarily separated; and denial of entitlements to special pays by removing unvaccinated members from their normal

occupational specialty, even while they had Religious Accommodation Requests or medical or administrative exemption requests pending.

## II.    RESCISSION OF THE MANDATE

### A.    A "Self-Imposed Readiness Crisis"

48.    Nearly 8,500 uniformed service members have been discharged for non-compliance with the Mandate. *See* Caitlin Doornbos, *Pentagon Ends COVID-19 Vaccine Mandate for US Troops* NY POST (Jan. 11, 2023), available at: https://nypost.com/2023/01/11/pentagon-ends-covid-19-vaccine-mandate-for-us-troops/.

49.    Congress took notice of the disastrous effects that the Mandate had on military readiness and recruiting across the military, which became a major campaign issue in the 2022 mid-term elections.

50.    For example, on September 15, 2022, over 50 Members of Congress wrote to Secretary Austin to express "grave concern of the effect of the" Mandate because, "[a]s a major land war rages in Europe our own military faces a self-imposed readiness crisis." Ex. 5, Sept. 15, 2022 Congressional Letter to Secretary Austin, at 1. These Congress members charged the military with "abus[ing] the trust and good faith or loyal servicemembers by handling exemptions in a sluggish and disingenuous manner," making many wait "for nearly a year to learn if they will be forcibly discharged for their sincerely held religious beliefs or medical concerns." *Id.* at 2. They identified the Mandate as the "primary cause of the [DoD]'s recruiting difficulties"—effectively "disqualify[ying] more than forty percent of the Army's target demographic from service nationwide and over half of the individuals in the most fertile recruiting grounds"—resulting in the loss of at least 75,000 from the Army alone. *Id.*

**B.    Expert Consensus That Mandated, FDA-Licensed Vaccines Are Obsolete and Ineffective**

51.    On January 10, 2022, Pfizer Chief Executive Officer Albert Bourla acknowledged that the mandated two-dose regimen "offer[s] very little, if any" protection against the then-dominant Omicron variant. *New COVID-19 Vaccine That Covers Omicron 'Will Be Ready in March,' Pfizer CEO Says* Yahoo!Finance (Jan. 10, 2022), available at: https://finance.yahoo.com/video/covid-19-vaccine-covers-omicron-144553437.html.

52.    On August 11, 2022, the Centers for Disease Control and Prevention ("CDC") issued updated guidance to "no longer differentiate based on a person's vaccination status." *See* CDC, Press Release *CDC streamlines COVID-19 guidance to help public better protect themselves and understand their risk* (Aug. 11, 2022), available at: https://www.cdc.gov/media/releases/2022/p0811-covid-guidance.html.

53.    On August 16, 2022, the White House announced that the U.S. Government, the sole customer and payor for the mandated COVID-19 vaccines, ceased purchasing or providing reimbursement for the mandated monovalent vaccines. *See* CNN, *Biden Administration Wil Stop Buying COVID-19 vaccines, treatments and tests as early as this fall, Jha says* (Aug. 16, 2022), available at: https://www.cnn.com/2022/08/16/health/biden-administration-covid-19-vaccines-tests-treatments/index.html.

54.    In related litigation, courts have found that the military has failed to provide any current or relevant data regarding the marginal risks and benefits of the Mandated messenger RNA ("mRNA") treatments for healthy service members under current circumstances, namely, 2022 data for the then prevalent Omicron sub-variants when

ninety-eight percent (98%) of other service members were fully vaccinated. Instead, Defendants have provided only "historical data from the 2020 and 2021 pre-Omicron, pre-vaccine phase" that does not "address the present state of the force." *Colonel Fin. Mgmt. Officer v. Austin*, 622 F.Supp.3d 1187, 1213, 2022 WL 3643512 (M.D. Fla. 2022).

55. The scientific evidence demonstrating the obsolescence and ineffectiveness of the FDA-licensed vaccines is too voluminous to summarize here. It should suffice to say that it is widely recognized that the mRNA gene therapies were, at best, a failed experiment.

56. One of the vaccines' loudest champions, Dr. Anthony Fauci, following his retirement as director of the National Institute of Allergy and Infectious Diseases, authored a peer-reviewed article in a prestigious journal acknowledging that viruses like COVID-19 are not "vaccine preventable," not even in theory, and never were. *See* Anthony Fauci, *et al., Rethinking next-generation vaccines for coronaviruses, influenzaviruses, and other respiratory viruses*, CELL HOST AND MICROBE at 1, Vol. 31, Iss. 2. (Feb. 8, 2023), available at: https://doi.org/10.1016/j.chom.2022.11.016.

## C. Congressional Rescission by Section 525 of the 2023 NDAA

57. On December 23, 2022, President Biden signed into law the 2023 NDAA, which was enacted by veto-proof majorities in the Senate (83-11) and the House of Representatives (350-80).

58. Section 525 of the 2023 NDAA directs Secretary Austin to "rescind" the August 24, 2021 Mandate. Pub. L. No. 117-263 (Dec. 23, 2022), § 525, 136 Stat. 2395.

59. "Rescind" is derived from the Latin "rescissio", which means "an annulling; avoiding, or making void; abrogation; rescission". BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990). "Rescind" is normally used in the context of "rescission of contract",

which means to "abrogate, annul, avoid or cancel a contract;" "void in its inception"; or "an undoing of it from the beginning." *Id.* "Rescind" thus necessarily has retroactive effect and renders the rescinded contract, policy or rule void *ab initio*.

60.     Congress intentionally used the term "rescind", rather than "amend" or "repeal", to instruct Secretary Austin and the courts that Section 525 must be applied retroactively.

61.     Section 525 reflects the determination by veto-proof majorities of Congress that Secretary Austin's Mandate is void *ab initio*.

62.     Consistent with this Congressional determination and directive, the Defendant must restore unvaccinated service members to the pre-Mandate status quo. All adverse personnel actions and denial of pay and benefits taken as a result of non-compliance with an order that is now a legal nullity must be undone from the beginning and corrected.

### D.     Congressional Funding of All Coast Guard Members

63.     Both the 2022 NDAA and 2023 NDAA included full funding for pay, training, benefits, and other financial compensation for all service members, including unvaccinated Coast Guard members who were discharged, constructively discharged, separated, transferred to inactive status, had their orders curtailed and/or denied pay or benefits for all of FY2022 and FY2023.

64.     The 2023 NDAA does not include any funding offsets to reflect the reduction in funding resulting from these discharges, separations, transfers, and/or denials of pay and benefits for service members.

65.    The Defendant Agencies have retained the funds for payment of Coast Guard members whose pay and benefits were withheld due to non-compliance with the Mandate.

66.    Congress' rescission creates no new financial outlay, but rather restores the Total Force to troop levels for which Congress has already budgeted by its unequivocal removal of the barrier to, and payment for, service in the armed forces that Defendant Agencies' actions created.

### E.    DoD and Coast Guard Post-Rescission Orders

67.    On January 10, 2023, Secretary Austin rescinded the August 24, 2021 Mandate. *See* Ex. 3, Jan. 10, 2023 Secretary Austin Rescission Memo.

68.    In the Rescission Memo, Secretary Austin acknowledged that Section 525 applies retroactively by ordering that all separations and discharges resulting solely from non-compliance with the Mandate should be halted and that all adverse personnel actions and paperwork should be corrected. *Id*. at 1.

69.    Secretary Austin further directed the Service Secretaries to cease adjudication of pending Religious Accommodation Requests and medical or administrative exemption requests. *Id*.

70.    On January 11, 2023, the Coast Guard issued ALCOAST 012/23 that rescinds the Coast Guard Mandate "[i]n alignment with the DoD." Ex. 4, ALCOAST 012/23, ¶ 1.

71.    On January 25, 2023, the Coast Guard issued additional guidance implementing the Coast Guard's rescission of the Mandate. *See* Ex. 6, Compiled Coast Guard Orders and Guidance.

72.    While the January 11, 2023 Coast Guard Rescission Memo formally rescinded the Mandate for Coast Guard members and stopped involuntary separations for non-compliance, the Coast Guard has not taken corrective actions to fully restore unvaccinated Coast Guard members who were discharged, separated, transferred to inactive status, and/or denied pay and benefits to the pre-Mandate status quo.

