**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CHRISTOPHER HARKINS, *et al.*,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 23-1238C** |
| **THE UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

QUESTIONS PRESENTED ...................................................................1

STATEMENT OF THE CASE ..............................................................1

I.  PROPOSED CLASS AND SUBCLASS DEFINITIONS ..................................... 2

II. PRETRIAL PROCEEDINGS AND RULING ON CROSS MOTIONS FOR JUDGMENT ON ADMINISTRATIVE RECORD................................................................3

III. EXECUTIVE ORDER AND MOTION TO STAY PROCEEDING ................................ 6

IV. REMAND ORDER AND NOTICE .......................................................7

STATEMENT OF FACTS IN SUPPORT OF CLASS CERTIFICATION .............................7

REFERENCED STATUTES AND REGULATIONS ..........................................14

    Standards for a RCFC 23 Motion for Class Certification .............................14

ARGUMENT ................................................................................17

I.  PLAINTIFFS' PROPOSED CLASS AND TWO SUBCLASSES SATISFY ALL THE PREREQUISITES OF RCFC 23(A). .......................................................... 17

    A. The Proposed Class and Subclasses Are Sufficiently Numerous to Support Certification under RCFC 23(a)(1). .......................................................... 17

    B. There Are Ample Common Questions of Law and Fact to Justify Class Certification. 22

    C. Plaintiffs' Claims Are Typical of Those of Proposed Class and Subclass Members. 23

    D. Plaintiffs and Their Counsel Meet the Adequacy Requirements of RCFC 23(a)(4). 25

II. PLAINTIFFS' PROPOSED CLASS AND TWO SUBCLASSES SATISFY ALL THE PREREQUISITES OF RCFC 23(B)(2) AND (B)(3). .................................................... 30

    A. The Prerequisites of RCFC 23(b)(2) Are Met........................................ 30

    B. Plaintiffs' Proposed Class and Subclasses Meet the Requirements of RCFC 23(b)(3)........................................................................................ 32

III. NOTICE UNDER RULE 23..............................................................37

CONCLUSION ........................................................................... 38

i

CERTIFICATE OF SERVICE..............................................................................................38

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S. Ct. 2231 (1997) .............. 24, 32, 34

*Barnes v. U.S.*, 68 Fed. Cl. 492 (2005) ................................................................... *Passim*

*Bauer v. U.S.*, 176 Fed. Cl. 240 (2025) ......................................................................19, 32

*Bright v. U.S.*, 603 F.3d 1273 (Fed. Cir. 2010) ......................................................... 14, 17

*Brown v. U.S.*, 126 Fed. Cl. 571 (2016) .............................................................................17

*Common Ground Healthcare Coop. v. U.S.*, 137 Fed. Cl. 630 (2018).........................15-17

*Curry v. U.S.*, 81 Fed. Cl. 328 (2008) ................................................................ 23, 25, 32

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 297 (W.D. Tex. 2007)................................. 37

*Devlin v. Scardelletti,* 122 S. Ct. 2005, 2010, 536 U.S. 1, 9 (U.S.,2002) .........................21

*Doe #1-#14 v. Austin*, 572 F. Supp. 3d 1224 (N.D. Fla. 2021) ........................................... 8

*Fewlass v. Allyn & Bacon, Inc.*, 83 F.R.D. 161 (1979).......................................................19

*Filosa v. U.S.*, 70 Fed. Cl. 609 (2006)......................................................................... 19, 30

*Fisher v. U.S.*, 69 Fed. Cl. 193 (2006) .......................................................................22-23

*Geneva Rock Prods., Inc. v. U.S.*, 100 Fed. Cl. 788 (2011) .............................................. 32

*Hill v. Canidae Corp.*, 2021 WL 12310804, at *4 (C.D. Cal. Sept. 28, 2021) ................. 37

*Horvath v. U.S.*, 149 Fed. Cl. 735 (2020)................................................................... 14, 16

*In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992)...................... 25

*In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs v. U.S.*,
    157 Fed. Cl. 189 (2021) .................................................................................... 25

*Jones v. U.S.*, 118 Fed. Cl. 728 (2014) ..............................................................................18

*King v. U.S.*, 84 Fed. Cl. 120 (2008) ..................................................................... 22, 23, 30

*Lohmann v. U.S.*, 154 Fed. Cl. 355 (2021) ......................................................................15

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012)........................................16

*Oztimurlenk v. U.S.*, 162 Fed. Cl. 658 (2022) .............................................................. 16, 19

*Quinault Allottee Ass'n v. U.S.*, 197 Ct. Cl. 134 (Ct. Cl. Jan. 21, 1972*)* ............................ 34

*Silver Buckle Mines, Inc. v. U.S.*, 132 Fed. Cl. 77 (2017) ................................................. 14

*Simerlein v. Toyota Motor Corp.,* 2019 WL 2417404, at *10 (D. Conn. June 10, 2019)  37

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S. Ct. 2541 (2011) ........... 16, 22, 24, 32

## **STATUTES**

10 USC § 890, UCMJ Art. 90 .......................................................................................... 12

10 USC § 892, UCMJ Art. 92 ........................................................................................ 9, 12

10 USC § 1107a ..................................................................................................... *Passim*

21 USC § 360bbb-3 .......................................................................................................... 8

Pub. L. No. 117-263 § 525, 136 Stat. 2395 ..................................................................... 8

## **RULES AND REGULATIONS**

ALCGPSC 104/21 ............................................................................................................ 10

ALCGPSC 016/22 ............................................................................................................ 10

ALCOAST 305/21 ............................................................................................................. 7

ALCOAST 315/21 ........................................................................................................... 7, 9

ALCOAST 352/21 ........................................................................................................... 9, 10

COMDTINST M1000.4 ................................................................................................... 13

FRCP 23 .................................................................................................................. *Passim*

RCFC 23 .................................................................................................................. *Passim*

## **OTHER AUTHORITIES**

FDA, Pfizer-BioNTech COVID-19 Vaccine EUA Re-Issuance Letter (Aug. 23, 2021) ...... 8

ii

FDA, *Vaccine Information Fact Sheet for Recipients and Caregivers about Comirnaty and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)* (Sept. 22, 2021) ........................................................................... 8

## QUESTIONS PRESENTED

1.      In light of the present posture of this action and the number of Coast Guard members with cognizable claims, whether the Court should continue utilizing the *ad hoc* joinder approach as set forth in its current remand order or instead should it certify a class and/or certify certain claims under Rule 23 of the Rules of the United States Court of Federal Claims ("RCFC").

2.      Whether Plaintiffs have satisfied the requirements of RCFC 23 justifying the Court certifying an opt-in class and two subclasses consisting of themselves and all current and former Coast Guard members who were discharged, separated, constructively discharged, involuntarily transferred to inactive status, and/or denied pay or benefits due to their unvaccinated status with respect to Defendant's COVID-19 Vaccine Mandate, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments to which they are entitled by law under the Military Pay Act.

## STATEMENT OF THE CASE

Six current and former United States Coast Guard active-duty personnel, as named plaintiffs and proposed class representatives, challenge their separations from military service in the fall of 2022 for reportedly failing (or refusing) to receive COVID-19 vaccinations under orders from the Coast Guard pursuant to its COVID-19 Vaccine Mandate. Following a 30-page order on the Parties' competing motions for judgment on the administrative record, an intervening Executive Order from the President, and a remand order creating a process for the Coast Guard to re-evaluate Plaintiffs' and certain class members' claims, Plaintiffs now request this Court to formally certify a class and two subclasses.

For the reasons discussed in greater detail in this memorandum, the Court should adopt the class certification approach to address the logistical challenges present in this case. In many ways, the Court already has functionally certified a class of 1,351[1] Coast Guard members through its remand order. By adopting a class certification approach under RCFC 23, however, the Court can ensure all affected Coast Guard members are notified of these proceedings and that they will have the benefit of class counsel when deciding whether to opt-in, when preparing a request to the Coast Guard during remand, and when deciding whether to accept the results of a remand. Class certification will serve as a gateway to the remand process the Court has already set in motion but will place that process on firmer legal grounds and protect the rights of absent class members who choose to participate in the action.

## I.    PROPOSED CLASS AND SUBCLASS DEFINITIONS

Plaintiffs request the Court to certify a class pursuant to RCFC 23 consisting of themselves and all current and former Coast Guard members who were discharged, separated, constructively discharged, involuntarily transferred to inactive status, and/or denied pay or benefits due to their unvaccinated status with respect to Defendant's COVID-19 Vaccine Mandate, and as a result lost pay, benefits, retirement points, training, promotion, or any other emoluments to which they are entitled by law under the Military Pay Act and/or other money-mandating statutes applicable to class members (hereinafter, the "Class").

---

[1] In the Joint Status Report filed by the Parties on February 13, 2025, the Coast Guard states it "has identified 1,351 individuals who submitted a religious accommodation request that was not granted." (ECF 47 at 1). In its March 13, 2025, Remand Order, however, the Court references "1,352 identified current and former service members." (ECF 57 at 2). In the present motion, Plaintiffs will use the 1,351 figure first used by the Coast Guard.