73.    On February 24, 2023, the Deputy Secretary of Defense issued a memorandum directing DoD components to formally rescind other existing vaccination requirements and stating that the DoD would revise DODI 6205.02 to prohibit commands from taking vaccination status into account in making assignment, deployment and operational decisions, without express DOD approval. *See* Deputy Secretary of Defense, *Guidance for Implementing Rescission of August 24, 2021 and November 30, 2021 Coronavirus Disease 2019 Vaccination Requirements for Members of the Armed Forces* (Feb. 24, 2023), available at: https://perma.cc/3MXS-2CNR) ("February 24, 2023 Guidance Memo").

74.    None of the named Plaintiffs have yet been reinstated, been permitted to return to active status, received backpay, or had all of their records corrected.

75.    The Coast Guard is not subject to Congress' rescission directive in Section 525 or the express terms of DoD Secretary Austin's August 24, 2021 Mandate Memo.

76.    Secretary Austin's January 10, 2023 Rescission Memo does not apply to, or even mention, the Coast Guard.

77.    The Coast Guard appears to acknowledge these facts in asserting that the Coast Guard's rescinded its mandate in voluntary "alignment" with the DoD, Ex. 4, ALCOAST 012/23, ¶ 1, rather than doing so pursuant to any Congressional or DoD directive.

78.     The Coast Guard has not cited any directive from Secretary Mayorkas excusing it from the DHS implementation of the Federal Employee Mandate, which is currently enjoined nation-wide by the Fifth Circuit. *See Feds for Medical Freedom v. Biden*, No. 3:21-cv-356, 581 F.Supp.3d 826 (S.D. Tex. 2022), *aff'd*, No. 22-40043, 64 F.4th 366 (5th Cir. 2023).

79.     If the President of the United States does not have the authority to order the vaccination of DHS civilian employees who serve—and even sit—alongside members of the Coast Guard, it is unclear what legal justification there can be to force the uniformed members of DHS to be vaccinated by a lesser executive officer.

80.     The legal basis for the Coast Guard's mandate remains a mystery even at this late date, and until that is explained, both the Coast Guard's mandate and rescission in name only must be treated as voluntary acts and pursuant to unknown and uncertain authority.

81.     The Defendant Agencies have not acknowledged that the 2023 NDAA Rescission necessarily requires the payment of backpay and other financial compensation to unvaccinated Coast Guard members who were discharged, constructively discharged, separated, transferred to inactive status, and/or denied pay and benefits.

**F.      The Military Has Exercised Any Discretion It May Have Had in Categorically Refusing Backpay to Service Members Denied Pay.**

82.     Secretary Austin's January 10, 2023 Rescission Memo retains existing restrictions and either retains or adopts a substantially similar *de facto* mandate, directing that "[o]ther standing Departmental policies, procedures, and processes regarding immunization remain in effect," which includes "the ability of commanders to consider, as appropriate, the individual immunization status of personnel in making

20

deployment, assignment, and other operational decisions ..." Ex. 3, Jan. 10, 2023 Secretary Austin Rescission Memo, at 2.

83.    Plaintiffs and Class Members continue to face a credible threat of involuntary discharge and even criminal prosecution for past violations of the now-rescinded Mandate. This threat has not been eliminated or mitigated by the military's post-Rescission orders and guidance issued to date.

84.    This threat is neither abstract nor speculative, as demonstrated by the testimony of Under-Secretaries from the DoD and the Armed Services at a February 28, 2023 hearing before the House Armed Services Committee ("HASC"). *See* Ex. 7, Partial Transcript for Feb. 28, 2023 HASC Hearing. (The full video is available at: https://www.youtube.com/watch?v=TRSZsKt5j_0 and full transcript without timestamps is available at: https://www.navy.mil/Press-Office/Testimony/display-testimony/Article/3315887/house-armed-services-subcommittee-on-military-personnel-holds-hearing-on-covid/.

85.    There, the Under-Secretaries repeatedly confirmed that the military deems service members who did not comply with the now-rescinded Mandate to have disobeyed a lawful order in violation of UCMJ Articles 90 and 92, 10 U.S.C. § 890 and § 892, for which they may be involuntarily discharged, without regard to their sincerely held religious objections. *See* Ex. 7 at 2-3 (Chairman Banks questions and answers) & 5-7 (Rep. Gaetz questions and answers).

86.    Defendant has refused to rule out criminal prosecution for violations of either Article 90 or Article 92 UCMJ, 10 U.S.C. § 890 and § 892, for unvaccinated service members who did not request religious accommodation or medical or administrative exemptions.

87.     The statute of limitations for charges under UCMJ Article 90 and Article 92 charges is five years, *see* 10 U.S.C. § 843, so Plaintiffs and Class Members will continue to face a credible threat of prosecution for years to come.

88.     The DoD has confirmed that no service members who were discharged, transferred to inactive status, or denied pay and benefits for non-compliance with the Mandate would receive backpay or other financial compensation to which they which they would otherwise be entitled. *See* Paul D. Shinkman, *Pentagon: No Back Pay to Troops Discharged for Refusing COVID-19 Vaccine*, U.S. News & World Report (Jan. 17, 2023), available at: https://www.usnews.com/news/national-news/articles/2023-01-17/pentagon-no-back-pay-to-troops-discharged-for-refusing-covid-19-vaccine.

89.     The DoD has confirmed that the military has no plans or procedures to reinstate discharged service members or to take corrective actions for current members to fully restore them to the pre-Mandate status quo. *See* Ex. 7 at 4-5, 40:55-41:18; *see also* Ex. 8, DoD Under-Secretary Cisneros Feb. 27, 2023 Response to HASC, at 3.

90.     Instead, service members must pursue the existing remedies that failed them before and that several courts have found to be futile and/or inadequate. *See infra* Section IV.B & cases cited therein.

91.     The military has not taken full corrective actions to restore service members to the pre-Mandate status quo or committed to take such corrective actions in the future.

92.     There is no reason to believe that Defendant Agencies will take corrective actions in the future because they have insisted in related litigation that service members have not been subject to final disciplinary action for non-compliance and that service members have not suffered any final adverse actions at all.

93.     The military has not rescinded related and unlawful vaccination policies and regulations, in particular, the DoD's Interchangeability Directives, *see infra* Sections III.C and III.D, which remain in full force and continue to be deemed lawful directives.

## III.   PREVIOUS MANDATES AND THE INFORMED CONSENT LAWS

### A.     This Is Not the First Vaccine Rodeo – For Military or Congress.

94.     Prior to the first Gulf War, the DoD sought to pretreat service members with several unlicensed, "investigational" new drugs, including pyridostigmine bromine and a botulinum toxoid vaccine, which under U.S. law could not be administered to military members without informed consent. The DoD successfully petitioned the FDA to establish a new rule waiving U.S. service members' rights to informed consent. In numerous hearings in the aftermath of the Gulf War, the administration of these experimental drugs has been correlated with "Gulf War Illness" or "Gulf War Syndrome," which "debilitated over 174,000 service members." *See generally* Efthimios Parasidis, *Justice and Beneficence in Military Medicine and Research*, 73 OHIO ST. L.J. 723, 732-39 & 759-60 (2012).

95.     After extensive hearings in Congress across multiple committees documenting systemic, repeated failures by the DoD involving the health of America's all-volunteer force, including the ill-fated and disastrous anthrax vaccine, the U.S. Congress passed Title 10 U.S.C. §1107 in 1997.

96.     10 U.S.C. § 1107 requires that, in any instance in which the DOD sought to use any unlicensed, investigational product on members of the Armed Forces, no one short of the Commander-in-Chief could waive a service members' right to informed consent.

97.     In the following years, as the anthrax vaccine program remained mired in failed FDA inspections and controversy, Congress continued to hold hearings on the subject and strengthened 10 U.S.C. §1107's protections and requirements for both the Secretary of Defense and Commander-in-Chief. Compare 10 U.S.C. §1107 (1997) with 10 U.S.C. §1107 (2000). *See also* 144 Cong. Rec. H. 4616 (June 16, 1998).

98.     In 2003, the U.S. District Court for the District of Columbia issued a preliminary injunction against the DoD and FDA for their violations of that statute, and in 2004 that same court issued a permanent nation-wide injunction prohibiting the DoD's anthrax vaccine mandate. *See Doe v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003)("*Rumsfeld I*"), *modified sub nom. John Doe No. 1 v Rumsfeld*, 341 F. Supp. 2d 1 (D.D.C. 2004) ("*Rumsfeld II*"), *modified sub nom. John Doe No. 1 v. Rumsfeld*, 2005 WL 774857 (D.D.C. Feb. 6, 2005) ("*Rumsfeld III*").