In addition to the Class, Plaintiffs request the Court to certify a subclass under RCFC 23(c)(5), consisting of members of the "Class" who prior to being discharged, separated, or constructively discharged due to their unvaccinated status with respect to Defendant's COVID-19 Vaccine Mandate, submitted a Religious Accommodation Request, a request for an administrative exemption, or a request for a medical exemption to the requirements of the COVID-19 Vaccine Mandate (hereinafter "Exemption Requested Subclass").

Plaintiffs also request the Court to certify a subclass under RCFC 23(c)(5), consisting of members of the "Class" who "voluntarily" separated from service rather than comply with the COVID-19 Vaccine Mandate (hereinafter "Voluntary Separation Subclass").

For the Class and the two subclasses, Plaintiffs request certification of the claims asserted in their Second, Third, and Fourth causes of action set forth in the operative Amended Class Action Complaint, along with all of the Coast Guard's associated defenses to each of those causes of action, including but not limited to the Coast Guard's assertion that putative class members' were lawfully discharged for the "Convenience of the Government," not for their refusal to comply with the COVID-19 Vaccine Mandate.

## II.    PRETRIAL PROCEEDINGS AND RULING ON CROSS MOTIONS FOR JUDGMENT ON ADMINISTRATIVE RECORD

The Plaintiffs and the Government each filed competing motions for judgment on the administrative record resulting in an order from the Court containing an extensive analysis of the many of the legal issues raised in this case as well as setting forth detailed findings of fact regarding each of the proposed class representatives. (ECF 36) ("MJAR Order"). Before reaching the specific legal issues and factual disputes present in this case,

the Court detailed the law applicable and the events leading to the Coast Guard's COVID-19 Vaccine Mandate and Congress's subsequent action to rescind it. *Id.* at pp. 3-4, 11-13. The Court found that the Coast Guard's COVID-19 Vaccine Mandate was rooted in a directive from the then Secretary of Defense, applicable to all branches of military service and then formally adopted by the Coast Guard. *Id.* at 3. The Court also found that with respect to each of the named Plaintiffs, the terms of Mandate were applied to them individually through a "substantively identical order from a duly authorized Coast Guard Officer in Charge." *Id.* at 14. This "substantively identical order" commanded each "to report to [a specified military medical clinic or an approved vaccination location] by [specified date] and to receive the first dose of *a fully FDA-approved COVID-19 vaccine*." *Id.* at 15 (emphasis in original).

With respect to Plaintiffs' § 1107a claims set forth in their Third Cause of Action, the Court analyzed and rejected the Coast Guard's contention that EUA products were functionally equivalent to the "fully FDA-approved COVID-19" vaccines, stating the Coast Guard engaged in a "misguided effort to conflate the biosimilarity of the EUA and FDA-approved vaccines with the informed consent legal requirements of § 1107a." (ECF 36 at 16-17). The Court also rejected the Coast Guard's defense that Plaintiffs lacked standing to bring § 1107a claims because they would not take *any* COVID-19 vaccine, licensed or otherwise. *Id.* at 15-16. The Court reasoned that the Coast Guard had failed to present any Plaintiff with any licensed, FDA approved vaccine and therefore the Coast Guard's standing argument "improperly presumes the critical choice the Coast Guard ordered them to make but then failed to actually present." *Id.* at 16. Indeed, the Court found that "five of the six named plaintiffs in this case maintain—and the government has not successfully rebutted—that no 'fully FDA-approved COVID-19 vaccine' was offered at the

designated vaccination sites or otherwise readily available in their respective regions in time for the Coast Guardsmen to comply with the vaccine orders as drafted and issued." *Id.* at 17.

Notwithstanding its finding that the Coast Guard had violated Plaintiffs' § 1107a informed consent rights, the Court accepted, with "misgivings," the Coast Guard's defense that it did not discharge Plaintiffs for their failure to take EUA product. *Id.* at 18. Rather, the Court agreed with the Coast Guard that it had authority to administratively discharge Plaintiffs for the "Convenience of the Government" on the basis of their "Unavailability for World Wide [sic] Assignment," due to their "immunization status." *Id.*

With respect to Plaintiffs' RFRA claims set forth in their Fourth Cause of Action, the Court found that the Coast Guard had a uniform policy of denying all Religious Accommodation Requests ("RARs") through the use of form, template documents. *Id.* at 20-21. Instead of engaging in the "to the person" analysis required by RFRA, "the Coast Guard predetermined that the military's need for near-universal vaccination trumped the constitutional rights and religious liberties of individual Coast Guardsmen." *Id.* at 21. The Court further found "[t]he Coast Guard's decision to ostensibly credit the sincerity of each Coast Guardsman's proffered religious beliefs and their faith-based objections to the COVID-19 vaccine in universally denying all religious accommodation requests runs afoul of the letter and spirit of RFRA." *Id.* Nevertheless, the Court ruled that it would not assume the outcome of a proper evaluation of Plaintiffs' RARs and instead would permit the Coast Guard a second chance to answer its question of whether any Coast Guardsmen would have been granted an exemption or temporary waiver if RARs "were duly considered under applicable law." *Id.* at 22.

Finally, with respect to the procedural violations asserted in Plaintiffs' Second

Cause of Action, the Court parsed through each alleged violation in detail. With some exceptions, the Court largely deferred full resolution of these alleged violations until following remand of certain of the Plaintiffs' claims to the Coast Guard. The Court later entered a Remand Order discussed below. *Infra*.

## III.    EXECUTIVE ORDER AND MOTION TO STAY PROCEEDING

On January 27, 2025, the President signed an Executive Order instructing the Secretary of Defense or the Secretary of Homeland Security to: (a) make reinstatement available to all members of the military (active and reserve) who were discharged solely for refusal to receive the COVID-19 vaccine and who request to be reinstated; (b) enable those service members reinstated under this section to revert to their former rank and receive full back pay, benefits, bonus payments, or compensation; and (c) allow any service members who provide a written and sworn attestation that they voluntarily left the service or allowed their service to lapse according to appropriate procedures, rather than be vaccinated under the vaccine mandate, to return to service with no impact on their service status, rank, or pay. Exec. Order, Reinstating Service Members Discharged Under the Military's COVID-19 Vaccination Mandate (Jan. 27, 2025) (available at https://www.whitehouse.gov/presidential-actions/2025/01/reinstating-service-members-discharged-under-the-militarys-covid-19-vaccination-mandate/).

The Executive Order further provides that "the Secretary of Defense and the Secretary of Homeland Security shall report to the President through the Assistant to the President for National Security Affairs on their progress implementing this order" within 60 days. *Id*.

The Coast Guard filed a motion to stay the proceedings based upon the President issuing this Executive Order. For reasons announced at a status conference held on January 30, 2025, the Court denied this motion to stay the same day. ECF 42.

## IV. REMAND ORDER AND NOTICE

Following its MJAR Order and its rejection of the Coast Guard's motion to stay, the Court entered an order remanding Plaintiffs' claims to the Coast Guard. (ECF 57) ("Remand Order"). The Court directed the Coast Guard to "conduct individualized reviews of each administrative claim submitted and promptly notify each current or former service member of the results of that review, including whether they are entitled to a records correction and any consequent administrative and/or monetary relief." *Id.* at 2. Of particular relevance to the present motion, the Court directed the Coast Guard not only to conduct remand proceedings on behalf of the six named plaintiffs but also to allow any other of the 1,351 Coast Guard members identified as having filed an RAR to participate, as well. The Court adopted a claim form for these unidentified Coast Guard members and directed that the Coast Guard send by email and certified mail to all 1,351 "identified current and former service members: i. the appropriate form notice (ECF 55-1); ii. an administrative claim form (ECF 55-2); and iii. a copy of this Court's January 23, 2025, decision (ECF 36)." (ECF 57 at 2).

## <u>STATEMENT OF FACTS IN SUPPORT OF CLASS CERTIFICATION</u>

In support of class certification, Plaintiffs rely on the facts set forth in their Motion for Judgment on the Administrative record, as well as the facts and findings set forth in the Court's ruling on the Parties' cross-motions for judgment on the administrative record. Specifically, Plaintiffs rely on the following:

1.  **Coast Guard Mandate.** On August 26, 2021, the Coast Guard issued the

Coast Guard Mandate and "directed that only vaccines that have received full licensure from the [FDA] be used for mandatory vaccination." ALCOAST 305/21 ¶ 1, AR 338

2.     The Coast Guard was required to provide members FDA-licensed vaccines. *See* ALCOAST 315/21 ¶ 3, AR 340-41 ("All members shall be provided any vaccine that has received [FDA]Licensure.").

3.     On December 23, 2022, President Biden signed into law the 2023 National Defense Authorization Act ("NDAA"). Section 525 of the 2023 NDAA directed Secretary Austin to "rescind" the Department of Defense's ("DoD") COVID-19 Mandate. Pub. L. No. 117-263 § 525, 136 Stat. 2395.