99.     In the middle of that litigation in 2004, and in part as a result of the anthrax letter attacks that occurred the week after 9/11, Congress passed the current EUA statute, 21 U.S.C. §360bbb-3, as part of the Project BioShield Act.

100.     Shortly thereafter, Congress also passed another mirror image statute for the protection for service members' informed consent rights to refuse EUA products, 10 U.S.C. §1107a.

101.     Much like its predecessor statute that was passed in 1997, 10 U.S.C. §1107a states in pertinent part:

(a) Waiver by the President —

(1) In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act and required under paragraph (1)(A) or (2)(A) of such section 564(e), designed to ensure that individuals are

informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a.

102.    After the EUA statute's passage, the FDA granted the first ever Emergency Use Authorization for the anthrax vaccine. After doing so, both the DoD and FDA jointly filed an emergency petition in the D.C. District Court to modify the injunction already in place against the anthrax vaccine program in order to allow the vaccine to be administered to service members solely on a *voluntary basis* in *Rumsfeld III*. *See Rumsfeld III*, 2005 WL 774857, at *1 ("ORDERED that the Court's injunction of October 27, 2004, is modified by the addition of the following language: 'This injunction, however, shall not preclude defendants from administering AVA, on a *voluntary* basis, pursuant to the terms of a *lawful* emergency use authorization ("EUA")[.]'")(emphasis in original). *See also* 70 Fed. Reg. 5452-56, IV "Conditions of Authorization."

103.    At that time, the FDA's Agency interpretation of what constituted informed consent was that informed consent includes:

(3)    the option to accept or refuse administration of AVA; of the consequences, if any, of refusing administration of the product; and of the alternatives to AVA that are available, and of their benefits and risks.

With respect to condition (3), above, relating to the option to accept or refuse administration of AVA, the AVIP will be revised to give personnel the option to refuse vaccination. *Individuals who refuse anthrax vaccination will not be punished. Refusal may not be grounds for any disciplinary action under the Uniform Code of Military Justice. Refusal may not be grounds for any adverse personnel action. Nor would either military or civilian personnel be considered non-deployable or processed for separation based on refusal of anthrax vaccination. There may be no penalty or loss of entitlement for refusing anthrax vaccination.*

70 FR 5455 (Feb. 2, 2005) (emphasis added).

104.    In 2008, the DoD issued DoD Instruction 6200.02 ("DoDI 6200.02") the currently effective regulation governing the mandate of EUA products. Consistent with the EUA statute, 10 U.S.C. § 1107a, and the nation-wide consent decree in *Rumsfeld III*, the instruction requires that the DoD include an option to refuse an EUA product.

> E3.3 <u>Implementation of EUA</u>. DoD Components using medical products under an EUA shall comply with all requirements of section 564 of Reference (d), FDA requirements that are established as a condition of granting the EUA (except as provided in section E3.4 concerning a waiver of an option to refuse), guidance from the Secretary of the Army as Lead Component, and instructions from the ASD(HA).

> E3.4. <u>Request to the President to Waive an Option to Refuse</u>. In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients are provided an option to refuse administration of the product, the President may, pursuant to section 1107a of Reference (e), waive the option to refuse for administration of the medical product to members of the armed forces. Such a waiver is allowed if the President determines, in writing, that providing to members of the armed forces an option to refuse is not in the interests of national security. Only the Secretary of Defense may ask the President to grant a waiver of an option to refuse.

DoDI 6200.02, *Application of Food and Drug Administration (FDA) Rules to Department of Defense Force Health Protection Programs*, ¶¶ E3.3, 3.4 (Feb. 27, 2008).

105.    DoDI 6205.02 is the extant governing regulation for routine military immunizations. This instruction defines a "vaccine" and "vaccination" as:

> **vaccination**. The administration of a vaccine to an individual for inducing *immunity*.

> **vaccine.** A preparation that contains one or more components of a biological agent or toxin and induces a protective immune response against that agent when administered to an individual.

DoDI 6205.02, ¶ G.2 ("Definitions").

106.    Army Regulation 40-562, *Immunization and Chemoprophylaxis for the Prevention of Infectious Diseases* (Oct. 7, 2013) ("AR 40-562") implements and complements DoDI 6205.02. AR 40-562 was signed on October 7, 2013, went into effect on November 7, 2013, and remains in effect today. It applies to all branches of the military, and it is designated as COMDTINST M6230.4G for the Coast Guard.

107.    Appendix D of AR 40-562 contains the list of required vaccines for members of the military. AR 40-562 applies to all military vaccines, whether they are "Investigational New Drugs" as defined in 21 CFR 56.104(c); an EUA product governed by 21 USC § 360bbb-3 and 10 U.S.C. § 1107a; or a fully licensed FDA vaccine.

108.    Secretary Austin's August 24, 2021 Mandate Memo amended the DoD and Coast Guard's immunization policies to place the FDA-licensed COVID-19 vaccines on the list of required vaccinations in Appendix D of AR 40-562. *See Abbott v. Biden*, 608 F.Supp.3d 467, 471, 2022 WL 2287547 (E.D. Tex. 2022), *vacated and remanded by Abbott v. Biden*, 70 F.4th 817 (5th Cir. 2023).

109.    Secretary Austin's January 10, 2023 Rescission Memo should have removed the COVID-19 vaccines from the list of required vaccines in AR 40-562 with retroactive effect, *i.e.*, restoring AR 40-562 Appendix D to the pre-Mandate list. In other words, no COVID-19 vaccines are now required, whether FDA-licensed or not.

## B.    Not Enough Guinea Pigs; From Volunteer to Volun-Told

110.    In December 2020, after only two months of clinical testing, the FDA granted EUAs for COVID-19 vaccines developed by Pfizer-BioNTech and Moderna.

111.    In March 2021, members of Congress sent a letter to President Biden asking him to invoke 10 U.S.C. § 1107a to "waive servicemembers right to informed consent" to refuse unlicensed, EUA vaccines because of low voluntary vaccine participation.

27

> Seven Democratic members of Congress signed the letter, including House Rules Committee Chairman Rep. James McGovern and House Armed Services Committee members Rep. Jimmy Panetta, Rep. Marilyn Strickland, Rep. Sara Jacobs and Rep. Marc Veasey…
>
> The Department of Defense has said publicly that the opt-out rate among service members eligible to be vaccinated is about 33%, but last week military officials and service members CNN spoke with from several bases and units across the country suggest the current rejection rate may be closer to 50%.

Ellie Kaufman, *Lawmakers ask Biden to issue waiver to make Covid-19 vaccination mandatory for members of military*, CNN (Mar. 24, 2021), available at: https://www.cnn.com/2021/03/24/politics/congress-letter-military-vaccine/index.html.

### C.    FDA Licensure and Interchangeability Determinations

112.    On August 23, 2021, the FDA approved the Biologic License Application ("BLA") submitted by Pfizer and BioNTech for the original "Purple Cap" formulation of COMIRNATY®. *See* FDA, Aug. 23, 2021 Purple Cap COMIRNATY® BLA Approval Letter at 1-2, available at: https://www.fda.gov/media/151710/download.

113.    Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer COVID-19 vaccine. *See* Ex. 9, Aug. 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter. This letter stated that the EUA for a different, "legally distinct" mRNA injectable would remain in place because the licensed product COMIRNATY was "not available… in sufficient quantities" for the eligible population. *Id*. at 5 n.9.

114.    In fact, it appears that the Purple Cap COMIRNATY® COVID-19 vaccine licensed by the FDA was never manufactured or marketed in the United States. *See* Package    Insert    for    COMIRNATY,    available    at: https://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=595377#

section-13 (FDA-approved product labeling for Purple Cap COMIRNATY® lists the "Marketing Start Date" and "Marketing End Date" both as "23 Aug 2021"); *see also* Sept. 13, 2021 Pfizer Announcement, available at: https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Pfizer confirmed that it did "not plan to produce any product with these new NDCs [*i.e.,* National Drug Codes 0069-1000 for Purple Cap COMIRNATY®] and labels over the next few months.").

115.    The FDA's August 23, 2021 EUA Re-Issuance Letter also included a footnote claiming that:

> The licensed vaccine [COMIRNATY] has the same formulation as the EUA-authorized vaccine [BNT162b2] and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

Ex. 9 at 2 n.8. This footnote is significant because "interchangeability" is a statutorily defined term in the Public Health Safety Act ("PHSA"). The PHSA requires the manufacturer to separately apply for, and receive, FDA approval to treat a product as interchangeable with another licensed product.