4.     On January 10, 2023, Secretary Austin rescinded the DoD Mandate.

5.     On January 11, 2023, the Coast Guard rescinded the Coast Guard Mandate "[i]n alignment with the DoD." Dkt. 1-5, ALCOAST 012/23 ¶ 1.

6.     **No FDA-Licensed Vaccines.** No FDA-licensed COVID-19 vaccines were available when the Mandate was issued. *See* Dkt. 17, Amend. Compl. ("FAC") ¶ 147 & *Doe #1-#14 v. Austin,* 572 F. Supp. 3d 1224, 1233-34 (N.D. Fla. 2021).

7.     The Coast Guard has not asserted that it had any FDA-licensed vaccine at any relevant time, and nothing in the AR demonstrates that it had FDA-licensed vaccines.

8.     Defendant did not offer or provide any FDA-licensed Comirnaty to any Plaintiff when his Vaccination Order was issued or prior to the deadline set therein.[2]

9.     **EUA Vaccines.** On August 23, 2021, the FDA re-issued the EUA for the

---

[2] Plaintiffs feel compelled to add a note regarding the one "exception" to this among the Plaintiffs that the Court made note of in its order,  *see* ECF 36, p. 15, OS1 Powers. OS1 Powers was at Sector Juneau at the same time as, and alongside, OS1 Harkins. *See, e.g*., AR 75 (Harkins RAR from Sec. Juneau dtd 20 Oct 2021); AR 247 (Powers RAR from Sec. Juneau dtd 29 Sep 2021). Powers also separately averred no licensed vaccines were made available to him. ECF 18-8, ¶ 12.

Pfizer-BioNTech COVID-19 EUA vaccine because the FDA-licensed and "legally distinct" Comirnaty (approved on the same day) was "not available." *See* Dkt. 1-10, FDA, Pfizer-BioNTech COVID-19 Vaccine EUA Re-Issuance Letter (Aug. 23, 2021), at 5 n.9.

10.     As required by 21 USC § 360bbb-3, the FDA factsheet for the Pfizer BioNTech COVID-19 vaccine informs recipients that: "[u]nder the EUA, it is your choice to receive or not receive the vaccine." FDA, *Vaccine Information Fact Sheet for Recipients and Caregivers about Comirnaty and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)* (Sept. 22, 2021) at 5, AR 161 ("EUA Factsheet").

11.     The FDA has never asserted in any regulatory approval or EUA letter that the Pfizer-BioNTech EUA COVID-19 vaccine is FDA-licensed or that this EUA product may be mandated "as if" it were the "legally distinct" FDA-licensed Comirnaty.

12.     Despite the FDA's clear statement that all recipients have a statutory right to refuse the EUA vaccine, the Coast Guard asserted that "[t]he FDA's guidance notes that Pfizer-BioNTech COVID-19 [*i.e.*, the EUA Vaccine] and Pfizer's name branded Comirnaty [*i.e.*, the FDA-Licensed Vaccine] are identically formulated and are interchangeable for the purposes of vaccine administration." ALCOAST 352/21 ¶ 10, AR 344-45.

13.     There was no "Presidential Waiver" under 10 USC § 1107a that could have authorized mandate of EUA vaccines. *See* FAC ¶ 214 & *Doe #1*, 572 F. Supp. 3d at 1233-34.

14.     Pfizer did not submit an application requesting that the FDA make the requisite statutory "interchangeability" determination under the procedures specified in the Public Health Safety Act, and the FDA did not purport to make a statutory interchangeability determination. *See* FAC ¶¶ 139-140 & Dkt. 1-11, Oct. 21, 2022, Marks Decl., ¶ 10.

15.     The Coast Guard mandated EUA COVID-19 vaccines. *See* ALCOAST 352/21 ¶ 10, AR 344-45; FAC ¶¶ 256-61; *Doe #1-#14*, 572 F. Supp. 3d at 1233 (DoD "mandat[ed] vaccines from EUA-labeled vials").

16.     Plaintiffs specifically and expressly challenged the legality of the mandate to take an EUA product and/or the Coast Guard's interchangeability guidance. *See, e.g.,* AR 115-17 (Byrd RAR ¶ 3.e); AR 3-4 (Gutierrez RAR Appeal ¶¶ 1 & 6); AR 20-21 (Harkins RAR ¶ 6); AR 272-78 & AR 291-93 (Nolan RAR Appeal ¶ 9 & Encl.).

17.     **Misconduct Discharge.** ALCOAST 315/21 ¶ 7, AR 341, states that failure to comply with the Mandate constituted "failure to obey a lawful order punishable under Article 92 of the Uniform Code of Military Justice [UCMJ]", which "may result in … initiation of discharge proceedings." *See also* ALCOAST 446/21 ¶ 6, AR 349 (unvaccinated members "subject to involuntary administrative separation").

18.     "When a member has been initially counseled and fails to seek vaccination, Commanders … will next document the process by which personnel who remain unvaccinated will be specifically ordered to a vaccine administration site, at a particular date and time designated by command." ALCOAST 352/21 ¶ 3, AR 342-43.

19.     "[A] member's failure to abide by this order [*i.e.*, the individual Vaccination Order] will be documented in follow-on CG-3307s … which will result in administrative consequences … [A] member who fails to abide by this order [*i.e.*, individual Vaccination Order] could be subject to involuntary separation." ALCOAST 352/21 ¶ 3, AR 343.

20.     **Coast Guard RAR Process.** Coast Guard orders provided that each Coast Guard member, including each Plaintiff, was to be automatically subject to adverse personnel actions while their RAR was pending, including: (i) immediate removal from command, *see* ALCGPSC 104/21 ¶ 7, AR 337; (ii) cancellation of current and prohibition

on future attendance of "A" and "C" schools and advanced education, *see* ALCOAST 352/21 ¶ 5.a, AR 343 & ALCGPSC ¶¶ 3-5, AR 334-336; (iii) removal from promotion selection pools, *see* ALCOAST 352/21 ¶ 6.a, AR344; (iv) prohibition on Permanent Change of Station (*i.e.*, accepting new assignments), *see* ALCGPSC 016/22 ¶ 2, AR 333; (v) leave and liberty restrictions, *see* ALCOAST 352/21 ¶ 5.b, AR 344.

21.    Coast Guard rules provided that, even if an RAR was granted, the member would be subject to adverse personnel actions. *See* ALCGPSC ¶ 1, AR 334 ("The administrative mitigation measures described in [¶¶ 3-5] will remain in place regardless of whether a members [sic] request [is] approved.").

22.    The Coast Guard rejected—for all members for the duration of the Mandate without regard to duties, assignment, location, unit, demographic characteristics, or other individual factors—any and all less restrictive alternatives to 100% vaccination.[3]

23.    Like other unvaccinated Coast Guard members, each Plaintiff was subject to the foregoing adverse personnel actions while their RARs and appeals were pending.

24.    **Plaintiffs' RARs & Denials.** Each Plaintiff submitted an RAR. *See* AR 172-74 (Byrd); AR 9-10 (Gutierrez); AR75-77 (Harkins); AR 97-98 (Musgrave); AR 299-300 & AR 302-304 (Nolan); AR 243-44 (Powers).

25.    Each Plaintiff's RAR included a letter from a Coast Guard chaplain stating that the chaplain had interviewed the Plaintiff and determined that the Plaintiff's request was based on his sincerely held religious beliefs. *See* AR 194 (Byrd); AR 12 (Gutierrez); AR 78-79 (Harkins); AR 100-01 (Musgrave); AR 305-06 (Nolan); AR 247 (Powers).

---

[3] *See generally Operational and Legal Analysis – Religious Accommodation Requests* (Nov. 15, 2021), AR357-76 ("RAR Legal Analysis"); *Religious Accommodation Appeal Guide*, AR591-603; *Outline: Religious Accommodation Appeal – Foreseeable Arguments and General Responses* (Mar. 17, 2022), AR616-27.

26.     Defendant denied each Plaintiff's RAR in nearly identical letters using the standard denial template. *See* AR 186-88 (Byrd); AR 5-7 (Gutierrez); AR 70-73 (Harkins); AR 92-94 (Musgrave); AR 295-98 (Nolan); AR 240-42 (Powers).

27.     Each Plaintiff appealed the denial of their RAR. *See* AR 110-23 (Byrd); AR 3-4 (Gutierrez); AR 19-23 (Harkins); AR 89-91 (Musgrave); AR 280-94 (Nolan) & AR 271-72 (Nolan Aug. 17, 2022, reevaluation request); AR 221-26 (Powers).

28.     Defendant denied each Plaintiff's RAR Appeal in nearly identical letters using the standard denial template. *See* AR 108-09 (Byrd); AR 2 (Gutierrez); AR 18 (Harkins); AR 88 (Musgrave); AR 267-70 & AR 279 (Nolan); AR 220 (Powers).

29.     Each Plaintiff proposed less restrictive means successfully used prior to the mandate (*e.g.*, masking, testing, social distancing, telework) or an alternative vaccine. *See* AR 173 (Byrd); AR 25 (Harkins); AR 302 & AR 306 (Nolan); AR 243 (Powers). Defendant denied each Plaintiff's request.