116.    Neither the manufacturers (Pfizer and BioNTech) nor the FDA followed these statutorily mandated requirements to make an "interchangeability" finding or determination.

117.    In related litigation, the Director the FDA's Center for Biologics Evaluation and Research, Dr. Peter Marks, has acknowledged that the FDA has not made a "statutory" interchangeability determination. *See* Ex. 10, Oct. 21, 2022 Declaration of Peter Marks, M.D., Ph.D., ¶ 10.

118.    On January 31, 2022, the FDA approved the BLA for Moderna's SPIKEVAX® COVID-19 vaccine. *See* FDA, Jan. 31, 2022 SPIKEVAX® BLA Approval Letter, available at: https://www.fda.gov/media/155815/download.

119.    Also on January 31, 2022, the FDA re-issued the EUA for Moderna's unlicensed COVID-19 vaccine because the FDA-licensed product was not available in sufficient quantities. Ex. 11, Jan. 31, 2022 Moderna EUA Re-Issuance Letter.

120.    The Moderna EUA letter similarly acknowledged that the FDA-licensed SPIKEVAX® and EUA product were "legally distinct" and asserted that the unlicensed Moderna EUA COVID-19 vaccine "can be used interchangeably" with the FDA-licensed SPIKEVAX®. *See id.* at 3 n.9.

### D.    Mandate of Unlicensed EUA Products

121.    Secretary Austin's August 24, 2021 Mandate Memo was  issued one day after FDA approved Purple Cap COMIRNATY® and reissued the EUA for the unlicensed Pfizer/BioNTech COVID-19 vaccine due to the unavailability of the only FDA-licensed product, Purple Cap COMIRNATY®.

122.    Secretary Austin's memo stated that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA labeling and guidance." Ex. 1, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1.

123.    The DoD has consistently asserted that EUA vaccines may be mandated.

124.    The DoD has admitted in related litigation that the DoD did not have any FDA-licensed COVID-19 vaccines when the August 24, 2021 Mandate Memo. *See Doe #1-#14 v. Austin,* 572 F.Supp.3d 1224, 1233-34, 2021 WL 5816632 (N.D. Fla. 2021) (defense

counsel for Defendant Agencies admitted in a November 3, 2021 hearing that the DoD and Armed Services were "mandating vaccines from EUA-labeled vials").

125.    Because there was no COMINARTY® available, all DoD components and the Armed Service began using and mandating the unlicensed, EUA Pfizer/BioNTech COVID-19 vaccine based on the DoD's determination that the EUA vaccine and the FDA-licensed vaccine are "interchangeable" and should be mandated.

126.    In a September 14, 2021 Memorandum, Assistant Secretary of Defense for Health Affairs, Terry Adirim, expressly relied on and quoted the FDA's footnote in directing all DoD components to treat the unlicensed, EUA version "as if" it were FDA-licensed. Asst. Sec. Adirim then went well beyond the FDA's guidance in asserting that the licensed and unlicensed products are legally interchangeable for the purposes of the Mandate.

> Per FDA guidance, these two vaccines are "interchangeable" and DoD health care providers should "use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.
>
> Consistent with FDA guidance, DoD health care providers will use both the Pfizer-BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the purpose of vaccinating Service members in accordance with Secretary of Defense Memorandum.

Ex. 12, Asst. Secretary of Defense Memorandum, *Mandatory Vaccination of Service Members Using the Pfizer-BioNTech COVID-19 and COMIRNATY COVID-19 Vaccines* at 1 (Sept. 14, 2021) ("Pfizer Interchangeability Directive").

127.    On May 3, 2022, due to the unavailability of FDA-licensed SPIKEVAX®, the Assistant Secretary of Defense issued the same directive that EUA Moderna COVID-19 vaccines were to be used interchangeably with, and "as if," they were the FDA-licensed and labeled Moderna Spikevax vaccine. *See* Ex. 13, May 3, 2022 Asst. Secretary of Defense

Memorandum, *Mandatory Vaccination of Service Members Using the Moderna and Spikevax Coronavirus Disease 2019 Vaccines* at 1 ("Moderna Interchangeability Directive").

128.    Only the FDA has the statutory authority to make a determination of legal interchangeability, which the FDA has expressly disclaimed having done. *See supra* ¶ 117 & Ex. 10, Marks Decl., ¶ 10.

129.    The Assistant Secretary of Defense for Health Affairs is a DoD employee without any authority to declare an unlicensed, EUA biologic product to be interchangeable with an FDA-licensed one.

130.    This official also lacks the authority to mandate any product for service members, much less to mandate an unlicensed EUA product in violation of 10 U.S.C. § 1107a and the PHSA's statutory interchangeability requirements.

131.    The President acting as the Commander-in-Chief is prohibited from mandating unlicensed EUA products (absent an express national security authorization) by three separate and unequivocal acts of Congress. *See* 10 U.S.C. § 1107a, 42 U.S.C. §262, and 21 U.S.C. §360bbb-3. Accordingly, no lesser officer may do so in the absence of express Presidential authorization required by law.

**E.    Plaintiffs and Class Members Have Been Wrongfully Discharged Despite Unavailability of Any FDA-Licensed Vaccines.**

132.    Defendant Agencies have consistently misrepresented that they had FDA-licensed COVID-19 vaccines available to service members when they did not and that unlicensed EUA vaccines are legally interchangeable with FDA-licensed vaccines.

133.    Defendant Agencies do not currently have, and never did have, any FDA-licensed COMIRNATY® or SPIKEVAX® COVID-19 vaccines.

134.    To the extent that any Defendant Agency ever did obtain COMIRNATY®
COVID-19 vaccines, the products obtained were: (1) in insufficient quantities to fully
vaccinate all putative Class Members; and/or (2) misbranded, expired, and/or
adulterated and could not have been mandated.

135.    Investigations by military whistleblowers and filings in related proceedings
demonstrate that the nearly 50,000 doses of "Comirnaty-labeled" vaccines were:
(1) unlicensed EUA "monovalent" products misbranded as FDA-licensed because they
were not manufactured at an FDA-licensed facility, as required by the PHSA and FDA
regulations; (2) unlicensed, EUA "bivalent" vaccines; and/or (3) expired or adulterated
products that may not be administered, much less mandated, to anyone.

136.    To the extent that any Defendant Agency ever obtained any SPIKEVAX®
COVID-19 vaccines, the products were obtained were: (1) in insufficient quantities to fully
vaccinate all putative Class Members; and/or (2) misbranded, expired, and/or
adulterated and could not have been mandated.

137.    The small number (approx. 770) of SPIKEVAX® doses obtained would
have been sufficient to vaccinate less than one percent (1%) of Class Members. In any
case, all SPIKEVAX® in DoD's possession as of January 23, 2023, has expired and can
no longer be ordered. *See* Ex. 14, Jan. 23, 2023 Defense Health Agency Guidance, at 1.

138.    In related litigation, the DoD has admitted that it did not have any FDA-
licensed COMIRNATY®, which they refer to as "Comirnaty-labeled" vaccines, until at the
earliest June 2022.

139.    Defendant has also admitted that the military did not have any FDA-
licensed SPIKEVAX®, which they refer to as "Spikevax-labeled" products, until at the
earliest September 2022.

140.    Even if it is assumed *arguendo* that the military obtained FDA-licensed COVID-19 vaccines on those dates, it is undisputed that there were no FDA-licensed vaccines available before those dates and that Defendants were mandating EUA vaccines, in violation of 10 U.S.C. § 1107a, at least until June 2022 for COMIRNATY® and until September 2022 for SPIKEVAX®.

141.    It is also undisputed that Plaintiffs and Class Members were punished for non-compliance with the Mandate—through discharge, separation, involuntary transfer to inactive status, curtailment of orders, and/or denial of pay and benefits—at a time (*i.e.*, prior to June 2022) when compliance was impossible due to the unavailability of any FDA-licensed vaccines.

### F.    Backpay and Other Compensation Due to Wrongful Removal from Active Status or Full-Time Duty; Denial of Pay, Benefits, Points, or Training; Transfer to ISL.