30.     The Coast Guard has not asserted, and there is nothing in AR, showing that Coast Guard granted a single RAR for the COVID-19 Mandate. The only document in the AR providing statistics on RARs states that 1304 RARs were received and that zero RARs or appeals were granted. AR 133. Congressional investigators found that the Coast Guard had denied "[o]ver 1,300" RARs. *See* Dkt. 1-6, Oct. 18, 2022, Ltr. to CMDT Fagan, at 1.

31.     The Coast Guard granted six permanent medical exemptions (and denied four for an approval rate of 60%) and 12 temporary medical exemptions. *See* AR 133.

32.     **Plaintiff Discharges.** Each Plaintiff was discharged prior to ETS.

33.     Each Plaintiff received a "warning" 3307 that he must receive an FDA-licensed vaccine or else be found in violation of UCMJ Arts. 90 and 92. *See* AR 703 (Byrd); AR 679 (Harkins); AR 692 (Musgrave); AR 725-26 (Nolan); AR 714 (Powers).

34.    Each Plaintiff received a 3307 ordering him to receive an FDA-licensed vaccine at specified clinic(s) or location(s) and time or time periods or else be found in violation of UCMJ Arts. 90 and 92.[4]

35.    Each Plaintiff received a 3307 stating or finding that he had violated UCMJ Arts. 90 and 92 by failing to receive an FDA-licensed vaccine at the location(s) and time(s) specified in his Vaccination Order ("UCMJ Violation 3307"). *See* AR 705 (Byrd); AR 670 (Gutierrez); AR 681-82 (Harkins); AR 691 (Musgrave); AR 730 (Nolan); AR 716 (Powers).

36.    Each Plaintiff's notification of intent to discharge ("NOID") was issued by his commander and stated that he was being discharged for the "convenience of the government" under COMDTINST M1000.4 Art. 1.B.12. *See* AR 701 (Byrd); AR 668 (Gutierrez); AR 677 (Harkins); AR 688 (Musgrave); AR 723 (Nolan); AR 712 (Powers).

37.    Each Plaintiff's Separation Authorization was issued by his command and stated he was separated under "1-B-12 Convenience of Government" with an "Honorable" "Character of Service" with an "RE3" code barring reenlistment. *See* AR 107 (Byrd); AR 1 (Gutierrez); AR 17 (Harkins); AR 87 (Musgrave); AR 266 (Nolan); AR 219 (Powers).

38.    Each Plaintiff received a DD-214 identifying his "Characterization of Service" as "Honorable" (Block 24), the "Separation Authority" as "COMDTINST M1000.4 1.B.12" (*i.e.*, "convenience of government") or "1.B.26" (inapplicable code for reservists) (Block 25), and the "Reentry Code" as "RE3" (Block 27). *See* AR 709-10 (Byrd 1.B.26 code); AR 675 (Gutierrez 1.B.26 code); AR 685-86 (Harkins); AR 694-99

---

[4] *See* AR 704 (Byrd); AR 671 (Gutierrez); AR 680 (Harkins); AR 692 (Musgrave); AR 729 (Nolan); AR 715 (Powers). No Plaintiff's Vaccination Order directed him to search for, source, procure or receive a "commercially available" FDA-license vaccine, and no Plaintiff was ordered to receive a "commercially available" FDA-licensed vaccine from a location or supplier other than the location(s) specified in his Vaccination Order. *See id.*

(Musgrave); AR 734-35 (Nolan); AR 720-21 (Powers).

39.     The Coast Guard did not convene an Administrative Discharge Board for any Plaintiff, each of whom was eligible after having served eight or more years. Each Plaintiff (except Musgrave) requested a board, and each request was denied. *See* Byrd Decl. ¶ 20; Gutierrez Decl. ¶ 17; Harkins Decl. ¶ 20; Nolan Decl. ¶ 21; Powers Decl. ¶ 17.

40.     The Coast Guard did not convene a reenlistment board for any Plaintiff, each of whom was eligible due to term and service and having been denied reenlistment.

41.     No Plaintiff received Separation Pay to which they were entitled.

### REFERENCED STATUTES AND REGULATIONS

### Standards for an RCFC 23 Motion for Class Certification

In most respects, RCFC 23 "is modeled largely on the comparable [Rule 23 of the Federal Rules of Civil Procedure ('FRCP')]." Rules Committee Notes on RCFC 23, 2022 Revision. RCFC 23's numerosity, commonality, typicality, adequacy, superiority, and predominance requirements all have nearly matching language in FRCP 23. Because "RCFC 23 is patterned after [FRCP] 23 ..., with the notable exception that RCFC 23 allows only opt-in class actions ..., case law analyzing FRCP 23 may be used to construe RCFC 23." *Silver Buckle Mines, Inc. v. U.S.*, 132 Fed. Cl. 77, 96 n.16 (2017) (citing *Curry v. U.S.*, 81 Fed. Cl. 328, 331–32 & n.10 (2008)); *see also Barnes v. U.S.*, 68 Fed. Cl. 492, 494 & n.1 (2005) ("Owing to the fact that the language of RCFC 23 and [FRCP] 23 is, in many regards, identical, this opinion relies upon numerous decisions that have construed the relevant portions of the latter rule.").

In that regard, "[c]ertification of an opt-in class pursuant to RCFC 23 requires several elements, often summarized by this Court as the following: (1) numerosity, (2) commonality, (3) typicality, (4) adequacy, and (5) superiority." *Horvath v. U.S.*, 149 Fed.

Cl. 735, 743 (2020) (citing *Barnes v. U.S.,* 68 Fed. Cl. 492 (2005)); *see also Bright v. U.S.*, 603 F.3d 1273, 1278 n.2 (Fed. Cir. 2010). Those requirements are defined, generally, as follows: (i) **numerosity** — that the proposed class is so large that joinder is impracticable; (ii) **commonality** — that there are common questions of law or fact *that predominate* over questions affecting individual prospective class members and that the government has treated the prospective class members similarly; (iii) **typicality** — that [the putative class representative's] claims are typical of the proposed class; (iv) **adequacy** — that [the putative class representative's] will fairly represent the proposed class; and (v) **superiority** — that a class action is the fairest and most efficient method of resolving the suit. *Common Ground Healthcare Coop. v. U.S.*, 137 Fed. Cl. 630, 637 (2018) (emphasis added) (citing *Toscano v. U.S.*, 98 Fed. Cl. 152, 155 (2011)). RCFC 23(a) contains the first four requirements, while RCFC 23(b)(3) contains not only the superiority requirement, but also an additional predominance requirement. The predominance requirement necessitates that the Court consider whether "the questions of law or fact *common* to class members *predominate* over any questions affecting only individual members." RCFC 23(b)(3) (emphasis added). Predominance is often analyzed concomitantly with the commonality requirement.

To understand these requirements in practice, cases applying FRCP 23 are instructive. *Lohmann v. U.S.*, 154 Fed. Cl. 355, 361 (2021) ("RCFC 23, which borrowed criteria from its counterpart in the Federal Rules of Civil Procedure (with some important distinctions), governs class actions in this Court."). That being said, one notable difference between RCFC 23 and FRCP 23 is that in contrast to FRCP 23(b)'s disjunctive requirements, RCFC 23(b)'s requirements are conjunctive. Thus, to support certification, the moving party must demonstrate that "the United States has acted or refused to act on

grounds generally applicable to the class" under RCFC23(b)(2). In addition, the moving party must show compliance with each of the elements of RCFC 23(b)(3) described above.

Another, significant difference between RCFC 23 and FRCP 23 is that, as noted above, "unlike the FRCP, the [RCFC] contemplates only opt-in class certifications, not opt-out classes." Rules Committee Notes on RCFC 23, 2002 Revision. Opt-out class actions are "viewed as inappropriate here because of the need for specificity in money judgments against the United States, and the fact that the court's injunctive powers — the typical focus of an opt-out class — are more limited than those of a district court." *Id.* Because opt-in class actions are fundamentally different from the opt-out class actions FRCP 23 contemplates, cases involving the latter rule must be applied with care in this Court. *Oztimurlenk v. U.S.*, 162 Fed. Cl. 658, 671–73 (2022)

Pursuant to RCFC 23, "[o]ne or more members of a class may sue as representatives on behalf of all members" if they satisfy the Rule's requirements. RCFC 23(a). When requested via motion, the Court "must determine by order whether to certify the action as a class action." RCFC 23(c)(1)(A). Such an order "must define the class and the class claims, issues, or defenses, and must appoint class counsel." RCFC 23(c)(1)(B).