142.    Any Plaintiffs or Class Members who were discharged, separated, transferred to inactive status, had their orders curtailed, denied pay, points or benefits, and/or suffered any other adverse financial consequences necessarily have a claim for Backpay under the applicable provisions of the Military Pay Statute, 37 U.S.C. § 204 or § 206, for the time of the adverse action through the date when the military first made an FDA-licensed product available to them.

143.    Given the unavailability of any FDA-licensed vaccines for the entire period, they are owed Backpay and other financial compensation from the date of wrongful discharge or denial pay, benefits, points, etc. through the present.

**IV.  THE GOVERNMENT HAS SYSTEMATICALLY VIOLATED SERVICE MEMBERS' RELIGIOUS LIBERTIES.**

### A.  The Religious Freedom Restoration Act

144.   The Religious Freedom Restoration Act states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

145.   The DoD has implemented RFRA through DoD Instruction 1300.17, *Religious Liberty in the Military Services* (Sept. 1, 2020).

146.   The Coast Guard has implemented RFRA and DoDI 1300.17 through COMDTINST 1000.15, *Military Religious Accommodations* (Aug. 30, 2021).

### B.  The Military's Sham Religious Accommodation Process

147.   The DoD and Armed Services have implemented a process for religious accommodations that courts have described as a "sham," *Navy SEAL 1 v. Biden*, 574 F.Supp.3d 1124, 1139, 2021 WL 5448970 (M.D. Fla. 2021), and a "quixotic quest" that amounts to little more than "theater." *Navy SEALs 1-26 v. Austin,* 578 F.Supp.3d 822, 826, 2022 WL 34443 (N.D. Tex. 2022).

148.   Several district and appellate courts have issued nation-wide injunctions, against three of the four Armed Services, finding a substantial likelihood of success on the merits for Plaintiff service members' RFRA claims. *See Navy SEALs 1-26 v. Austin*, 596 F.Supp.3d 767, 2022 WL 1025144 (N.D. Tex. 2022) (Navy); *Doster v. Kendall*, 2022 WL

2974733 (S.D. Ohio July 27, 2022) (Air Force), *aff'd*, 54 F.4th 398 (6th Cir. 2022); *Colonel Fin. Mgmt. Officer v. Austin*, 622 F.Supp.3d 1187, 2022 WL 364351216 (M.D. Fla. 2022) (Marine Corps); *see also Schelske v. Austin*, --- F.Supp.3d ---, 2022 WL 17835506 (N.D. Tex. Dec. 21, 2023) (injunction for individual Army soldiers and cadets).

149.    While certain courts have held that the rescission of the August 24, 2021 Mandate has mooted service members' RFRA claims and dissolved the nation-wide injunctions, the proceedings in *Doster* (Air Force), *Navy SEALs 1-26* (Navy), and *Schelske* (Army) have not been dismissed as moot.

150.    Whether or not service members' claims for injunctive relief have been mooted by the 2023 NDAA Rescission, the claims of Plaintiffs and Class Members for backpay and other monetary relief are not moot. Plaintiffs and Class Members have suffered ongoing and irreparable harms from the deprivation of religious liberties and the resulting unlawful discharges, constructive discharges, separations, curtailment of orders, transfers to inactive status and denial of pay and benefits.

151.    The military has not rescinded or reformed the sham process, which has resulted in nearly uniform denials of service members requests for religious accommodations, using nearly identical form letters with only names, dates, and titles or duties changed.

152.    The Armed Services have denied at least ninety-nine percent (99%) of Religious Accommodation Requests that were adjudicated.

153.    The true number likely approaches one hundred percent (100%) given that the small number of Religious Accommodations requests that were approved all appear to have been disguised administrative exemptions granted to service members on terminal leave in their final months of service.

154.    The Coast Guard has achieved such high denial rates through the use of "Digital Tools" disclosed by Coast Guard whistleblowers to congressional committees. *See* Ex. 15, Oct. 18, 2022 Congressional Letter to Coast Guard Commandant Linda Fagan (including the Religious Accommodation Appeal Generator and Denial Template).  The Congressional Letter and whistleblower documents demonstrate the Coast Guard denied all, or nearly all, Religious Accommodation Requests and dismissed appeals "*en masse* with the help of computer-assisted technology, indicating that no case-by-case determinations were taking place." *Id.* at 2.

155.    All Plaintiffs who have submitted Religious Accommodation Requests have either had their requests denied, or if they were still pending when the Mandate was rescinded, these requests will not be adjudicated pursuant to Secretary Austin's January 10, 2023 Rescission Memorandum.

156.    The 2023 NDAA Rescission of the Mandate has eliminated any possibility for the Government to even raise a defense of its religious accommodation policies, which remain in effect through the present.

157.    There is no longer any governmental interest, compelling or otherwise, in systematically denying religious accommodations to enforce a rescinded requirement.

158.    Further, the policy is no longer a permissible means at all for achieving any legitimate purpose, much less the least restrictive means for doing so.

159.    Accordingly, Plaintiffs need only show that the previous denials of religious liberties substantially burdened their free exercise of religion to shift the burden to the government to justify its policies, and the Government's policies necessarily fail strict scrutiny.

## V.    CLASS ACTION ALLEGATIONS

### A.    Class Definition

160.    Plaintiffs bring this action pursuant to Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC") on behalf of themselves and the Class of all current and former Coast Guard members who were discharged, separated, constructively discharged, or transferred to inactive status due to their unvaccinated status, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments to which they are entitled by law under the 2023 NDAA, the Military Pay Act, and the other money-mandating sources of federal law enumerated herein. *See supra* ¶ 12.

### B.    The Proposed Class Satisfies RCFC 23(a).

161.    **Numerosity.** The Class consists of at least 1,200 service members who were discharged, separated, constructively discharged, involuntarily transferred to inactive status, and/or denied pay or benefits.

162.    The exact size of the Class and the identities of the individual members thereof are ascertainable through Defendant Agencies' records and centralized computer payroll and personnel systems.

163.    The large class size and geographical dispersion makes joinder impractical, in satisfaction of RCFC 23(a)(1).

164.    **Commonality.** The proposed Class has a well-defined community of interest. The Defendant has acted and failed to act on grounds generally applicable to each Plaintiff and putative Class Member, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

165.    There are many questions of law and fact common to the claims of Plaintiffs and the proposed Class Members, and those questions predominate over any questions that may affect individual Class Members within the meaning of RCFC 23(a)(2) and 23(b)(2).

166.    Common questions of law and fact affecting members of the proposed Class include, but are not limited to, the following:

i)      Whether the 2023 NDAA and Section 525 thereof is a "money mandating" statute that confers a substantive right to compensation for Plaintiffs and Class Members;

ii)     Whether the 2023 NDAA Rescission of the Mandate should be applied retroactively such that the Mandate is void *ab initio*;

iii)    Whether Section 525 requires Plaintiffs and Class Members to be restored to the *status quo ante* before the imposition of the Mandate and adverse actions taken thereunder;

iv)     If the Court determines that rescission of the Mandate is not retroactive, whether the Defendant Agencies' mandate of unlicensed EUA vaccines was unlawful in violation of 10 U.S.C. § 1107a;

v)      Whether Defendant Agencies' discharge of Plaintiffs and other Class Members for not accepting injection with an unlicensed, EUA vaccine was unlawful for the purposes of the Military Pay Act, 37 U.S.C. § 204 & § 206;

vi)     Regardless of whether 2023 NDAA is a money-mandating statute, does the 2023 NDAA Rescission render all discharges unlawful for the purposes of Military Pay Act, 37 U.S.C. § 204 & § 206;

vii)    Whether the Defendant Agencies' systematic denial of Plaintiffs' and Class Members' Religious Accommodation Requests substantially burdened their free exercise of religion;

viii)   Whether the Defendant Agencies' policy of systematically denying religious accommodations can survive strict scrutiny where the 2023 NDAA Rescission has eliminated any compelling governmental interest for denying religious accommodations; and,

ix)     Whether the Mandate and the systematic denial of religious accommodations was the least restrictive means in light of the fact that the Mandate is no longer a permissible means of further a legitimate governmental interest.

167.    **Typicality.** The claims of Plaintiffs are typical of the claims of all of the other Class Members as required by RCFC Rule 23(a)(3). The claims of the Plaintiffs and Class Members are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to the Plaintiffs and the Class.

168.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the proposed Class. As an opt-in class action, there is no conflict of interest between Plaintiffs and putative Class Members who choose to opt-in.