Plaintiffs seeking class certification bear the burden of affirmatively establishing that the RCFC 23 requirements are "*in fact*" met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 at 350, 131 S. Ct. 2541 (2011). In determining whether Plaintiffs in this case have carried their burden, the Court must conduct a "rigorous analysis" and thus must probe beyond the pleadings to assess Plaintiffs' showing and proffered evidence. *Id.* at 350–51, 131 S. Ct. 2541. Indeed, Rule 23 requirements "must be proven by a preponderance of the evidence." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012); *see also Common Ground Healthcare*, 137 Fed. Cl. at 637 ("The class action's proponent must

16

satisfy each of the requirements by a preponderance of the evidence."). "Mere speculation is insufficient." *Marcus*, 687 F.3d at 596. Because RCFC 23's requirements are all stated in the conjunctive, the failure of Plaintiffs "to satisfy any one of them is fatal to class certification." *Barnes*, 68 Fed. Cl. at 494. At the end of the day, though, "[s]o long as this rigorous analysis is conducted, the Court has wide discretion in deciding whether the requirements of RCFC 23 have been satisfied." *Horvath*, 149 Fed. Cl. at 743–44 ("Although RCFC 23 differs from FRCP 23 in important respects, both use the same permissive ('may'), not mandatory ('shall'), language in allowing a court to certify a class.").

If a class is certified, the Court gives notice to class members that, among other things, "the court will include in the class any member who *requests* inclusion." RCFC 23(c)(2)(B)(v) (emphasis added); *see also* RCFC 23(c)(2)(B)(iv) ("a class member *may* enter an appearance … if the member so desires" (emphasis added)); Rules Committee Notes on RCFC 23, 2002 revision. The "objectives of the [RCFC] class action procedure" include efficient and economical litigation. *Bright*, 603 F.3d at 1285 & 1288 (citing cases); *see* RCFC 23(b)(3) ("A class action may be maintained if … a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.").

## ARGUMENT

## I.    PLAINTIFFS' PROPOSED CLASS AND TWO SUBCLASSES SATISFY ALL THE PREREQUISITES OF RCFC 23(A).

### A.    The Proposed Class and Subclasses Are Sufficiently Numerous to Support Certification under RCFC 23(a)(1).

The numerosity requirement is satisfied if the proposed class is "so numerous that joinder of all members is impracticable." RCFC 23(a)(1). Many decisions from the Court confirm that "[t]he number of potential class members is considered to be the most

17

important factor of the numerosity requirement." *Common Ground Healthcare*, 137 Fed. Cl. at 638 (citing cases); *Brown v. U.S.*, 126 Fed. Cl. 571, 578 n.3 (2016) (indicating that the Court of Federal Claims has found potential class sizes of 23, 25, 135, 150, and 152 members sufficient to satisfy the numerosity requirement). While the "numerosity requirement" necessitates "that there be a legally definable class that can be ascertained through reasonable effort[,] ... the fact that plaintiffs do not know the exact number of class members does not preclude the granting of class status." *Jones v. U.S.*, 118 Fed. Cl. 728, 733 n.2 (2014) (citing cases).

From a numbers-only perspective, the proposed Class and Subclasses are more than large enough to justify class certification. For starters, the Coast Guard has acknowledged that 1,351 members filed religious accommodation requests seeking exemptions to its COVID-19 Vaccine Mandate, and the Court has found that Coast Guard granted zero of those requests. ECF 47, and MJAR Order. Of those members filing RARs, the Coast Guard admits it discharged 274, either voluntarily or involuntarily, and it further states that of those 1,351 members filing RARs, 904 were not immediately separated based "solely on their COVID-19 vaccination status." *Id.* The Coast Guard has not shared, however, if any of these 904 members filing RARs were "later" separated based "solely," or even in part, on their COVID-19 vaccination status.

Moreover, Plaintiffs' present motion for class certification is not limited to the 1,351 Coast Guard members who filed RAR requests, nor is it limited to Coast Guard members who were discharged or otherwise separated from service. Rather, the proposed class and subclass definitions set forth herein include *all* Coast Guard members, regardless of whether the member filed an RAR or sought some other administrative or medical exemption, who were discharged, separated, or constructively discharged, as well

as those who remained in active service, but nonetheless suffered some diminution or forfeiture of a financial benefit, for failing to comply with the Coast Guard's COVID-19 Vaccine Mandate. Thus, at a minimum, *all* 1,351 members identified by the Coast Guard are encompassed within Plaintiff's definition of the Class and Subclasses, including those "voluntarily" discharged or those not "immediately" separated "solely" on their COVID-19 vaccination status.

In addition, as the date of this memorandum, undersigned counsel have been contacted by over 200 Coast Guard members seeking representation regarding the negative repercussions they have suffered by virtue of the Coast Guard's now rescinded COVID-19 Vaccine Mandate. (Decl. of Dale Saran, Exhibit 1 at ¶ 14). Of these 200 plus individuals, 30 have indicated they did not file an RAR request and yet were nonetheless separated from service due to their failure to comply with the Coast Guard's COVID-19 Vaccine Mandate. *Id*. Thus, from undersigned counsel's experience, there is reason to believe the potential class is at least 15% larger than the 1,351 members identified by the Coast Guard. Of these 30 additional class members, only 5 have indicated they separated to avoid some adverse consequence stemming from their failure to comply with the COVID-19 Vaccine Mandate (likely placing them within the Voluntarily Separated Subclass). *Id*.

Despite the sheer number of Class Members, the language of RCFC 23(a)(1) plainly indicates that the class must be so numerous "that joinder is impracticable." *Oztimurlenk*, 162 Fed. Cl. at 675-76; *Fewlass v. Allyn & Bacon, Inc.*, 83 F.R.D. 161, 165 (1979) ("The question of whether joinder is impracticable is not strictly one of numbers[.]"). At least in the context of FRCP 23, the count of potential class members speaks to the practicability of joining all of them. But on the other hand, at least two recent Court of Federal Claims'

19

decisions have acknowledged that under the opt-in requirement of RCFC 23, the concept of joinder being "impracticable" seems nonsensical. *Id.; Bauer v. U.S.*, 176 Fed. Cl. 240 (2025). Indeed, the opt-in nature of RCFC 23 class actions reduces the need for a "legally definable class" in cases where the number of proposed members is indeterminate and potentially high. *See Filosa v. U.S.*, 70 Fed. Cl. 609 (2006) (quoting *Barnes*, 68 Fed. Cl. at 495 n.4).

Whether numbers alone are sufficient to meet this prong, or if Plaintiffs must show some kind of "impracticability" to joinder as an alternative, the Plaintiffs have satisfied the requirements of RCFC 23(a)(1) either way. As discussed in greater detail in the superiority analysis below, the nature of the claims at issue in this action and the sheer number of potentially affected Coast Guard members taken together makes joinder an impracticable alternative. Not because of geographic uncertainty necessarily, a factor often cited in cases applying FRCP 23, but of little utility in this Court of national scope and limited jurisdiction, but because of practical realities.

First, the impracticability of a joinder approach is highlighted by the work the Court and the Parties have already undertaken in this action which so far has only involved six named plaintiffs. Yet, the administrative burden of the Parties' assembling and agreeing upon an appropriate administrative record has been significant. In ruling on the Coast Guard's initial motion to dismiss and on the Parties' cross motions for judgment on the administrative record, the Court has had to spend significant time and resources parsing out the facts relevant to their claims. Under a joinder approach, much of this same work will be necessary at the front end, particularly if there are any disagreements over whether any specific Coast Guard member should be permitted to join the action.

20

In contrast, under a class action approach, Coast Guard members can "opt-in" using a comparatively sparse form for purposes of assigning them into categories and then sending through a remand process as developed by the Court, presumably similar to the process the Court has developed thus far, but as modified and narrowed after the Court and Parties have the benefit of seeing how the process works for the six named Plaintiffs. By opting in only, not joining, Coast Guard members can preserve and exercise their rights in this Court, but the Court and the Parties can rely on the remand process to parse the records necessary to confirm an entitlement to any specific relief.

Indeed, the impracticability of a joinder approach is laid bare by the "voluntary" discharge "category" that the Court has identified in its Remand Order. (ECF 57 at 4). In that Order, the Court directs the Coast Guard to "maintain a file of any administrative claims submitted from this putative subclass and include the data in its final report," for any Coast Guards members who, like plaintiffs Christopher S. Musgrave and Aaron Gutierrez, "voluntarily" separated. The purpose of this file is presumably to allow such members to appeal this Court's finding of voluntariness which is predicated on the Court's conclusion that there was no "coercion" leading up to such members' discharges. (ECF 36 at 23 n. 41). Yet, by virtue of that finding, the Court ruled that such Coast Guard members have "forfeited their rights to seek legal redress in this Court." (ECF 57 at 4). Thus, allowing such members to "join" as plaintiffs in this action, presumably under RCFC 20, is untenable in that there is no jurisdiction for the Court to justify such joinder in the first instance. By using the class vehicle, however, the Court can segregate such members who choose to "opt-in" into the Voluntary Subclass and permit an appeal by the two affected named Plaintiffs to vindicate any such rights such subclass members might have should that ultimately become necessary. *Cf. Devlin v. Scardelletti,* 122 S. Ct. 2005, 2010, 536

U.S. 1, 9 (U.S.,2002) (recognizing non-named class members are generally not considered parties to the action but are nevertheless bound by any judgment).