169.    Plaintiffs' undersigned counsel are adequate to serve as class counsel under RCFC Rule 23(g).  Plaintiffs' counsel have expended significant time identifying and investigating the claims brought in this action, and collectively, they have substantial experience in prosecuting complex cases, including class actions, military backpay cases, and cases challenging the legality of military vaccine mandates.

170.    Counsel Dale Saran has significant experience with cases involving military, employment, and vaccine mandate matters, including cases challenging the military's anthrax vaccine mandate. Counsel Brandon Johnson has significant experience litigating class action cases challenging Mandate, while counsel J. Andrew Meyer has significant experience in representing Class Members as court-appointed class counsel under Rule 23.

171.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class; appreciate their duty to fairly and adequately represent the interests of Class Members; are able to faithfully discharge those duties; and have the resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other Class Members.

### C.    The Proposed Class Satisfies RCFC 23(b)(3).

172.    The proposed Class is maintainable under Rule 23(b)(3) RCFC as each of the prerequisites to certification under that Rule are met as alleged below.

173.    **Predominance.** Common issues of fact and law predominate over any individual questions or determinations as required by Rule 23(b)(3). The Government's liability can be determined on a class-wide basis for the Class based on the answers to the common legal and factual questions listed above.

174.    **Superiority.** A class action is superior to other available methods for fairly and efficiently adjudicating these issues. There are approximately 1,200 Class Members, the majority of which have a claim in the range of $10,000 to $100,000. Absent a class action, most members would find the cost of litigating their individual claims to be prohibitive and will have no effective and complete remedy absent the present class action.

175.    Calculation of backpay and other compensation will not require individualized determinations. All amounts can be calculated mechanically using a matrix like that set forth in the "FY22 Monthly Basic Pay Table", Ex. 16, which states the statutory payment rates for all service members.

176.    The amount to which each Plaintiff and Class Member is entitled for Backpay can be determined from their rank, years in service, and similar criteria to calculate their statutorily defined pay per drill period, training or duty day for which they were entitled to pay but were not paid due to the unlawful Mandate.

177.    Alternatively, the amounts can be calculated by the Defendant Agencies in the same manner using the Defendant Agencies' payroll system and the corresponding

personnel records to confirm the dates of drills, training, or other duty for which they were not paid. The value of lost points can be calculated in a similar manner.

178.   With respect to collateral relief such as correction of individual records, the Court's rulings in the present class action will provide guidance on questions of law and fact on a class-wide basis that the Coast Guard Board for Corrections of Military Records ("BCMR") can apply as appropriate to individual Class Members' military records.

179.   There are no obstacles that would present heightened difficulties for managing a class action. There is a relatively small number of common questions of law and fact that can produce common answers on a class-wide basis. The backpay and damages calculations do not require individualized determinations and may be calculated mechanically with a matrix like that proposed by Plaintiffs based on statutorily defined pay rates and confirmed using the government's own centralized computerized payroll and personnel systems. Similarly, the identity of Class Members and best method of providing notice to them can be obtained from the government's own centralized computerized payroll and personnel systems.

180.   While there have been many court challenges to the lawfulness of the Mandate seeking injunctive and declaratory relief, as far as Plaintiffs are aware, this is the only class action filed post-Rescission seeking backpay for the Class Members and the only such action of its kind filed in the Court of Federal Claims.

181.   The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. There are numerous threshold issues of law and fact that the Court can resolve through an adjudication of the Plaintiffs' claims that will serve to resolve those same issues present

in each Class Member's claims.  On the other hand, requiring each class member to file an individual claim would likely result in unnecessary, duplicative judicial labor and runs the risk of inconsistent rulings from the Court. For example, by determining the legal significance of rescission of the Mandate on the propriety of Defendants' refusal to pay Plaintiffs, the Court will necessarily determine the legal significance of that rescission for all Class Members.

**FIRST CAUSE OF ACTION**
**VIOLATION OF SEC. 525 OF THE FY2023 NDAA**

182.    Plaintiffs reallege the foregoing paragraphs and facts in Sections I-II and V as if fully set forth in this count.

183.    A statute is money-mandating if "it can fairly be interpreted as mandating compensation for damages sustained as a result of the breach of the duties [it] impose[s]." *Fisher v. United States,* 402 F.3d 1167, 1173-74 (Fed.Cir.2005) (en banc) (citations and quotation omitted). For a "fair interpretation," "[i]t is enough ... that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 473, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).

184.    The money-mandating requirement "may ... be satisfied if the Government retains discretion over the disbursement of funds but the statute: (1) provides 'clear standards for paying' money to recipients; (2) states the 'precise amounts' that must be paid; or (3) as interpreted, compels payment on satisfaction of certain conditions." *Samish Indian Nation v. United States*, 657 F.3d 1330, 1336 (Fed.Cir.2011) (*quoting Perri v. United States,* 340 F.3d 1337, 1342–43 (Fed.Cir.2003)).

185.    The 2023 NDAA Rescission is a "money mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

186.    The 2023 NDAA Rescission, in conjunction with the Military Pay Act and other applicable federal laws and regulations, *see supra* ¶ 12, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

187.    "Rescind" means "an annulling; avoiding, or making void; abrogation; rescission", while "rescission" means "void in its inception"; or "an undoing of it from the beginning." BLACK'S LAW DICTIONARY at 1306 (6th ed. 1990).

188.    Congress chose this term to direct the Defendant Agencies and the courts to apply the rescission with full retroactive effect to restore Plaintiffs and other similarly situated Coast Guard members to the position in which they would have been in the absence of the unlawful Mandate.

189.    Secretary Austin's January 10, 2023 Rescission Memo acknowledges this Congressional directive by rescinding the Mandate with limited retroactive effect by committing to correct service members' records and adverse personnel actions.

190.    The Rescission Memo and the Coast Guard's implementing orders, *see* Ex. 4 and Ex. 6, fail to give retroactive effect to the 2023 NDAA Rescission for backpay and financial compensation.

191.    To the extent Congress left any discretion to implement the 2023 NDAA Rescission, the 2023 NDAA, in conjunction with the Military Pay Act and the other money-mandating federal laws and regulations enumerated herein, *see supra* ¶ 12, provide clear standards for payment, provide the precise amounts for payment (*e.g.*, the

2022 NDAA and 2023 NDAA provide the statutory rates for salaries, allowances, benefits, and other compensation), and compel payment on satisfaction of the conditions therein.

192.    The military has already exercised any discretion it may have through the issuance of its post-Rescission implementation orders. *See supra* Sections II.D-II.F. *See also Collins v. U.S.*, 101 Fed.Cl. 435, 450 (Fed.Cl.2011) (where the DoD issued regulations implementing the NDAA providing "a servicemember who qualifies for pay under those regulations would be entitled to pay under the statute as not otherwise disqualified by the Secretary", the court found that the Secretary's discretion had "already ... been exercised in the form of the DoDI and is no longer available to the Secretary.").

193.    Even if the military retains some limited discretion, these statutes are money-mandating requirements because they: "(1) provide[] 'clear standards for paying' money to recipients; (2) state[] the 'precise amounts' that must be paid; or (3) ... compel[] payment on satisfaction of certain conditions." *Samish Indian Nation*, 657 F.3d at 1336 (citation and quotation omitted).

194.    The Military Pay Act and other money-mandating federal statutes and regulations enumerated herein, *see supra* ¶ 12, provide clear standards for payment, the precise amounts for payment, and the conditions for payment.

195.    This Court has routinely found provisions of previous National Defense Authorization Acts and other money-authorizing or appropriations statutes to be "money mandating" where there was a separate source of federal law for determining the standards, amounts and conditions for payment. *See, e.g. Collins*, 101 Fed.Cl. at 457-59 (holding that NDAA provisions repealing the unconstitutional "Don't Ask, Don't Tell" policy were money-mandating in conjunction with the Separation Pay Statute, 10 U.S.C. § 1174); *Striplin v. U.S.*, 100 Fed.Cl. 493, 500-01 (Fed.Cl.2011) (holding that NDAA

provisions to be money-mandating where they established conditions for waiver of pay limitations). *See also San Antonio Housing Authority v. United States*, 143 Fed.Cl. 425, 475-76 (Fed.Cl.2019) (appropriations act money-mandating where separate statute prohibited diminution in funding to specific group); *Lummi Tribe of Lummi v. U.S.*, 99 Fed.Cl. 584, 603-04 (Fed.Cl.2011) (holding that statute providing grants to specific Indian tribes was money-mandating).