### B.    There Are Ample Common Questions of Law and Fact to Justify Class Certification.

The next prerequisite to class certification is that "there are questions of law or fact common to the class," RCFC 23(a)(2), which is satisfied if there is "at least one core legal question common to all proposed members that "is likely to have one common defense." *Fisher v. U.S.*, 69 Fed. Cl. 193, 199 (2006). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test [for FRCP 23] is met when there is 'at least one issue whose resolution will affect all or a significant number of the putative class members.'" *King v. U.S.*, 84 Fed. Cl. 120, 125-126 (2008) (citing *Forbush v. J.C. Penny Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993)). The threshold for "commonality" under RCFC 23(a)(2) is not high. *Fisher*, 69 Fed. Cl. at 199-200. To satisfy RCFC 23(a)(2), "the questions underlying the claims of the class merely must share essential characteristics, so that their resolution will advance the overall case." *Barnes*, 68 Fed. Cl. at 496 (citation omitted). In cases interpreting FRCP 23, at least, courts often state that common questions are ones that "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 349, 131 S. Ct. 2541 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The Court's ruling on the Parties' cross-motions for judgment on the administrative record clearly demonstrates there are numerous common answers to questions of law and fact supporting class certification. The Court's finding that the Coast Guard violated 10 USC § 1107a through a "misguided effort to conflate the biosimilarity

of the EUA and FDA-approved vaccines with the informed consent legal requirements of § 1107a" identifies and resolves a central legal question present in every Class and Subclass member's backpay claim in this Court. (ECF 36 at 17). Similarly, the Court's factual and legal findings with respect to the Coast Guard's stated policy of addressing religious accommodation requests versus its actual "Mad Libs® fill-in-the-blank approach to processing—and summarily denying—religious accommodation requests," identifies and resolves a central legal question present in every Exemption Requested Subclass member's claims based upon violations of RFRA. The Court's acceptance of the Coast Guard's defense that subsequent "convenience of the government" discharges provided a separately justifiable basis for separations based upon "vaccination status" resolves in one fell swoop the question of whether any Class or Subclass Member can assert a claim for backpay absent having first requested some kind of administrative exemption to the COVID-19 Vaccine Mandate. In short, the Court's MJAR Order is replete with legal conclusions and factual findings that have general applicability to every Class and Subclass member's claims, thereby meeting the commonality requirement of Rule RCFC 23(a)(2).

### C. Plaintiffs' Claims Are Typical of Those of Proposed Class and Subclass Members.

Under RCFC 23(a)(3), the claims of the representative parties must be "typical of the claims or defenses of the class." "Typical does not mean identical, and a finding of commonality leads to one of typicality." *Curry*, 81 Fed. Cl. at 335 (internal citations omitted). Even if there are factual differences between the claims of the named representatives and the claims of the class, typicality exists if the named representatives' claims share the same essential characteristics as the claims of the class. *See Fisher*, 69

Fed. Cl. at 200. "Courts 'have found typicality if the claims or defenses of the representatives and the members of the class stem from . . . a unitary course of conduct, or if they are based on the same legal theory or remedial theory.'" *King,* 84 Fed. Cl. at 126 (quoting Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 1764 at 270-71 (3d. Edition 2005)). Like the threshold for commonality, the typicality threshold is "not high." *Id.*; *see also*, *Fisher*, 69 Fed. Cl. at 200; *Curry*, 81 Fed. Cl. at 335.

  This prong is readily satisfied as the claims of the Plaintiffs align with the claims of all Class and Subclass members and are all based upon the Coast Guard's unlawful implementation of its COVID-19 Vaccine Mandate. All Plaintiffs and Class members are seeking redress from this Court for monetary damages sustained by virtue of the Coast Guard violating § 1107a as set forth in their Third Cause of Action. The Court's findings in its MJAR Order with respect to how the Coast Guard violated Plaintiffs' § 1107a rights apply with equal force to all Class Members. The same conclusion follows with respect to the Court's findings in its MJAR Order relating to the Coast Guard's violation of Plaintiff's RFRA rights. The misconduct identified by the Court with respect to the Plaintiffs is the very same misconduct members of the Exemption Subclass will have suffered, as well. Lastly, the Court's disposition of the procedural violations set forth in Plaintiff's Second Cause of Action shows the Plaintiffs' claims are typical of Class and Subclass members, as well. For example, in commenting on the involuntary discharge of Mr. Harkins following his nineteen years of service with a pre-approved retirement date on the books, the Court noted that his case "exemplifies the perils of the one-size-fits-all approach adopted by the Coast Guard." ECF 36 at 22.

**D.    Plaintiffs and Their Counsel Meet the Adequacy Requirements of RCFC 23(a)(4).**

The adequacy requirement continues the class certification inquiry into whether "the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart*, 564 U.S. at 349, 131 S. Ct. 2541. RCFC 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Thus, a "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S. Ct. 2231 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977), and discussing FRCP 23(a)(4) specifically). The "adequacy inquiry" then has the purpose of "uncover[ing] conflicts of interest between named parties and the class they seek to represent." *Id.* (citing *Falcon,* 457 U.S. at 157–158, n.13, 102 S. Ct. 2364). Adequacy of representation is measured by two standards. *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). "First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir. 1968)); *see also In re Upstream Addicks & Barker (Texas) Flood-Control Reservoirs v. U.S.*, 157 Fed. Cl. 189, 200 (2021) ("Adequacy asks both whether proposed class counsel is qualified and capable of representing the class and whether conflicts exist between the putative class representatives and the remaining class members." (citing *Geneva Rock Prods., Inc. v. U.S.*, 100 Fed. Cl. 788, 790 (2011)).

To determine whether plaintiffs and the proposed class are free from conflicting interests, plaintiffs may simply allege as much in the pleadings. *See Curry*, 81 Fed. Cl. at

337. That is, representative parties will be found to fairly and adequately represent the interests of the class if counsel has experience litigating similarly complex class actions, if counsel will devote time and energy to the current litigation, and if the named plaintiffs are free from conflicts of interest with class members. To determine whether counsel will fairly and adequately represent the class, the Court considers 1) the work counsel has done to identify or investigate potential claims; 2) counsel's experience with class actions, complex litigation, and claims similar to those asserted in the action; 3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. RCFC 23(g)(1)(C)(1).

Here, there is no evidence that any named Plaintiff has a conflict of interest with Class or Subclass members. To the contrary, in opposing the Coast Guard's COVID-19 Vaccine Mandate despite the fusillade of threats and negative paperwork, Plaintiffs showed remarkable conviction which they now are carrying into the present action.

With respect to class counsel, the four attorneys seeking appointment are well qualified and will more than fairly and adequately represent the Class and Subclasses. Of course, the Court is already acquainted with Colonel Barry Steinberg (Ret.), currently a partner of the Washington, D.C., office of Kutak Rock LLP, who is a retired Army colonel with over 26 years of active duty, military legal experience in the U.S. Army's Judge Advocate General Corps, and over 34 years of experience in the private sector. At the time of his military retirement in 1989, he was the Army's first Chief of Environmental Law Division, an organization which he conceived and established while still at his post as Chief of the Army's Litigation Division at the Pentagon. He has also litigated, and won as certified class counsel, some of the more important recent cases in both this Court and the Federal Circuit, specifically regarding class harms to military members' civil rights.

26

*Berkley v. U.S.*, 287 F.3d 1076 (Fed. Cir. 2002); *Christensen v. U.S.*, 60 Fed. Cl. 19 (2004); *Baker v U.S.* (Fed. Cir. 1997); *Christian v. U.S.*, 337 F.3d 1338 (Fed. Cir. 2003).

Attorney Dale Saran is an attorney with over 22 years of litigation experience as an attorney in civil, criminal, military litigation and administrative/regulatory matters. He served as an active duty and Reserve military judge advocate, including as an instructor at the Naval Justice School teaching new Navy, Marine Corps, and Coast Guard judge advocates and paralegals, as well as senior officers at the Naval War College. Attorney Saran was previously general counsel for CrossFit, Inc., for 8.5 years, where he litigated or managed other firms in 58 separate cases in various jurisdictions around the world, including *inter alia* the EU, Finland, South Africa, and India.

Attorney Saran was among the earliest judge advocates to defend Navy and Marine Corps servicemembers facing criminal charges for challenging the DoD's anthrax vaccine immunization program in 1999. *See Ponder v. Stone*, 54 M.J. 613 (N.M.C.C.A. 2000); *U.S. v. Stonewall*, 54 M.J. 412 (C.A.A.F. 2001). One of those clients also testified before Congress. *See* "The Anthrax Vaccine Immunization Program: What Have We Learned?" Hearings Before the House Committee on Government Reform, Oct. 3 and 11, 2001, Serial No. 106-249. In addition, he worked on parts of the *Doe v. Rumsfeld* series of class action cases in the federal courts that challenged the legality of the DoD's and FDA's actions to forcibly inoculate servicemembers with an unlicensed product. *See John Doe #1 v. Rumsfeld*, 297 F. Supp. 2d 119, 135 (D.D.C. 2003); *John Doe #1 v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004), *modified sub nom.* 2005 WL 774857 (D.D.C. 2005); *John Doe #1 v. Rumsfeld,* 501 F. Supp. 2d 186 (D.D.C. 2007) (EAJA Opinion finding for Plaintiffs that the government's arguments were "not substantially justified" and awarding plaintiffs their attorney's fees.)