196.    Statutes governing pay and benefits for service members or federal employees that may not be money-mandating on their own are money-mandating when read in conjunction with other federal statutes or regulations that establish conditions for entitlement to such pay and benefits. *See, e.g., Colon v. United States*,  132 Fed.Cl. 665 (Fed.Cl.2017) (living quarters allowance statute in conjunction with the Department of State Standardized Regulations and applicable agency regulations); *Stephan v. United States,* 111 Fed.Cl. 676 (Fed.Cl.2013) (same); *Roberts v. U.S.*, 745 F.3d 1158, 1165-66 (Fed.Cir.2014) (same); *Agwiak v. United States*, 347 F.3d 1375, 1379-80 (Fed.Cir.2003) (remote duty pay statute money-mandating).

197.    The 2023 NDAA Rescission, in addition to being an independent "money-mandating" source of federal law, removes any bar or prohibition on payment to unvaccinated service members, or any grounds for differential treatment or payment, on the basis of their COVID-19 vaccination status or non-compliance with the now-rescinded Mandate.

198.    The 2023 NDAA Rescission applies uniformly to eliminate the Mandate for all service members. The statutory text, structure, and purpose of the 2023 NDAA Rescission all support the conclusion that Congress could not have intended to exclude unvaccinated service members from the benefits, protections or remedies to which they

are entitled under the Military Pay Act and the other applicable laws and regulation governing basic pay, retirement, or other military benefits. *See supra* ¶ 12.

199.    "When a statute has been repealed, the regulations based on that statute automatically lose their vitality. Regulations do not maintain an independent life, defeating the statutory change." *Aerolineas Argentinas v. U.S.*, 77 F.3d 1564, 1575 (Fed.Cir.1996). This applies *a fortiori* to regulations, rules or policies based on an agency rule rescinded by Congress.

200.    Failure to provide backpay and other relief required to restore service members to the pre-Mandate status quo would have the effect of creating a two-tier governance and payment structure for service members, where some are made whole through the 2023 NDAA Rescission, while other similarly situated members receive nothing.

201.    The 2023 NDAA Rescission applies to all service members equally, and the military was required to provide pay and benefits on the same basis or conditions to all service members.

202.    There is no indication that Congress intended to create a two-tiered system or to prohibit unvaccinated service members from receiving the pay and benefits to which they are otherwise entitled, or to permit the illegal exaction and recoupment of payments and benefits that they have been paid or earned.

203.    Accordingly, no fair interpretation of the 2023 NDAA Rescission would permit the military to exercise its discretion to create a two-tiered system for the payment of service members. *See, e.g., Abbott*, 70 F.4th at 843-44; *Hatter*, 185 F.3d at 1361-62; *Collins*, 101 Fed.Cl. at 457-459.

204.    Defendant Agencies' refusal to provide backpay required by the 2023 NDAA Rescission is an unlawful act in defiance of an express Congressional directive.

205.    The Secretary cannot "defeat an otherwise money-mandating statute merely by reserving last-ditch discretion. ... The ability to change the nature of a statute by issuing regulations that provide a veto would completely upend this area of law." *Collins*, 101 Fed.Cl. at 459. "Such a perverse understanding of Congress's purpose cannot be the law ... [for] [i]t is the statute, not the Government official, that provides for the payment." *Fisher,* 402 F.3d at 1175.

206.    Plaintiffs' and Class Members' Tucker Act claims for backpay do not require any showing that the Mandate was unlawful or wrongful (though it is both). Instead, to give full effect to the 2023 NDAA Rescission, Plaintiffs must be provided backpay and other compensation to which they are entitled to restore the pre-Mandate status quo.

## SECOND CAUSE OF ACTION
### VIOLATION OF 10 U.S.C. § 1107a & 2023 NDAA

207.    Plaintiffs reallege the foregoing paragraphs and facts in Sections I-III and V as if fully set forth in this count.

208.    Under 37 U.S.C. § 204(a)(1), a service member is "entitled to the basic pay of their ..., in accordance with their years of service" if they are "a member of a uniformed service on active duty".

209.    Each Plaintiff and each Class Member was "a member of a uniformed service on active duty" when the Mandate was issued up until the time that they were wrongfully discharged, constructively discharged, separated, involuntarily transferred to inactive status, had their orders curtailed, and/or were denied pay and benefits.

210.    37 U.S.C. § 204 is a money-mandating statute for all Plaintiffs and Class Members who satisfy the foregoing conditions.

211.    Each Plaintiff and Class Member has a claim for Backpay for the full period from that date on which they were wrongfully discharged, constructively discharged, separated, or involuntarily transferred to inactive status through the end of the term of service during which the discharge occurred and any subsequent terms of reenlistment for which they would have been eligible absent the now-rescinded Mandate.

212.    The Military Pay Act, in conjunction with 10 U.S.C. § 1107a, the 2023 NDAA Rescission, and the other money-mandating sources of federal law enumerated herein, *see supra* ¶ 12, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

213.    10 U.S.C. § 1107a expressly prohibits the military from mandating any service member to take an unlicensed EUA product, absent an express Presidential authorization on the grounds of national security.

214.    There has not been a Presidential authorization to mandate an unlicensed EUA product from the issuance of the Mandate through the present.

215.    The August 24, 2021 Mandate permits only COVID-19 mRNA gene therapy "vaccines" with "full licensure from the [FDA], in accordance with FDA-approved labeling and guidance." Ex. 1, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1

216.    The Defendant Agencies mandated gene therapy products that do not meet the DoD's own definition for being vaccines. *See supra* ¶ 105.

217.    A "therapy" or "treatment," even if lifesaving, cannot be mandated.

218.    The Defendant Agencies have mandated unlicensed, EUA COVID-19 gene therapies from the issuance of the Mandate on August 24, 2021, until at least the 2023

NDAA Rescission of the Mandate was partially implemented by the DoD on January 10, 2023.

219.    No FDA-licensed COVID-19 vaccines were available at all at the time that the August 24, 2021 Mandate was issued.

220.    In related litigation, Defendant Agencies have admitted that they have mandated unlicensed EUA vaccines from the date the mandate was issued and extending through the discharge date of each Plaintiff. *See supra* ¶ 123.

221.    Defendant Agencies' consistent and generally applicable policy—as reflected in the September 14, 2021 Pfizer Interchangeability Directive, the May 3, 2022 Moderna Interchangeability Directive, and their litigation position in all related litigation—is that unlicensed EUA COVID-19 vaccines are legally interchange with FDA-licensed vaccines and that the unlicensed EUA vaccines should be mandated "as if" they were the FDA-licensed product for the purposes of the Mandate. *See supra* Section III.D.

222.    Defendant Agencies did not have "Comirnaty-labeled" vaccines until at least June 2022.

223.    Defendant Agencies did not have any "Spikevax-labeled vaccines" until at least September 2022.

224.    Military Whistleblowers and filings in related litigation in *Coker v. Austin*, No. 3:21-cv-1211 (N.D. Fla.) and *Bazzrea v. Austin*, No. 3:22-cv-265 (S.D. Tex.) have demonstrated that all doses of "Comirnaty-labeled" vaccines that are not only unlicensed EUA products, but are also misbranded, expired, and/or adulterated. As such these products may not be legally given to anyone, much less mandated, and must be removed from the market and destroyed.

225.    All "Spikevax-labeled" vaccines have expired, as confirmed by Defendant Agencies on January 23, 2023. *See supra* ¶ 137.

226.    All Plaintiffs' and Class Members' harms, financial and otherwise, described above are a direct result of the Defendant Agencies' unlawful order mandating an unlicensed EUA product in violation of 10 U.S.C. § 1107a and express requirements of the Secretary Austin's August 24, 2021 Mandate Memo that permitted only FDA-licensed products to be mandated.

**The Military Pay Act, 37 U.S.C. § 204**

227.    Under 37 U.S.C. § 204(a), a service member is "entitled to the basic pay of their ..., in accordance with their years of service" if they are "(1) a member of a uniformed service on active duty ..."

228.    All Plaintiffs and Class Members who were on active duty, or reservists on active status on full-time, active-duty orders, are entitled to their basic pay for their rank and years of service pursuant to 37 U.S.C. § 204(a)(1) or § 204(a)(2), for the full period from which they were removed from active status or were denied pay, benefits, or points, regardless of whether they actually performed the service where the failure or inability to perform is due to the wrongful or unlawful act, rule, regulation or order.