Of particular applicability to the present action, Attorney Saran was the lead trial counsel in the first case challenging the legality of the DoD's Covid-19 vaccine mandate. *Robert et al. v. Austin, et al*, 1:21-cv-2228-RM-STV (D. Co.). He was also lead counsel in a declaratory judgment action against the same mandate in *Wilson, et al v. Austin, et al*, 4:22-cv-438-ALM (N.D. Tx) (dismissed as moot after rescission of the Mandate), as well as in case on behalf of Coast Guardsmen to enjoin the Mandate because of its violations of both RFRA and the informed consent statute at issue in this case. *See Bazzrea v. Mayorkas*, 3:22-cv-00265 (S.D. Tex.) (dismissed as moot after rescission of the Mandate).

Attorney Brandon Johnson has over 20 years of experience with administrative, regulatory, civil and constitutional litigation before state and federal regulatory agencies and federal district and appellate courts with leading international law firms (Freshfield Bruckhaus Deringer, King & Spalding, Kirkland & Ellis, Gibson Dunn & Crutcher), as senior in-house counsel at Berkshire Hathaway Energy and general counsel to for start-up energy and medical technology companies, and as an attorney-advisor with the Federal Energy Regulatory Commission. From October 2021 until dismissed as moot in 2023 due to Congress' recission of the mandate, Attorney Johnson was lead counsel or co-counsel in several related individual and putative class actions filed in various U.S. District Courts making raising similar challenges to the Department of Defense's COVID-19 vaccine mandate under the First Amendment, the Religious Freedom Restoration Act, and the Administrative Procedure Act, including: *See Bazzrea v. Mayorkas*, 3:22-cv-00265 (S.D. Tex.) (putative class action for U.S. Coast Guard members); *Bongiovanni v. Austin*, 3:22-cv-580 (M.D. Fla.); *Coker v. Austin*, Case No. 3:21-cv-1211 (N.D. Fla.); *Davis v. Austin*, 3:22-cv-237 (M.D. Fla.); *Wilson v. Austin*, 4:22-cv-438 (E.D. Tex.) (putative

class action for members of the U.S. Air Force/Space Force, Army, Marine Corps and Navy).

Finally, Attorney J. Andrew Meyer has been an attorney for nearly 30 years focusing the last 20 years as a class action practitioner in state and federal courts around the country. Attorney Meyer been appointed by the court as counsel for plaintiffs in several nationwide consumer class action cases, including *DeHoyos v. Allstate Insurance Company*, Civil Action No. 5:01-1010 (Western District of Texas), *Healey v. Allianz Life Insurance Company*, Civil Action No. 2:05-8908 (Central District of California), and *Hill v. Countrywide*, Case No. A-0178441 (Texas 58th District Court, Jefferson County). He has been appointed as class counsel in the case *In re Black Farmers Discrimination Litigation*, Misc. No. 08-ML-0511-PLF (District Court for the District of Columbia), and served as co-lead counsel in an MDL case, *In re Collecto, Inc. Telephone Consumer Protection Act (TCPA) Litigation*, Case No. 14-md-2513-RGS (District Court for the District of Massachusetts). Mr. Meyer was also appointed as a member of the Plaintiffs' Steering Committee in the case of *In Re: Apple iPhone 3G and 3GS "MMS" Marketing and Sales Practices Litigation*, MDL No. 2116 (Eastern District of Louisiana). Attorney Meyer has also been involved with several civil rights class actions, including serving as class counsel in the matter *In re Black Farmers Discrimination Litigation*, Case. No. 08-ML-0511-PLF (District Court for the District of Columbia), a case resulting in a $1.2 billion settlement for farmers subjected to discrimination by the USDA. He also served as class counsel in *DeHoyos v. Allstate Corp.*, Case No. 01-CA-1010-FB (District Court for the Western District of Texas), a case involving a class of African-American and Hispanic insureds alleging racial discrimination in the underwriting of homeowners' insurance, and was appointed as class counsel in *Lea Family Partnership, Ltd. v. City of Temple*

29

*Terrace*, Case No. 8:16-cv-03463 (District Court for the Middle District of Florida) in which plaintiffs alleged that the City of Temple Terrace violated class members' constitutional rights through an unlawful rental housing inspection ordinance. He also worked alongside Attorney Johnson in representing a putative class of military chaplains challenging the DoD's vaccine mandate at issue in the present action in *Alvarado v. Austin*, Case No. 1:22-cv-00876 (District Court for the Eastern District of Virginia) and raising RFRA and First Amendment claims.

As detailed in their supporting declarations, these four attorneys seeking appointment as class counsel collectively have dedicated thousands of hours to identifying and investigating the claims raised in this action and two other actions pending in this Court asserting nearly similarly claims, *Botello v. United States*, No. 23-174C, and *Bassen v. United States*, No. 23-211C. If appointed these four attorneys will continue to zealously represent the named Plaintiffs along with Class and Subclass members and have the requisite experience and sufficient resources to do so.

## II.    PLAINTIFFS' PROPOSED CLASS AND TWO SUBCLASSES SATISFY ALL THE PREREQUISITES OF RCFC 23(B)(2) AND (B)(3).

RCFC 23(b)'s requirements are conjunctive, in contrast to Rule 23(b) of the Federal Rule of Civil Procedure, and thus to warrant class certification, Plaintiffs must meet the elements of both 23(b)(2) and 23(b)(3). Here, the pleadings and the evidence before the Court are more than sufficient to establish both.

### A.    The Prerequisites of RCFC 23(b)(2) Are Met.

Rule 23(b)(2), the United States must have "acted or refused to act on grounds generally applicable to the class." RCFC 23(b)(2). This requirement can be met when there is a system-wide practice, or refusal, to pay that is generally applicable, or affecting,

the entire proposed class. *See Filosa*, 70 Fed. Cl. at 610; *see also, King,* 84 Fed. Cl. at 126 ("Here, the claim is that the United States has refused to pay FBI police officers in accordance with 28 U.S.C. § 540C . . . The alleged refusal to act applies to the entire potential class of plaintiffs.").

As detailed above in the discussion regarding the commonality requirement, the Court has already found that the Coast Guard engaged in systemic practices giving rise to Plaintiffs' and Class Members' backpay claims in this Court. In particular, the Court has found that the COVID-19 Vaccine Mandate was a top-down directive applicable to everyone and implemented by a "substantively identical order from a duly authorized Coast Guard Officer in Charge." MJAR Order at 14-15 (emphasis in original). The Court ruled the Coast Guard applied a "misguided" justification for requiring Plaintiffs and Class Members to take EUA product instead of a fully licensed, FDA approved vaccine, based upon a legally unsupportable medical equivalence theory uniformly applied to everyone.

Ultimately, the Court rejected Plaintiffs' 10 USC § 1107a claims, but in so doing the Court relied upon a Coast Guard practice generally applicable to Plaintiffs and the Class. Specifically, the Court noted the Coast Guard' employed a generally applicable policy of completing Separation Authorization Forms for Plaintiffs and Class Members with the basis for separation being "Convenience of the Government" due to "Unavailability for World Wide Assignment" by virtue of their "immunization status." *Id.* at 18. Despite its misgivings, the Court accepted this practice at face value, divorcing "immunization status" from an insistence on only taking a fully licensed, FDA approved COVID-19 vaccine as countenanced by 10 USC § 1107a. In any event, the Court allowed Plaintiff's involuntary discharges to stand despite finding the Coast Guard fundamentally failed to

comply with § 1107a. Yet, by doing so, the Court accepted a defense to Plaintiffs' and Class members' claims that arose from a uniform and systemic practice "generally applicable to the class."

Lastly, the Court found that the Coast Guard systemically "failed to properly evaluate religious accommodation requests," by refusing to examine the sincerity of any service member's religious beliefs but instead crediting those beliefs at the same time as it universally denied all such requests. *Id.* at 21. The Court found that "the Coast Guard's preordained outcome of religious accommodation request processing "improperly assessed the burden to the group as a whole rather than any individual" in a process that was "quite plausibl[y] . . . a ruse" and "just 'theater," as well as cruel. *Id. (citing Navy Seal 1 v. Biden*, 574 F. Supp. 3d 1124, 1144 (M.D. Fla. 2021); *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338, 1354 (M.D. Ga. 2022)).

All of the above findings represent instances where the Coast Guard acted or refused to act on grounds generally applicable to the proposed Class and Subclasses. Thus, the requirement of RCFC 23(b)(2) is satisfied.