229.    All Plaintiffs and Class Members were ready, willing, and able to perform their duties at all relevant times. The proposed class definition excludes those who were physically disabled from performing their duties.

230.    37 U.S.C. § 204 is a money-mandating statute for all Plaintiff and Class Members who were on active-duty, or reservists on active status on full-time, active-duty orders, satisfy the foregoing conditions. The constructive service doctrine provides

payment for those members "ready, willing, and able" to serve, yet were illegally denied the ability to do so by unconstitutional acts of the Defendant Agencies.

**The Military Pay Act, 37 U.S.C. § 206**

231.    37 U.S.C. § 206(a) requires that any Reservists who participated in and performed drills, annual training, or any other required training, instruction or duties to be paid in accordance with the statutory rates for drill periods and training as set forth in the FY22 Monthly Basic Pay Table. Ex. 16.

232.    37 U.S.C. § 206(a) is a money-mandating statute for Reserve members for drills, training, or duties actually performed.

233.    Plaintiffs and Class Members who performed drills, training, and other duties pursuant to 37 U.S.C. § 206(a) are entitled to pay, benefits, points, and other compensation for any duties they actually performed. *Palmer v. United States*, 168 F.3d 1310 (Fed.Cir.1999).

234.    Defendant Agencies' actions are unlawful in violation of the 2023 NDAA Rescission, which retroactively rendered the Mandate and all other orders based on the Mandate null and void *ab initio*.

235.    The 2023 NDAA Rescission of the Mandate eliminated any legal basis or authority for the Pfizer and Moderna Interchangeability Directives to treat unlicensed EUA products as legally interchangeable with FDA-licensed products or to use the unlicensed EUA products "as if" they were FDA-licensed products for the purposes of the now-rescinded Mandate.

### THIRD CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. §§ 2000bb-1, et seq, and 37 U.S.C. § 204 & § 206

236.    Plaintiffs reallege the paragraphs and facts in Sections I-II and Sections IV-V as if fully set forth in this count.

237.    The Religious Freedom Restoration Act is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

238.    The Religious Freedom Restoration Act, in conjunction with the 2023 NDAA Rescission, the Military Pay Act and the other money-mandating sources of federal law enumerated herein, *see supra* ¶ 12, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

239.    RFRA applies to Defendant Agencies, each of which is a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

240.    RFRA expressly creates a remedy in district court, granting any "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

241.    RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

242.    The Mandate and other challenged Defendant Agency actions substantially burdened the free exercise of religion in violation of RFRA.

243.   The Defendant Agencies each adopted a policy of systematically denying Religious Accommodation Requests using form letters, without providing the "to the person" individualized determinations required by RFRA, DoDI 1300.17, and COMDTINST 1000.15.

244.   The Mandate and Defendant Agencies' religious accommodation policies substantially burdened and unlawfully discriminated against religious exercise by treating comparable secular activities, *i.e.*, medical and administrative exemptions, more favorably than comparable religious exercise, *i.e.*, religious accommodations, by granting thousands of medical and administrative exemptions, while granting zero or only a handful of Religious Accommodation Requests. *See supra* ¶¶ 148-150 & cases cited therein.

245.   If the Government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

246.   Plaintiffs and Class Members have carried their burden of demonstrating that the Mandate and the Government's religious accommodation policies substantially burdened service members free exercise of religion, shifting the burden to the government to demonstrate that its policy satisfy strict scrutiny with respect "to the person" seeking religious accommodation. *See O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

247.   The 2023 NDAA Rescission retroactively removes any compelling governmental interest in mandating vaccination against COVID-19 of service members over their religious objections.

248.   The 2023 NDAA Rescission retroactively eliminates the Mandate as a permissible means for achieving that goal, necessarily entailing that it was not the least restrictive means for doing so.

249.   Accordingly, the Government's policies necessarily fail strict scrutiny.

250.   In addition to backpay, Plaintiffs and Class Members may seek monetary damages for wrongful discharges due to RFRA violations. *See Klingenschmitt v. U.S.*, 119 Fed.Cl. 163 (Fed.Cl.2014).

### FOURTH CAUSE OF ACTION
### ILLEGAL EXACTION

251.   Plaintiffs reallege the foregoing paragraphs and facts in Sections I-II and V as if fully set forth in this count.

252.   An illegal exaction claim generally involves money "improperly paid, exacted, or taken from the claimant[.]" *Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 372 F.2d 1002, 1007 (Ct.Cl.1967).

253.   An illegal exaction has occurred when "the Government has the citizen's money in its pocket." *Clapp v. United States,* 127 Ct.Cl. 505, 512, 117 F.Supp. 576, 580 (Cl.Ct.1954), *cert. denied,* 348 U.S. 834, 75 S.Ct. 55, 99 L.Ed. 658 (1954).

254.   Suit can then be maintained under the Tucker Act to recover the money exacted. *Clapp*, 127 Ct.Cl. at 513; *Pan American World Airways v. United States,* 129 Ct.Cl. 53, 55, 122 F.Supp. 682, 683–84 (Cl.Ct.1954) ("the collection of money by Government officials, pursuant to an invalid regulation" is an illegal exaction).

255.   Defendant punished Plaintiffs and Class Members through the illegal exaction and recoupment of separations pay, special pays, (re)enlistment bonus payments, post-9/11 GI Bill benefits, costs of training and tuition at military schools or

academies and public and private universities, travel and permanent change of station allowances, all of which Plaintiffs were entitled to by law.

256.    "When a statute has been repealed, the regulations based on that statute automatically lose their vitality. Regulations do not maintain an independent life, defeating the statutory change." *Aerolineas Argentinas v. U.S.*, 77 F.3d 1564, 1575 (Fed.Cir.1996); *see also Carriso v. United States,* 106 F.2d 707, 712 (9th Cir.1939) (when a government agent construes a statute as remaining in effect after it has been repealed and uses it as a basis to collect fees, a claim to recover the fees is "founded upon a law of Congress" and "does not sound in tort"). This applies *a fortiori* to regulations, rules or policies based on an agency rule rescinded by Congress.

257.    The 2023 NDAA Rescission of the Mandate eliminated any legal basis for the recoupment or withholding of bonuses, post-9/11 GI Bill, the costs of training and tuition, and other benefits and special pays.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF 10 U.S.C. § 1552**

258.    Plaintiffs reallege the foregoing paragraphs and facts in Sections I-V as if fully set forth in this count.

259.    10 U.S.C. § 1552, in conjunction with the Military Pay Act and the 2023 NDAA, Act, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs and Class Members.

260.    Plaintiffs seek an order from the Court directing the appropriate BCMR to correct their military records and remove any adverse paperwork resulting from their unvaccinated status or failure to comply with the Mandate.

261.    For any Plaintiffs or Class Members who may have been denied promotion, removed from promotion selection lists, or not selected due to adverse actions or loss of points due to non-compliance with the Mandate, Plaintiffs request that the Court direct these matters to the appropriate BCMR or Special Selection Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court:

262.    Certify the Class under Federal Court of Claims Rule 23 as the Class is defined in this Complaint;

263.    Appoint Plaintiffs as the representatives of the Class certified by the Court;

264.    Appoint undersigned Counsel as counsel for the Class certified by the Court;

265.    Direct that appropriate notice be given to Class Members in order to allow Class Members to opt-in as required by Federal Court of Claims Rule 23;

266.    Award and enter a judgment of at least $2.4 million due in military backpay and other financial compensation for the Plaintiffs, and in an additional amount to be determined for a common fund for all members of the Class who opt into the Class;

267.    Award Plaintiffs and Class Members the above monetary judgment, plus interest, costs, and attorney's fees, as a result of the improper actions of the Defendant and Defendant Agencies;

268.    Reinstate and correct the military records of Plaintiffs and Class Members as requested herein; and

269.    Grant such other relief as the Court may deem just and proper to provide Plaintiff and Class Members "full and fitting relief."

Date:  August 4, 2023                    Respectfully submitted,

*/s/ Dale Saran*
Dale Saran, Esq.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
E-mail: dale.saran@militarybackpay.com

*/s/ Brandon Johnson*
Brandon Johnson, Esq.
Washington, DC Bar No. 491370
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
Email: brandon.johnson@militarybackpay.com

*/s/ J. Andrew Meyer*
J. Andrew Meyer, Esq.
FL Bar No. 0056766
FINN LAW GROUP, P.A.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
Email: a.meyer@militarybackpay.com

*Attorneys for the Plaintiffs*