### B.    Plaintiffs Proposed Class and Subclasses Meet the Requirements of RCFC 23(b)(3).

#### 1.    Common Questions of Law and Fact Predominate Over Questions Affecting Individual Class and Subclass Members.

RCFC 23(b)(3) requires that the "questions of law or fact common to class members predominate over any questions affecting individual members." The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "[F]actual variation among the class grievances is acceptable as long as 'a common nucleus of operative fact' exists." *Curry*, 81 Fed. Cl. at 334. Although

predominance has occasionally been confused with RCFC 23(a)(1)'s commonality requirement, *see, e.g.*, *Geneva Rock*, 100 Fed. Cl. at 788; *see also Wal-Mart*, 564 U.S. at 359, 131 S. Ct. 2541, predominance is "far more demanding." *Bauer*, 176 Fed. Cl. at 256 (citing *Oztimurlenk*, 162 Fed. Cl. at 692). For common issues to predominate, plaintiffs must show "whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from class member to class member." *Id.* at 692 (quoting *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156–57 (8th Cir. 2017)). If the common question requires a "detailed, highly individualized inquiry" in order to answer it for each plaintiff, then the predominance requirement is unmet and class certification is not appropriate. *Id.* (quotes omitted).

With respect to Plaintiffs' and Class Members' § 1107a claim set forth in their Third Cause of Action, the Court's findings contained within the MJAR Order show that not only do common issues predominate, but those common issues control the disposition of the claim entirely, at least for those Class members ultimately discharged for the "Convenience of the Government." As detailed throughout this memorandum, the Court has found that the Coast Guard's COVID-19 Vaccine Mandate was implemented force-wide through uniform implementing orders. The Court also found that the Coast Guard's implementation of the COVID-19 Vaccine Mandate was entirely illegal as it rested on a false equivalence between fully licensed, FDA approved vaccine and EUA product. Notwithstanding this flagrant violation of Coast Guard members' statutory rights, granted by Congress following a sordid history of the Government's use of service members as fodder for experimentation, the Court wholesale accepted the Coast Guard's subsequent administrative, "Convenience of the Government" discharges based on vaccination status for the same exact unlicensed product that it has said members had a right to refuse not

to take. *Supra*. p. 31. Thus, the Court found, through the resolution of these common issues of law and fact, that Plaintiffs and the Class alike had suffered a violation of their informed consent rights under § 1107a, but at same time had no right to recovery.

In a similar vein, the Court's MJAR and Remand Orders both illustrate that common issues predominate with respect to Plaintiffs' and Subclass Members' RFRA claims set forth in their Fourth Cause of Action. In its MJAR Order, the Court determined that the Coast Guard had a uniform policy to deny all Religious Accommodation Requests and did so through the use of form templates and documents. *Supra*. p. 22 and ECF 36 at 21. This finding alone establishes a *prima facie* case under RFRA for Plaintiffs and Subclass Members. Nevertheless, the Court posited the question of whether the Coast Guard would have granted any specific Coast Guard member's Religious Accommodation Request had it undertaken a proper, "to the person," inquiry, and subsequently entered a Remand Order directing that the Coast Guard "redo" this analysis under the Court's supervision. (ECF 57 at 2-3.) Yet, the Court's finding that the named plaintiffs are entitled to such a re-adjudication applies with equal force to any Subclass member. Said differently, by deciding that Plaintiffs should have their RARs reevaluated, the Court effectively ruled that all Subclass members should have their RARs reevaluated, as well. Again, this threshold finding not only predominates but it controls the disposition of this claim for Plaintiffs and Subclass members alike. For these reasons, the Court should find the predominance requirement of RCFC 23(b)(3) has been met.

### 2.    Superiority

A class action must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3). Under FRCP 23, the "superiority requirement" is met when "a class action would achieve economies of time, effort, and

expenses, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Barnes*, 68 Fed. Cl. at 499 (quoting FED. R.CIV.P 23 Advisory Comm. Note (1966 amendment, subdivision (b)(3))); *see also*, *Amchem Prods., Inc.*, 521 U.S. at 617; *Quinault Allottee Ass'n v. United States*, 197 Ct. Cl. 134, 140-41 (Ct. Cl. Jan. 21, 1972). Similarly, under RCFC 23, "the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action." *Barnes*, 68 Fed. Cl. at 499.

As discussed above in the analysis of RCFC 23(b)(1), the current *ad hoc* joinder approach the Court has adopted is untenable, at least as a legal proposition, for those who "voluntarily" separated. *See supra p. 20*. Indeed, in its Remand Order the Court essentially directs the Coast Guard to label and bin any Coast Guard member falling into this category, which is effectively akin to creating a subclass without using the name.

First, certifying a class under RCFC 23 is superior to a joinder approach because without a class there is no real temporal imperative to encourage affected members to file claims. As the Court has already experienced in establishing the remand process underway now, which is akin to a permissive joinder approach, the Court is only able to encourage participation but otherwise cannot establish a formal claim-in process with an enforceable time limit as it can under a class approach. Similarly, absent a class action, the Coast Guard must face the prospect of claims for the entirety of the normal six-year Tucker Act statute of limitations. Of course, an opt-in class action cannot cut short this six-year statute, but an RCFC 23 approach can create a specific opt-in time frame to

compress claims into a limited period, allowing for speedier recoveries while limiting the duration of the administrative burden on the Coast Guard in processing claims.

Class treatment of the present action is superior to individual actions and the current remand process in that RCFC 23 requires the Court to appoint counsel for the class ("Class Counsel"). By having Class Counsel appointed, all Class Members will then have the benefit of legal counsel when determining whether they should opt-in. Indeed, having Class Counsel available to provide legal advice to affected Coast Guard members is no small benefit, as typically military backpay cases are filed pro-se or handled by a relatively small cohort of qualified members of the bar of the Court of Federal Claims. Much like in consumer class actions where the relatively small dollar recoveries at issue make class treatment a superior option to individual litigation, here the highly technical nature of the claims and the specialized body of law applicable means that class treatment, with concomitant appointment of class counsel, weighs heavily in support of certification.

Similarly, by appointing class counsel, the Court and the Coast Guard are better insulated from non-meritorious pro-se filings. Also, Class Counsel will be duty-bound to notify Class Members and advise clients about the need to file a claim within whatever opt-in period the Court imposes as well as within the various time limitations applicable to Tucker Act claims or Board review. Class Counsel can assist Coast Guard members in preparing their specific cases for Coast Guard or Board consideration on remand and then evaluating whether the outcome warrants seeking further review by this Court.

Finally, Class treatment is also superior to the current joinder process because, as described below, the notice requirements of RCFC 23 are more fulsome than what has been provided to the Class under the Court's current Remand Order. While the Court directed that notice be sent by certified and electronic mail, the relatively low response

rate most recently reported by the Coast Guard strongly suggests that having Class Counsel involved with notice would be superior to the current process.

## III.    NOTICE UNDER RULE 23

Should the Court certify the Class and Subclasses as requested by Plaintiffs, RCFC 23(c)(2)(B) directs that the Court "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." RCFC 23(c)(2)(B) further provides that such notice may be by "United States mail, electronic means, or other appropriate means," and delineates a list of information that must be included and "clearly and concisely state in plain, easily understood language." Cases interpreting FRCP 23(c) generally recognize that notice mailed directly to class members constitutes best notice practicable under the circumstances, as was directed by the Court in its Remand Order. Nevertheless, absent formal class certification and the applicability of RCFC 23(c) the Court, and more importantly putative class counsel, have no guideposts for what additional notice efforts may be necessary to effectively apprise absent class members of the action and their need to opt-in to preserve their rights. Instead, by appointing Class Counsel, and empowering and incentivizing them to engage a class action notice expert, the Court can use the RCFC 23(c)(2) lens to evaluate notice, its reach and effectiveness, and the potential need for other forms of notice, whether written in more accessible language or delivered through alternative means more likely to reach putative Class and Subclass members. *See, e.g., Hill v. Canidae Corp.*, 2021 WL 12310804, at *4 (C.D. Cal. Sept. 28, 2021) (describing extensive notice program designed to reach over 24 million consumers); *Simerlein v. Toyota Motor Corp.*, 2019 WL 2417404, at *10 (D. Conn. June 10, 2019) (outlining notice program including toll free number, website, and updated mailing addresses); *DeHoyos*

*v. Allstate Corp.*, 240 F.R.D. 269, 297 (W.D. Tex. 2007) (describing notice program as based on "a scientific methodology which is used throughout the advertising industry and which has been routinely embraced routinely by the Courts").

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully request the Court to certify the Class and Subclasses defined herein under the authority of RCFC 23, appoint named Plaintiffs as Class and Subclass representatives, and appoint the undersigned as counsel for the Class and Subclasses.

July 9, 2025                     Respectfully submitted,

*/s/ Dale Saran*
Dale Saran, Esq.
19744 W. 116th Terr.
Olathe, KS 66061
Tel. (727) 709-7668
dale.saran@militarybackpay.com

*/s/ Barry Steinberg*
Barry Steinberg, Esq.
Kutak Rock LLP
1625 Eye Street, NW, Suite 800
Washington, DC 20006-4099
Tel. (202) 828-2316
barry.steinberg@kutakrock.com

*/s/ J. Andrew Meyer*
J. Andrew Meyer, Esq.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
a.meyer@militarybackpay.com

*/s/ Brandon Johnson*
Brandon Johnson, Esq.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
brandon.johnson@militarybackpay.com

## **CERTIFICATE OF SERVICE**

This is to certify that on this 9th day of July 2025, the foregoing document was e-filed using the CM/ECF system.

*/s/ Dale Saran*