**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **CHRISTOPHER HARKINS, SHANE NOLAN, MARK BYRD, AARON GUTIERREZ, CHRISTOPHER MUSGRAVE, and MATTHEW POWERS, and Listed Additional Members,**<br>***Plaintiffs*,**<br>**v.**<br>**THE UNITED STATES OF AMERICA,**<br>***Defendant*.** | **Case No. 23-1238 C**<br>**Hon. Armando Bonilla** |

**SECOND AMENDED COMPLAINT**

Plaintiffs Christopher Harkins, *et al.*, on behalf of themselves and a group of similarly situated persons, bring this action against Defendant United States of America (the "Government") and allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon reasonable information and belief, including investigation conducted by their attorneys.

**NATURE OF THE CLAIMS**

1. Plaintiffs file this Second Amended Complaint (the "Complaint") pursuant to the Court's August 5, 2026 Order lifting the stay and granting in part Plaintiffs' Motion for Joinder (ECF 108, 109), which authorized Plaintiffs to join these 219 additional current and former Coast Guard members identified in Exhibit 1 hereto and to add claims arising from the April 16, 2026 settlement in *Jackson v. Mullin*, No. 4:22-cv-00825-P (N.D. Tex.) (the "*Jackson* Settlement"). ECF 103-1.

2. This Complaint joins those additional Plaintiffs ("Joined Plaintiffs"), adds a claim to enforce the *Jackson* settlement, removes the count previously dismissed by the Court, and streamlines and updates the factual and procedural allegations. *See infra* Section IV.

3. This is a Military Pay Act "mass" action for backpay and other ancillary relief for members of the United States Coast Guard ("Coast Guard"), in the regular or reserve components, who were wrongfully denied pay by virtue of being discharged, constructively discharged, and/or separated, had orders curtailed, or dropped to inactive status, as a consequence of not being "fully vaccinated" pursuant to Department of Defense ("DoD") Secretary Lloyd Austin, III's August 24, 2021 COVID-19 vaccine mandate, ECF 1-2, and the Coast Guard's August 26, 2021 ALCOAST Message 305/21 implementing the mandate, ECF 1-3 (collectively, the "Mandate").

4. On December 23, 2022, the Mandate was "rescind[ed]" by act of Congress by Section 525 of the Fiscal Year 2023 National Defense Authorization Act (the "2023 NDAA").

5. On January 10, 2023, Secretary Austin issued a memorandum rescinding the August 24, 2021 Mandate. ECF 1-4, Jan. 10, 2023 Rescission Memo. In the Rescission Memo, Secretary Austin committed to correct military records and adverse personnel actions resulting from non-compliance with the now-rescinded Mandate and orders issued pursuant to it.

6. On January 11, 2023, the Coast Guard rescinded the Coast Guard Mandate "[i]n alignment with the DoD." ECF 1-5, ALCOAST 012/23, ¶ 1.

7. Each Plaintiff has a claim to Backpay either under 37 U.S.C. § 204 or § 206 for wrongful discharge, constructive discharge, separation, curtailment of orders, involuntary transfer to inactive status, and/or denial of pay and benefits, because the DoD and Coast Guard unlawfully mandated Emergency Use Authorization ("EUA") only products in violation of Congress' explicit statutory prohibition in 10 U.S.C §1107a.

8. Further, compliance with the Mandate was also impossible on its own terms because the DoD and Coast Guard did not have any products licensed by the Food and Drug Administration ("FDA") (*i.e.*, COMIRNATY® and SPIKEVAX®) while the Mandate was in effect. *See infra* Section II.

9. The named Plaintiffs and (most) Joined Plaintiffs also have a claim to Backpay under the Military Pay Act for violation of the Religious Freedom Restoration Act ("RFRA"), the First Amendment's Free Exercise Clause, DoD Instruction 1300.17, and the Coast Guard's implementing regulation, COMDTINST 1000.15.

10. The named Plaintiffs and Joined Plaintiffs also have a cause of action under the *Jackson* settlement agreement and ALCOAST 126/26, ECF 103-2, which is one of requirements that the Coast Guard agreed to issue to implement that agreement. *See infra* Section III.

11. The Government also turned some of these Coast Guard Members into debtors by virtue of its own illegal actions, including recoupment of enlistment bonuses, post-9/11 GI Bill benefits, the costs of training and tuition at military schools or academies and public and private universities, other allowances or special pays, such as separation pay or travel allowances, to which they were entitled by law.

12. These recoupments and exactions lacked any lawful basis in the first instance, but once the Mandate was rescinded and repudiated, the affected Plaintiffs become thereby entitled to restitution of the amounts taken, and cancellation of any related indebtedness as part of their relief sought herein.

## **PROCEDURAL HISTORY**

13. This action has been pending before this Court since 2023, and the Court has already resolved the core questions of liability in Plaintiffs' favor. On February 16,

2024, the Court dismissed the count premised on Section 525 of the FY2023 NDAA—holding that Section 525 is not a money-mandating source—and dismissed the illegal-exaction count, while sustaining the Military Pay Act claims based on violations of 10 U.S.C. § 1107a and RFRA and permitting the records-correction allegations to proceed as ancillary relief. ECF 13 at 1-2.

14. On January 23, 2025, following cross-motions for judgment on the administrative record, the Court held that the Coast Guard violated 10 U.S.C. § 1107a by mandating an emergency-use vaccine without the required Presidential informed-consent waiver, and violated RFRA by denying religious accommodation requests without the least-restrictive-means, "to the person" analysis RFRA requires, and confirmed that jurisdiction over Plaintiffs' pay claims rests on the Military Pay Act, 37 U.S.C. § 204. ECF 36 at 14-22 (reported as *Harkins v. United States*, 174 Fed. Cl. 592 (2025)). Those liability determinations are the law of the case.

15. The Court remanded the named Plaintiffs' claims to the Coast Guard for individualized review, ECF 57, and later denied class certification—concluding that the individualized, "to the person" RFRA inquiry defeated the prerequisites of RCFC 23 and that permissive joinder was the preferable path. ECF 81 at 6-13.

16. The Coast Guard acknowledged that the four named Plaintiffs whose claims it reviewed are owed relief. In status reports filed in July 11 and 18, 2025, the Government represented that Plaintiffs Byrd and Nolan were included in a group application to the Coast Guard BCMR and would be awarded backpay, benefits, and bonuses following a constructive-service order, and that it had determined to award Plaintiffs Powers and Harkins constructive service credit. ECF 70 & 71.

17. On February 12, 2026, the Coast Guard Board granted that group application, awarding relief to 56 members—including approximately 24 of the Joined Plaintiffs, together with named Plaintiffs Byrd and Nolan—consisting of retroactive reinstatement, constructive service credit, and backpay.

18. After 16 months, however, this remand process had still produced no individualized decision, records correction, proposed payment estimate, or actual payment for any of the represented Plaintiffs. ECF 103 at 6.

19. This procedural history frames the claims asserted here: the Complaint carries forward the sustained § 1107a and RFRA theories and the Military Pay Act money-mandating anchor, omits the dismissed Section 525, and adds a claim to enforce the *Jackson v. Mullin* settlement.

20. In addition, the Complaint joins the additional Plaintiffs by permissive joinder under RCFC 20, consistent with the model this Court applied in *Wolfing v. United States*, 163 Fed. Cl. 135 (2022), and 144 Fed. Cl. 516 (2019), for a court-supervised remand to the Coast Guard Board for Correction of Military Records ("BCMR" or "Board") to correct records and compute the relief the Court's rulings require.

## JURISDICTION AND VENUE

21. This Court has jurisdiction under the Tucker Act, 28 U.S.C. §1491(a). The Tucker Act provides, in relevant part:

> (1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.
>
> (2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such

judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

22. Plaintiffs' claims against Defendant are founded upon the following money-mandating sources of federal law, whether standing alone or read in conjunction with one or more of the following:

a. Military Pay Act, 37 U.S.C. §§ 201, *et seq.*, including 37 U.S.C. §§ 204 & 206;

b. Title 37, Chapter 5, Special and Incentive pays, 37 U.S.C. §§ 301, *et seq.*;

c. Allowances under Title 37, Chapter 7, such as Basic Allowance for Subsistence ("BAS"), Basic Allowance for Housing ("BAH"), Housing treatment for dependents undergoing a permanent change of station, etc., 37 U.S.C. §§ 402, *et seq.*;

d. Allowances under Title 37, Chapter 8, Travel and Transportation Allowances, 37 U.S.C. §§ 451, *et seq.*;

e. Military Retirement Pay statutes, including 14 U.S.C. § 2152 and 14 U.S.C. § 2306;

f. Separation Pay statutes, 10 U.S.C. § 1174 and 14 U.S.C. § 2146;

g. Sanctuary statute, 10 U.S.C. § 1176;

h. Medical and disability examination and retention statutes, including 14 U.S.C. § 2156 and 14 U.S.C. § 2513; and

i. Applicable service regulations where agency discretion has been exercised through the publication of rules and regulations governing such entitlements, such as *inter alia* the DoD Financial Management Regulation 7000.14-R (DoDFMR), and the Joint Federal Travel Regulations, Vols. 1 and 2 (JFTR).

23. Plaintiffs invoke this Court's ancillary equitable powers and 10 U.S.C. § 1552 to have their records appropriately corrected. Coast Guard members were removed from promotion lists after being selected, some were prohibited from competing on selection

boards, and almost all have some form of "bad paper" in their records that must in equity be removed, corrected, or suitable special boards convened for grade determinations.

24. Additionally, the selective application of remedies outside of this Court's purview, including the *Jackson* settlement terms, leaves non-Reinstating plaintiffs uncertain if the documentary evidence to prove their underlying claims has now been spoiled or destroyed by compliance with settlement terms that are being denied to them.

25. This Court also has independent Tucker Act jurisdiction for the Government's illegal exactions from Plaintiffs through the recoupment of enlistment bonuses under any of the entitlements for military members listed above; post-9/11 GI Bill benefits either used or transferred under the educational assistance eligibility statute, 38 U.S.C. §§ 3311, *et seq.*; costs of training and tuition at military schools or academies and public and private universities; and other benefits to which they were entitled by law.

26. The Military Pay Act and the other aforementioned federal statutes and regulations constitute an express waiver of the sovereign immunity of the United States of America and mandate compensation by the Government for damages sustained that create a cause of action and/or a substantive right to recover money damages against the Government.

27. This Court also has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), over Plaintiffs' claim to enforce the *Jackson* Settlement, ECF 103-1, and its implementing regulations and orders, as an express contract with the United States. A settlement agreement with the United States is a contract, and a suit to enforce it "is just that: a suit to enforce a contract with the government" over which this Court exercises Tucker Act jurisdiction. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011); *see also*

*VanDesande v. United States*, 673 F.3d 1342, 1347-49 (Fed. Cir. 2012); *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999).

28. In a contract case, the money-mandating requirement for Tucker Act jurisdiction "normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary," so no separate money-mandating statute need be identified. *Holmes*, 657 F.3d at 1314.

29. Where the amount in controversy exceeds $10,000, this Court is the exclusive forum for such a claim, and incorporation of a settlement into a court order does not divest the Court of that jurisdiction. *VanDesande*, 673 F.3d at 1347-49; *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994).

30. Plaintiffs are intended third-party beneficiaries of the Settlement Agreement with standing to enforce it against the United States.

31. Venue is proper in this Court pursuant to 28 U.S.C. §1491(a)(1).

## **PARTIES**

32. The named Plaintiffs are current and former Coast Guard members who were discharged, separated, or transferred to inactive status for their unvaccinated status after the imposition and enforcement of the COVID-19 Mandate, now openly acknowledged by the Coast Guard as having been "unlawful as implemented, unfair, overbroad, and an unnecessary burden, and that service members were unjustly discharged for refusing the vaccine." ECF 103-2, ALCOAST 126/26, § 1.

33. Because each named Plaintiff also previously sought a religious exemption from the COVID-19 vaccine requirement, each is a "Covered Service Member" and an intended third-party beneficiary of the *Jackson* Settlement and implementing regulations

and orders, entitled to records correction, constructive service, and backpay from the Coast Guard BCMR; each seeks relief as set forth below and in the Prayer for Relief.

34. Plaintiff Mark Byrd was a Marine Science Technician First Class (E-6) who enlisted on October 17, 2006 and had served more than seventeen years. He submitted a Religious Accommodation Request ("RAR") on September 22, 2021, which was denied on February 24, 2022, and his appeal was denied on May 18, 2022. After being ordered to receive a "fully FDA-approved" vaccine that was not available at any military clinic or pharmacy within a 50-mile radius, he received a negative Form 3307.

35. On October 28, 2022, with approximately seven months remaining on his enlistment, Plaintiff Byrd was involuntarily discharged with a negative RE-3 reenlistment code solely for his unvaccinated status, without separation pay; the discharge cost him his anticipated advancement to E-7 and delayed his retirement eligibility to June 2027. He returned to active duty on July 5, 2023 but was offered no backpay or records correction.

36. In its July 18, 2025 status report, the Government represented that Byrd was included in the group application to the Coast Guard BCMR and would be awarded backpay, benefits, and bonuses following a constructive-service-credit order. ECF 71. He still seeks backpay and other financial compensation for the lost pay, allowances, advancement, and retirement credit resulting from his discharge, together with correction of his records. ECF 18-3Byrd Decl. ¶¶ 9-10, 13-17, 24, 28, 30-31.

37. Plaintiff Aaron Gutierrez was a Petty Officer First Class (E-6) who enlisted in June 2006 and had served continuously for sixteen years and one month, most recently under a three-year contract running from September 2020 through September 2023. He submitted an RAR in October 2021, which was denied on or about February 14, 2022, and his appeal was denied on May 13, 2022.

38. On July 30, 2022, with approximately ten months remaining on his enlistment, Plaintiff Gutierrez separated with a negative RE-3 (JND) reenlistment code as a consequence of his unvaccinated status, without separation pay; he later received a VA disability rating of 80% without having been afforded a medical evaluation board. He returned to active-duty service and is currently serving on active duty in the Coast Guard. Because he sought a religious exemption, he is also a Covered Service Member under the *Jackson* Settlement and ALCOAST 126/26, and he entitled to relief from the Coast Guard BCMR independent of his other MPA claims. He seeks backpay and other financial compensation for his lost pay, allowances, and retirement opportunity, together with correction of his records. ECF 18-4, Gutierrez Decl. ¶¶ 3, 6, 9, 20-22.

39. Plaintiff Christopher Musgrave is a Boatswain's Mate First Class (E-6) who first enlisted in the Coast Guard in July 2007, separated to attend college from 2013 to 2017, and re-enlisted in December 2017. On August 9, 2021—weeks before the Mandate was announced—he re-enlisted for a further four-year term set to end in 2025. He submitted an RAR on October 10, 2021, which was denied on February 2, 2022, and his appeal was denied on May 27, 2022.

40. In the fall of 2022, with roughly twenty months remaining on his enlistment, Plaintiff Musgrave was separated with a negative RE-3 (JND) reenlistment code as a consequence of his unvaccinated status, without an out-processing physical, and without a DD-214 with a wife just weeks away from giving birth to their fourth child. At separation, the Coast Guard seized his final paycheck and applied it toward repayment of his reenlistment bonus, and required him to repay the balance of that already-paid bonus with interest and administrative fees, forcing him to take out a loan to do so. ECF 18-6, Musgrave Decl. ¶¶ 3-5, 13-14, 26-27, 30.

41. Plaintiff Christopher Harkins is an Operations Specialist First Class (OS1/E-6) who first enlisted on December 1, 2003, then most recently under a six-year contract running from March 2018 through March 2024. He reached his eighteen-year mark and entered "sanctuary" status on December 1, 2021, and held an approved retirement date of January 1, 2024. He submitted an RAR in October 2021, which was denied on February 1, 2022, and his appeal—which the Coast Guard failed to process until his commander resubmitted it—was denied on August 17, 2022.

42. On December 1, 2022, at exactly nineteen years of service and with 13 months to his approved retirement date, Plaintiff Harkins was involuntarily discharged with a negative RE-3 reenlistment code solely for his unvaccinated status, without separation pay, and not allowed to retire despite his sanctuary status. He was also forced to sell back 60 days of leave and forfeit an additional 14 days.

43. In its July 11, 2025 status report, the Government represented that the Coast Guard had determined to award Plaintiff Harkins constructive service from December 1, 2022 through his approved retirement date. ECF 70. He still seeks backpay and other financial compensation for his lost pay, allowances, and retirement, together with correction of his records. *See* ECF 18-5, Harkins Decl. ¶¶ 5-9, 13, 33, 35.

44. Plaintiff Shane Nolan is an Operations Specialist First Class (OS1/E-6) who enlisted in December 2005, most recently under a six-year contract running from June 2020 through June 2026. He submitted an RAR on October 13, 2021, which was denied on February 10, 2022, and his appeal was denied on May 6, 2022. Although he had been ceremonially advanced (frocked) to Chief (E-7) in April 2022 with an approved DOR of June 1, 2022, the Coast Guard rescinded that advancement and refused to pay him as an E-7 because of his unvaccinated status.

45. On November 15, 2022, after sixteen years and eleven months of service and with more than three years remaining on his contract, Plaintiff Nolan was involuntarily discharged as an E-6 with a negative RE-3 (JND) reenlistment code solely for his unvaccinated status, without separation pay; he was also required to sell back 39 days of leave. ECF 17 ¶ 289. He reenlisted on May 16, 2023 as an E-7, but the Coast Guard refused to backdate his rank to his original advancement date of June 1, 2022 or to provide any backpay or records correction.

46. In its July 18, 2025 status report, the Government represented that Nolan was included in the group application to the Coast Guard BCMR and would be awarded backpay, benefits, and bonuses following a constructive-service-credit order. ECF 71. He still seeks backpay and other financial compensation for his lost pay, allowances, and lost advancement to E-7, together with correction of his records. ECF 18-7, Nolan Decl. ¶¶ 3, 5-6, 14, 16-20, 26, 28.

47. Plaintiff Matthew Powers is an Operations Specialist First Class (OS1/E-6) who enlisted in 2011, most recently under a five-year contract running from July 24, 2021 through May 25, 2026. He submitted an RAR on October 25, 2021, which was denied on January 25, 2022, and his appeal was denied on May 31, 2022. On November 14, 2022, after eleven years and nine months of service and with approximately three years and six months remaining on his contract, Plaintiff Powers was involuntarily discharged with a negative RE-3 (JND) reenlistment code solely for his unvaccinated status, without separation pay; he later received a VA disability rating of 100%.

48. On November 13, 2022, the Coast Guard notified Plaintiff Powers that it was recouping his already-paid reenlistment bonus in the amount of $13,135.51, and on

November 15, 2022 it withheld his final paycheck of $4,503.59 without warning; his request for a waiver of that debt was denied.

49. In its July 11, 2025 status report, the Government represented that the Coast Guard had determined to award Plaintiff Powers constructive service from November 14, 2022 through June 19, 2023, the day he returned to work for the Coast Guard as a civilian employee. ECF 70. He still seeks backpay, the return of the recouped $13,135.51 bonus and the withheld $4,503.59 paycheck, and correction of his records. ECF 18-8, Powers Decl. ¶¶ 3-5, 9-10, 21, 23-24.

50. In addition to the named Plaintiffs, this Complaint joins the 219 additional current and former Coast Guard members identified in Attachment 1 (the "Joined Plaintiffs"), whom the Court authorized to be joined by its August 5, 2026 Order, ECF 109.

51. Each Joined Plaintiff is a current or former Coast Guard member who was, similarly to the above-named plaintiffs, either discharged, constructively discharged, involuntarily separated or retired, involuntarily transferred, or tour-curtailed to inactive status, due to their "unvaccinated status," which is to say their non-compliance with the illegal and impossible Mandate, and who as a result lost pay, benefits, retirement points, training, promotion, or other emoluments to which he or she was entitled by law.

52. Because the *Jackson* Settlement, and ALCOAST 126/26, declare that the Mandate was "unlawful as implemented," ECF 103-1 § 1 & ECF 103-2 § 1, and because the settlement requires DHS and the Coast Guard to adopt the same terms as the May 7, 2025 Guidance, each of the Joined Additional Plaintiffs have a claim for relief before the CG BCMR, even if he or she did not file an RAR or were previously deemed to have "voluntarily" left the service during the Mandate.

53. Exhibit 1 sets forth, for each Joined Plaintiff and to the extent applicable, his or her full name, military rank, separation date, return-to-service date (if applicable), total years of service, the date the Plaintiff formally joined this action, and, for any terminated Plaintiff, the date and manner of termination.

54. The Joined Plaintiffs assert the same claims arising out of the same series of transactions and occurrences as the named Plaintiffs—the Coast Guard's unlawful Mandate and the resulting discharges, separations, denials of pay and benefits, and, for the vast majority of the joined plaintiffs, denials of their religious accommodations.

55. Their claims present questions of law and fact common to those of the named Plaintiffs. Joinder is therefore proper under RCFC 20(a), and each Joined Plaintiff's allegations satisfy the pleading requirements of RCFC 10, as demonstrated by the individualized information set forth in Exhibit 1 and prior rulings in the case.

56. Defendant is the United States of America (the "Government"), a sovereign entity and body politic. Defendant is responsible for the actions of its various agencies, including the DoD, the Department of Homeland Security ("DHS"), and the Coast Guard (collectively, "Defendant Agencies").

## STATEMENT OF FACTS

## I. THE COVID-19 VACCINE MANDATE: LEGAL BACKGROUND, ENFORCEMENT, AND RESCISSION

### A. Vaccine Mandates & Informed Consent of Service Members

57. In 2004, Congress enacted the emergency-use-authorization statute, 21 U.S.C. § 360bbb-3, as part of the Project BioShield Act. This came in the midst of litigation over the anthrax vaccine and a nation-wide injunction against the DoD and FDA in *Doe*

*v. Rumsfeld*, 297 F. Supp. 2d 119 (D.D.C. 2003). That litigation involved the DoD'S Anthrax Vaccine Mandate and applicable informed consent statute, 10 U.S.C. ¶1107.

58. The passage of the EUA statute (21 U.S.C. §360bbb-3) in 2004 led to the anthrax vaccine becoming the first ever EUA-vaccine, followed by the passage of a mirror informed consent statute as to EUA products, 10 U.S.C. § 1107a, which provides in pertinent part:

> (a) Waiver by the President — (1) In the case of the administration of a product authorized for emergency use under section 564 of the Federal Food, Drug, and Cosmetic Act to members of the armed forces, the condition described in section 564(e)(1)(A)(ii)(III) of such Act . . . designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a.

59. In 2008, the Department of Defense issued DoD Instruction (DoDI) 6200.02, incorporating all of this into its regulation governing the mandate of EUA products. The DoD instruction requires that there be an option for servicemembers to refuse an EUA product.

> E3.3 <u>Implementation of EUA</u>. DoD Components using medical products under an EUA shall comply with all requirements of section 564 of Reference (d), FDA requirements that are established as a condition of granting the EUA (except as provided in section E3.4 concerning a waiver of an option to refuse), guidance from the Secretary of the Army as Lead Component, and instructions from the ASD(HA).
>
> E3.4. <u>Request to the President to Waive an Option to Refuse</u>. In the event that an EUA granted by the Commissioner of Food and Drugs includes a condition that potential recipients are provided an option to refuse administration of the product, the President may, pursuant to section 1107a of Reference (e), waive the option to refuse for administration of the medical product to members of the armed forces. Such a waiver is allowed if the President determines, in writing, that providing to members of the armed forces an option to refuse is not in the interests of national security. Only

> the Secretary of Defense may ask the President to grant a waiver of an option to refuse.

DoDI 6200.02, *Application of Food and Drug Administration (FDA) Rules to Department of Defense Force Health Protection Programs*, ¶¶E3.3, 3.4 (Feb. 27, 2008).

60. August 9, 2021, Secretary of Defense Lloyd Austin III sent a Memorandum to the entire Department of Defense, explaining that based on "…consultations and on additional discussions with leaders of the White House COVID Task Force, I want you to know that I will seek the President's approval to make the vaccines mandatory no later than mid-September, or immediately upon the U.S. Food and Drug Administration (FDA) licensure, whichever comes first." See Ex. 2, Secretary of Defense Lloyd Austin III, *Message to the Force* (Aug. 9, 2021).

61. In context, Secretary Austin was invoking one of two dichotomous legal pathways for mandating (EUA) COVID-19 vaccines: either (a) asking for and obtaining a Presidential waiver of servicemembers' informed consent rights under 10 U.S.C. §1107a, OR (b) awaiting FDA approval for a *fully*-licensed vaccine to be added to the list of mandatory vaccines.

62. COMDTINST M6230.4G, a joint service publication administered by the Army (as AR 40-562), governs required military immunizations:

> This regulation applies to the Active Army, the Army National Guard/Army National Guard of the United States, and the U.S. Army Reserve, unless otherwise stated. It also applies to the following: uniformed Departments of the Navy, Air Force, and Coast Guard (including the active and reserve components); non-military persons under military jurisdiction; selected Federal employees…

63. Secretary Austin's August 24, 2021 Mandate Memorandum placed the COVID-19 vaccines on the required-vaccine list, and his January 10, 2023 Rescission Memo removed them, restoring the pre-Mandate list.

### B. The COVID-19 Vaccine Mandate Implementation

64. On August 24, 2021, the day after the FDA issued a single-day license for the first Covid-19 vaccine, COMIRNATY®, the Secretary of Defense directed the "Secretaries of the Military Departments" "to immediately begin full vaccination of all members of the Armed Forces … or in the Ready Reserve …, who are not fully vaccinated against COVID-19." ECF 1-2, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1.

65. Secretary Austin directed that mandatory vaccination "will only use COVID-19 vaccines that receive *full licensure from the Food and Drug Administration* (FDA), *in accordance with FDA labeling and guidance*." *Id.*

66. On August 26, 2021, the Coast Guard Commandant implemented Secretary Austin's August 24, 2021 directive in ALCOAST Message 305/21. ECF 1-3, ALCOAST 305/21, *Mandating COVID-19 Vaccination for Military Members* (Aug. 26, 2021).

67. In Section 736 of the National Defense Authorization Act for Fiscal Year 2022 ("FY2022 NDAA"), Congress prohibited the military from dishonorably discharging, or imposing anything less than a general discharge under honorable conditions, for non-compliance with the Mandate. Pub. L. 117-81 (Dec. 27, 2021), § 736, 135 Stat. 1541.

68. In Title 10 of the U.S. Code, the terms "armed forces" and "uniformed services" includes the Coast Guard. 10 U.S.C. § 101(a)(4) ("armed forces") and § 101(a)(5) ("uniformed services").

69. Defendant illegally discharged Coast Guard members without providing military counsel, including each Named Plaintiff, in violation of express requirements set forth in governing Coast Guard regulations and depriving them of rights protected by the Sixth Amendment of the U.S. Constitution. ECF17-5, COMDTINST M1000.4, Arts.

1.B.5.a.2, 1.B.13.j & 1.B.23.a; ECF 17-6, PCINST M1910.1, 1.C.1 & 2.D. Plaintiffs Byrd Harkins, Nolan, and Powers each expressly requested military counsel, and were each told that military counsel could not and would not assist.

70. Defendant illegally discharged Coast Guard members, including Plaintiffs, before their discharge certificate was ready for delivery, in violation of 10 U.S.C. § 1168. *See also* COMDTINST M1000.4, Arts. 1.B.33 & 1.B.34.

71. Defendant illegally discharged Coast Guard members, including each named Plaintiff and most Joined Plaintiffs, without providing a complete physical and medical examination prior to discharge, in violation of 10 U.S.C. § 1145 and 14 U.S.C. § 2313. Instead, Plaintiffs received at best a cursory interview with a military healthcare provider that failed to address any serious medical conditions that required treatment.

72. Defendant illegally discharged Coast Guard members, including each named Plaintiff and most Joined Plaintiffs, without providing benefits and services required by federal law and Coast Guard regulations, in violation of 10 U.S.C. §§ 1141-1155. *See generally* ECF 17-6, COMDTINST M1000.4, Ch. 1.B ("Separating Active-Duty Enlisted Members") & Ch. 1.C ("Retirement").

73. In the rush to illegally discharge Plaintiffs in 30 days or less, the Coast Guard failed to provide legally required vocational training and counseling on post-discharge benefits for Plaintiffs and their spouses, and in most cases failed to permit Plaintiffs to apply for VA benefits and, in conjunction with ¶ 55, to receive their VA disability ratings.

74. Defendant illegally discharged Coast Guard members who had completed at least six years but less than 20 years of service, including each Plaintiff with six or more years of service, without providing separation pay, in violation of 10 U.S.C. § 1174.

75. Defendant illegally discharged Coast Guard members who had completed 20 years of service, who were in "sanctuary" status, or who would have completed 20 years of service or entered sanctuary status at the expiration of their terms of service, including Plaintiffs Harkins and Nolan, without permitting them to request retirement or denying their approved retirement dates, in violation of 14 U.S.C. § 2306.

76. Defendant punished unvaccinated Coast Guard members through wrongful discharges that are categorized as "misconduct" that prevent reenlistment and significantly harmed their ability to seek future employment in the private or public sectors.

77. The President and Defendant Agencies punished unvaccinated Coast Guard members through the foregoing actions that, among other things, resulted in the loss or reduction of, or ineligibility for, earned retirement benefits, the post-9/11 GI Bill, VA benefits, healthcare benefits, and other governmental benefits to which they were or otherwise would have been entitled by law.

### C. Illegal Exactions from Service Members

78. Defendant used the above enumerated illegal punishments as the basis for additional, collateral consequences. As one example, service members who were discharged or dropped to an inactive status, were then subject to recoupment and indebtedness to the government for their "failure" (*i.e.*, inability due to unlawful discharge or transfer to inactive status) to complete the terms of the underlying service obligation.

79. Defendant sought recoupment of enlistment bonuses; denial of or recoupment of already paid or transferred post-9/11 GI Bill benefits, including the costs of training and tuition at military schools or academies and public and private universities; and denial of entitlements to special pays by removing unvaccinated

members from their normal occupational specialty, even while they had Religious Accommodation Requests or medical or administrative exemption requests pending.

**D. Congressional Rescission of Mandate & Post-Rescission Orders**

80. Roughly 8,500 active duty, uniformed service members were discharged for non-compliance with the Mandate, along with thousands of others serving in various statuses across Title 10, Title 14, and Title 32 Orders.

81. On December 23, 2022, President Biden signed into law the 2023 NDAA; Section 525 directed Secretary Austin to “rescind” the August 24, 2021 Mandate. Pub. L. No. 117-263 (Dec. 23, 2022), § 525, 136 Stat. 2395.

82. On January 10, 2023, Secretary Austin rescinded the August 24, 2021 Mandate. ECF 1-4, Jan. 10, 2023 Secretary Austin Rescission Memo.

83. In the Rescission Memo, Secretary Austin ordered that all separations and discharges resulting solely from non-compliance with the Mandate be halted and that all adverse personnel actions and paperwork be corrected. *Id.* at 1.

84. Secretary Austin further directed the Service Secretaries to cease adjudication of pending Religious Accommodation Requests and medical or administrative exemption requests. *Id.*

85. On January 11, 2023, the Coast Guard issued ALCOAST 012/23 that rescinds the Coast Guard Mandate “[i]n alignment with the DoD.” ECF 1-5, ALCOAST 012/23, ¶ 1.

86. On January 25, 2023, the Coast Guard issued additional guidance implementing the Coast Guard’s rescission of the Mandate. ECF 1-7, Compiled Coast Guard Orders and Guidance.

87. While the January 11, 2023 Coast Guard Rescission Memo formally rescinded the Mandate for Coast Guard members and stopped involuntary separations for non-compliance, the Coast Guard has not taken corrective actions to fully restore unvaccinated Coast Guard members who were discharged, separated, transferred to inactive status, and/or denied pay and benefits to the pre-Mandate status quo.

## II. THE MANDATE OF UNLICENSED EMERGENCY-USE PRODUCTS IN VIOLATION OF 10 U.S.C. § 1107A

### A. FDA Licensure and Interchangeability Determinations

88. In December 2020, after two months of testing, the FDA granted EUAs for COVID-19 vaccines developed by Pfizer-BioNTech and Moderna.

89. From this period through the August 24, 2021 Mandate, the EUA only COVID-19 vaccines were "voluntary" for members of the armed services.

90. On August 23, 2021, the FDA approved the Biologic License Application ("BLA") submitted by Pfizer and BioNTech for the original "Purple Cap" formulation of COMIRNATY®. *See* FDA, Aug. 23, 2021 Purple Cap COMIRNATY® BLA Approval Letter at 1-2, available at: https://www.fda.gov/media/151710/download.

91. Also on August 23, 2021, the FDA re-issued the EUA for the Pfizer COVID-19 vaccine. *See* ECF 1-10, Aug. 23, 2021 Pfizer/BioNTech EUA Re-Issuance Letter. This letter stated that the EUA for a different, "legally distinct" mRNA injectable would remain in place because the licensed product COMIRNATY was "not available... in sufficient quantities" for the eligible population. *Id.* at 5 n.9.

92. In fact, the Purple Cap COMIRNATY® COVID-19 vaccine licensed by the FDA was never manufactured or marketed in the United States because it could not physically have been outside of one single day. *See* Package Insert for COMIRNATY:

https://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=595377#section-13.[1] This is confirmed by Pfizer's own subsequent regulatory filing. *See* Sept. 13, 2021 Pfizer Announcement: https://dailymed.nlm.nih.gov/dailymed/dailymed-announcements-details.cfm?date=2021-09-13 (Pfizer notes that it did "not plan to produce any product with these new NDCs [*i.e.,* National Drug Codes 0069-1000 for Purple Cap COMIRNATY®] and labels over the next few months.").

93. The FDA-approved product labeling for Purple Cap COMIRNATY® lists the "Marketing Start Date" and "Marketing End Date" both as "23 Aug 2021." An FDA Biologic License (BLA) approval requires not only approval for the product, but also for the facility where it was manufactured, meaning that a licensed vaccine must come from an FDA licensed manufactured facility approved to produce specific lot numbers. Thus, if the manufacturing BLA expired on the same day to was granted, there could be no vaccine beyond whatever the one facility produced for the license approval.

94. The FDA's August 23, 2021 EUA Re-Issuance Letter also included a footnote:

> The licensed vaccine [COMIRNATY] has the same formulation as the EUA-authorized vaccine and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns. The products are legally distinct with certain differences that do not impact safety or effectiveness.

ECF 1-10 at 2 n.8. This footnote is significant because "interchangeability" is a statutorily

[1] The FDA-approved product labeling for Purple Cap COMIRNATY® lists the "Marketing Start Date" and "Marketing End Date" both as "23 Aug 2021." An FDA Biologic License (BLA) approval requires not only approval for the product, but also for the facility where it was manufactured, meaning that a licensed vaccine must come from an FDA licensed manufactured facility approved to produce specific LOT numbers. Thus, if the manufacturing BLA expired on the same day to was granted, there could be no vaccine beyond whatever the one facility produced for the license approval.

defined term in the Public Health Safety Act ("PHSA"). The PHSA requires the manufacturer to separately apply for, and receive, FDA approval to treat a product as interchangeable with another licensed product.

95. Neither the manufacturers (Pfizer and BioNTech) nor the FDA followed these statutorily mandated requirements to make an "interchangeability" finding or determination.

96. In other federal litigation, the Director the FDA's Center for Biologics Evaluation and Research, Dr. Peter Marks, acknowledged that the FDA did not make a statutory interchangeability determination. ECF 1-11, Oct. 21, 2022 Declaration of Peter Marks, M.D., Ph.D., ¶ 10.

97. On January 31, 2022, the FDA approved the BLA for Moderna's SPIKEVAX® COVID-19 vaccine. *See* FDA, Jan. 31, 2022 SPIKEVAX® BLA Approval Letter, available at: https://www.fda.gov/media/155815/download.

98. Also on January 31, 2022, the FDA re-issued the EUA for Moderna's unlicensed COVID-19 vaccine because the FDA-licensed product was not available in sufficient quantities. ECF 1-12, Jan. 31, 2022 Moderna EUA Re-Issuance Letter.

99. The Moderna EUA letter similarly acknowledged that the FDA-licensed SPIKEVAX® and EUA product were "legally distinct" and asserted that the unlicensed Moderna EUA COVID-19 vaccine "can be used interchangeably" with the FDA-licensed SPIKEVAX®. *See id.* at 3 n.9.

**B. Mandate of Unlicensed EUA Products**

100. Secretary Austin's August 24, 2021 Mandate Memo was issued one day after FDA approved Purple Cap COMIRNATY® and reissued the EUA for the unlicensed

Pfizer/BioNTech COVID-19 vaccine due to the unavailability of the only FDA-licensed product, Purple Cap COMIRNATY®.

101. Secretary Austin's memo stated that mandatory vaccination "will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA labeling and guidance." ECF 1-2, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1.

102. The DoD has consistently asserted that EUA vaccines may be mandated.

103. The DoD has admitted in related litigation that the DoD did not have any FDA-licensed COVID-19 vaccines when the August 24, 2021 Mandate Memo. *See Doe #1-#14 v. Austin,* 572 F.Supp.3d 1224, 1233-34 (N.D. Fla. 2021) (defense counsel for Defendant Agencies admitted in a November 3, 2021 hearing that the DoD and Armed Services were "mandating vaccines from EUA-labeled vials").

104. Because there was no COMINARTY® available, all DoD components and the Armed Service began using, and mandating, the unlicensed, EUA Pfizer/BioNTech COVID-19 vaccine based on the DoD interpretation of the FDA's Memoranda that the EUA vaccine and the FDA-licensed vaccine are "interchangeable" and therefore are "the same thing" – or close enough for DoD.

105. In a September 14, 2021 Memorandum, Assistant Secretary of Defense for Health Affairs, Terry Adirim, expressly relied on and quoted the FDA's footnote in directing all DoD components to treat the unlicensed, EUA version "as if" it were FDA-licensed. Asst. Sec. Adirim then went well beyond the FDA's guidance in asserting that the licensed and unlicensed products are legally interchangeable for the purposes of the Mandate.

> Per FDA guidance, these two vaccines are "interchangeable" and DoD health care providers should "use doses distributed under the EUA to administer the vaccination series as if the doses were the licensed vaccine.
>
> Consistent with FDA guidance, DoD health care providers will use both the Pfizer-BioNTech COVID-19 vaccine and the Comirnaty COVID-19 vaccine interchangeably for the purpose of vaccinating Service members in accordance with Secretary of Defense Memorandum.

ECF 1-13, Asst. Secretary of Defense Memorandum, *Mandatory Vaccination of Service Members Using the Pfizer-BioNTech COVID-19 and COMIRNATY COVID-19 Vaccines* at 1 (Sept. 14, 2021) ("Pfizer Interchangeability Directive").

106. On May 3, 2022, due to the unavailability of FDA-licensed SPIKEVAX®, the Assistant Secretary of Defense issued the same directive that EUA Moderna COVID-19 vaccines were to be used interchangeably with, and "as if," they were the FDA-licensed and labeled Moderna Spikevax vaccine. ECF 1-14, May 3, 2022 Asst. Secretary of Defense Memorandum, *Mandatory Vaccination of Service Members Using the Moderna and Spikevax Coronavirus Disease 2019 Vaccines* at 1 ("Moderna Interchangeability Directive").

107. Only the FDA has the statutory authority to make a determination of legal interchangeability, which the FDA has expressly disclaimed having done. *See supra* ¶ 96 & ECF 1-11, Marks Decl., ¶ 10.

108. The President acting as the Commander-in-Chief is statutorily prohibited from mandating unlicensed EUA products, absent an express national security authorization, by three separate and unequivocal acts of Congress. *See* 10 U.S.C. § 1107a, 42 U.S.C. § 262, and 21 U.S.C. § 360bbb-3.

109. The Assistant Secretary of Defense for Health Affairs is an inferior officer without any authority to change the status of an unlicensed, EUA biologic product to be

interchangeable with an FDA-licensed one, nor to make a determination that only the President is authorized to make by law on behalf of service members.

### C. There Were No "Commercially Available" Sources of FDA-Licensed Vaccines.

110. Every single dose of the Pfizer/BioNTech and Moderna vaccines, whether licensed or not, was purchased by Defendant pursuant to the exclusive contracts between the manufacturers, Pfizer and Moderna, and the DoD and Department of Health and Human Services ("HHS").

111. There were no alternative sources or distribution channels outside the DoD/HHS exclusive contracts. Any doses that may have been "commercially available" from third parties would have been downstream from the DoD/HHS distribution sources, such that the DoD and Coast Guard had exclusive control and knowledge regarding any "commercially available" supplies.

112. Plaintiff service members had no such knowledge and were entirely reliant on the Defendant for supply and administration of FDA-licensed vaccines.

### D. The FDA's Reauthorizations and 2025 Revocation of the EUA Confirm That Only an Unlicensed Product Was Available Throughout the Mandate.

113. The FDA issued the original Emergency Use Authorization for the Pfizer-BioNTech COVID-19 Vaccine on December 11, 2020, under section 564 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3, and thereafter reissued that EUA more than twenty times between December 11, 2020 and its revocation in 2025. By statutory definition, an EUA product is one that "is not approved, licensed, or cleared for commercial distribution." 21 U.S.C. § 360bbb-3(a)(2).

114. An EUA may issue "only if" the FDA finds that "there is no adequate, approved, and available alternative to the product," 21 U.S.C. § 360bbb-3(c)(3), and each reissuance of the Pfizer-BioNTech EUA repeated—in materially identical terms—the finding that "[t]here is no adequate, approved, and available alternative" to the product.

115. That finding is a formal, repeated acknowledgment by the United States that no FDA-licensed alternative was available by the only Official and Agency with the authority to make such a determination.

116. Although the FDA approved the COMIRNATY® Biologics License Application on August 23, 2021, it reissued the Pfizer-BioNTech EUA in its entirety that same day and provided that the EUA "will remain in place" because the licensed product was "not available" in sufficient quantities; the licensed "Purple Cap" COMIRNATY® product was never marketed or distributed in the United States.

117. On August 27, 2025, the FDA revoked the Pfizer-BioNTech EUA under section 564(g)(2). The FDA explained that revocation was appropriate because, as of July 9, 2025, an approved COVID-19 vaccine had become available as an alternative, and expressly stated that "safety concerns are not the basis for our decision to revoke the EUA." ECF 115-6.

118. This final EUA revocation confirms that for the entire Mandate period only an unlicensed EUA product—which service members had a statutory right to refuse—was available.

## III. THE UNITED STATES SYSTEMATICALLY VIOLATED SERVICE MEMBERS' RELIGIOUS LIBERTIES

### A. The Religious Freedom Restoration Act (RFRA)

119. RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

120. If the government substantially burdens a person's exercise of religion, it can do so only if it "demonstrates that application of the burden to the person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

121. The DoD has implemented RFRA through DoD Instruction 1300.17, *Religious Liberty in the Military Services* (Sept. 1, 2020).

122. The Coast Guard has implemented RFRA and DoDI 1300.17 through COMDTINST 1000.15, *Military Religious Accommodations* (Aug. 30, 2021). ECF 17-1.

### B. The Sham Religious Accommodation Process

123. Defendant punished and illegally discharged unvaccinated Coast Guard members, including each Plaintiff, through the systematic violations of the religious liberties protected by the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1.

124. The DoD and Armed Services implemented a process for religious accommodations that courts have described as a "sham," *Navy SEAL 1 v. Biden*, 574 F.Supp.3d 1124, 1139 (M.D. Fla. 2021), and a "quixotic quest" that amounts to little more than "theater." *Navy SEALs 1-26 v. Austin,* 578 F.Supp.3d 822, 826, 2022 WL 34443 (N.D. Tex. 2022).

125. Several district and appellate courts issued nation-wide injunctions, against three of the four Armed Services, finding a substantial likelihood of success on the merits for Plaintiff service members' RFRA claims. *See Navy SEALs 1-26 v. Austin*, 596 F.Supp.3d 767 (N.D. Tex. 2022) (Navy); *Doster v. Kendall*, No. 1:22-cv-84, 2022 WL 2974733 (S.D. Ohio July 27, 2022) (Air Force), *aff'd*, 54 F.4th 398 (6th Cir. 2022); *Colonel Fin. Mgmt. Officer v. Austin*, 622 F.Supp.3d 1187 (M.D. Fla. 2022) (Marine Corps); *see also Schelske v. Austin*, 649 F.Supp.3d 254 (N.D. Tex. Dec. 21, 2023) (injunction for individual Army soldiers and cadets).

126. The Armed Services denied something close to ninety-nine percent (99%) of Religious Accommodation Requests that were even adjudicated; many were simply ignored or not acted upon.

127. The true number likely approaches one hundred percent (100%) given that the small number of Religious Accommodations requests that were approved all appear to have been disguised administrative exemptions granted to service members on terminal leave in their final months of service.

**C. Coast Guard Digital Tools Used to Deny Plaintiffs' Requests**

128. The Coast Guard achieved high denial rates through the use of "Digital Tools" disclosed by Coast Guard whistleblowers to congressional committees. ECF 1-16, Oct. 18, 2022 Congressional Letter to Coast Guard Commandant Linda Fagan (including the Religious Accommodation Appeal Generator and Denial Template).

129. The Congressional Letter and whistleblower documents demonstrate the Coast Guard denied all, or nearly all, Religious Accommodation Requests and dismissed appeals "*en masse* with the help of computer-assisted technology, indicating that no case-by-case determinations were taking place." *Id.* at 2.

130. Defendant violated the religious liberties of each Plaintiff by requiring them to request religious accommodation through a sham process with a pre-determined denial using a computer-generated form letter.

131. Each named Plaintiff and most Joined Plaintiffs submitted a Religious Accommodation Request, which was denied. Each Plaintiff appealed the denial, which was also denied.

132. Each named Plaintiff's request and each Plaintiff's appeal was denied using a nearly identical, computer-generated form letter that did not address their religious objections, the requirements of their positions, proposed accommodations, or otherwise provide the "to the person" analysis required by RFRA.

133. Following the denial of their respective appeals, each named Plaintiff was ordered to receive the injection or else face further punishment followed by discharge and the deprivations of rights, procedures, pay, benefits, and services to which they were entitled by law as set forth below, despite the unavailability of any FDA-licensed vaccines and the consequent impossibility of compliance with the Secretary's Mandate, which required only FDA-licensed vaccines.

134. Plaintiffs suffered concrete, money-mandating, and in many cases irreparable career harms from the deprivation of religious liberties and the resulting unlawful discharges, constructive discharges, separations, curtailment of orders, transfers to inactive status and denial of pay and benefits.

## IV. THE *JACKSON* SETTLEMENT

135. On April 14, 2026, the United States entered into a settlement agreement resolving *Jackson v. Mullin*, No. 4:22-cv-00825-P (N.D. Tex.), ECF 103-1, a class action brought by Coast Guard members alleging that the denial of religious accommodations

from the COVID-19 vaccination mandate violated the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act. ECF 103-1.

136. The *Jackson* Settlement was executed by DoJ counsel on behalf of the Secretary of Homeland Security, in their official capacities, and the dismissal was filed under Fed. R. Civ. P. 41(a)(1)(A)(ii), with the Settlement Agreement attached.

137. On May 11, 2026, the Coast Guard issued ALCOAST 126/26, ECF 103-2, implementing the first ALCOAST required by Section 2.

138. Section 1 of ALCOAST 126/26 admits that the Mandate "was unlawful as implemented, unfair, overbroad, and an unnecessary burden, and that service members were unjustly discharged for refusing the vaccine," directs that "no Coast Guard member will be disadvantaged in promotions, advancements, assignments, or other opportunities based on COVID-19 vaccination status or a break in service resulting from the mandate," and confirms that all CG-3307 administrative remarks documenting COVID-19 vaccination decisions "have been removed." ECF 103-2 at 1.

139. The United States has not yet issued the Department of Homeland Security memorandum required by Section 8, ECF 103-1 at 7, and it has not directed the Coast Guard Board to exercise broad discretion in correcting the records of service members harmed by the Mandate.

> [A] memorandum matching, to the greatest extent possible, the Department of Defense memorandum dated May 7, 2025[.] Specifically, the memorandum will state that the vaccination mandate was unlawful as implemented and an unfair, overbroad, and completely unnecessary burden on service members. The memorandum will also direct the Board of Correction of Military Records of the Coast Guard to exercise broad discretion in providing appropriate corrections to the records of service members and former service members who suffered harms resulting from the COVID-19 vaccine requirement. Service members who requested a religious accommodation to the COVID-19 vaccine requirement shall

receive a decision and any necessary records corrections within the existing regulations and policies regarding timing of BCMR decisions.

140. That obligation remains unperformed, to the detriment of Plaintiffs as intended third-party beneficiaries.

## V. THE UNITED STATES HAS SINCE DISMANTLED THE LEGAL, REGULATORY, AND SCIENTIFIC BASIS FOR ANY COVID-19 VACCINE MANDATE.

141. Since 2025, the United States has repeatedly and formally admitted that the Covid-19 Mandate was unlawful and that the resulting separations were therefore unjust; these are admissions of the United States, the Defendant here, not of any individual agency, and they confirm the illegality of the conduct underlying Plaintiffs' claims.

142. On January 27, 2025, the President issued Executive Order 14184, "Reinstating Service Members Discharged Under the Military's COVID-19 Vaccination Mandate." Exec. Order No. 14184, 90 Fed. Reg. 8,761 (Jan. 27, 2025). The Executive Order declares that the Mandate was "an unfair, overbroad, and completely unnecessary burden" under which the military "unjustly discharged those who refused the vaccine," and it directed the reinstatement of members discharged under the Mandate.

143. In guidance dated May 7, 2025, the DoD conceded that the Mandate "was unlawful as implemented, and 'an unfair, overbroad, and completely unnecessary burden' on Service members," Ex. 3 at 1 (quoting Exec Order. 14184 § 1), and that requiring vaccination "without an adequate due process mechanism for vaccine accommodations was an injustice," *id.* at 3. The May 7, 2025 guidance further directed that "any present or former Service member who attests that they would have filed a request for exemption from the COVID-19 vaccine mandate were it not for the Department's very high rate of

disapproval of such requests shall be evaluated as if they had requested, and been denied, such an exemption." *Id.* at 4.

144. In its December 10, 2025 Guidance, the DoD directed the correction of records to "right the wrongs of the COVID-19 vaccine mandate," and it adopted a causation presumption under which a member who received multiple adverse actions or whose discharge documents cite multiple UCMJ violations "is considered to have been 'solely' separated due to refusal to be vaccinated" where the record demonstrates that all adverse actions were based solely upon the refusal to obey the order to be vaccinated. Ex. 4 at 1-2.

145. In guidance dated May 7, 2026, the DoD directed an expedited reinstatement program and recognized that the adverse actions "effectively ended the careers of Service members who would have otherwise continued to faithfully serve," that the Department "must not penalize those who separated under coercive conditions rather than await formal administrative or criminal action," and that "[w]e must recognize these specific circumstances for what they were: unjust discharges." Ex. 5 at 1.

146. These admissions also served as the template for the parallel admissions the United States made in settling *Jackson v. Mullin*, *see supra* Section IV, and in ALCOAST 126/26.

147. In May 2025, the FDA adopted a risk-based approval framework limiting approval of COVID-19 vaccines to adults sixty-five and older and to individuals with high-risk conditions, and requiring manufacturers to conduct placebo-controlled clinical trials demonstrating safety and efficacy in healthy individuals aged six months to sixty-four before any approval for that population. ECF 115-7.

148. HHS and the Centers for Disease Control and Prevention ("CDC") likewise acted to remove the COVID-19 vaccine from the recommended immunization schedule for healthy children and pregnant women, and to replace the blanket recommendation that healthy adults be vaccinated with a regime of individualized, "shared clinical decision-making."

149. These actions and admissions all establish that the United States has formally repudiated the Mandate as unlawful and the resulting separations as unjust, leaving no lawful basis for the denial of constructive service applied to the facts of each person's case along with the resultant pay, benefits, and records correction to each Plaintiff.

## VI. PROCEDURAL HISTORY OF THIS ACTION

150. Plaintiffs filed their initial Complaint on August 8, 2023. Defendant moved to dismiss under RCFC 12(b)(1) and 12(b)(6) (ECF 7), Plaintiffs opposed (ECF 8), and Defendant replied (ECF 11).

151. On February 16, 2024, the Court granted in part and denied in part the motion to dismiss (ECF 13). The Court dismissed the count premised on the FY2023 NDAA and the illegal-exaction count without prejudice under RCFC 12(b)(6), and denied the motion as to the counts under 10 U.S.C. § 1107a, RFRA, and 10 U.S.C. § 1552, permitting those to proceed. The Court set an amended-complaint deadline and a schedule for cross-motions for judgment on the administrative record.

152. Plaintiffs moved for judgment on the administrative record (ECF 26); Defendant responded and cross-moved to dismiss and for judgment on the administrative record (ECF 27); Plaintiffs replied (ECF 30); and Defendant replied in support of its cross-motion (ECF 33).

153. On January 23, 2025, the Court issued its decision on Plaintiffs' motion for judgment on the administrative record ("MJAR"). *Harkins v. United States*, 174 Fed. Cl. 592 (2025) (ECF 36). The Court held that the Coast Guard ordered an unlicensed emergency-use vaccine without the Presidential informed-consent waiver required by 10 U.S.C. § 1107a, and that the Coast Guard's uniform denial of religious accommodation requests, without the least-restrictive-means "to the person" analysis RFRA requires, violated RFRA. The Court ordered a remand as to the involuntarily separated plaintiffs and held that the plaintiffs it found to have voluntarily separated had forfeited their claims in this Court. The Court further directed the parties to file a joint status report addressing class certification and remand proceedings.

154. On January 30, 2025, the Court denied Defendant's motion to stay (ECF 42). In a February 13, 2025 joint status report (ECF 47), the Coast Guard identified 1,351 members who had submitted unsuccessful religious accommodation requests, 173 members granted administrative exemptions, 274 members removed from service, and 904 members who remained in service.

155. On March 13, 2025, the Court entered a remand order under RCFC 52.2 (ECF 57), directing the Coast Guard to send notice, a claim form, and the Court's January 23, 2025 decision to all identified current and former members, to conduct individualized reviews, and to complete the remand within 180 days, with proceedings stayed and status reports due every 60 days. Defendant thereafter filed a series of status reports and motions to extend the remand period (ECF 64, 70, 71, 79, 83, 85, 88, 91, 94, and 97).

156. In status reports filed on July 11 and July 18, 2025, the Government committed to relief for all four named Plaintiffs whose claims the Coast Guard reviewed. It reported that Plaintiffs Byrd and Nolan had been included in a group application to the

Coast Guard BCMR and that, following a constructive-service-credit order, the Coast Guard would "calculate and award backpay, benefits, bonuses, or other compensation." ECF 70; ECF 71. It further reported that the Coast Guard had determined to award Plaintiff Powers constructive service from November 14, 2022 through June 19, 2023, and Plaintiff Harkins constructive service from December 1, 2022 through his approved retirement date. ECF 70 & 71.

157. On July 9, 2025, Plaintiffs moved to certify a class and subclasses (ECF 69). On October 14, 2025, the Court denied class certification, concluding that the individualized "to the person" RFRA inquiry defeated predominance and superiority, and extended the remand period (ECF 81). The Court granted further extensions of the remand period (ECF 89), which is currently set to expire on September 9, 2026.

158. On February 12, 2026, the Coast Guard Board granted a group application that the Secretary of Homeland Security had submitted on behalf of members discharged solely for refusing the COVID-19 vaccine. ECF 103-5, Final Decision, BCMR Docket No. 2025-182 (Feb. 12, 2026). The Board awarded relief to 56 of the 59 members in the application—at least 24 of whom are among the Joined Plaintiffs, together with named Plaintiffs Byrd and Nolan—consisting of retroactive reinstatement effective on each member's discharge date, removal of the COVID-related discharge, constructive service credit establishing unbroken service, restoration of rank and seniority, and backpay calculated from that credit. The Coast Guard has thus formally determined that these members are due constructive service and backpay; but, as of the filing of this Complaint, it has produced no individualized findings, records-correction, or pay computation for any of them.

159. The military now presumes that COVID-related separations were involuntary, even where the record contains indications that a member separated voluntarily. The Department of Defense's May 7, 2025 guidance directs that any member who attests he would have sought an exemption but for the Department's near-uniform denials "shall be evaluated as if [he] had requested, and been denied, such an exemption." Ex. 3 at 4. The December 10, 2025 guidance adopts a causation presumption that a member subjected to adverse actions "is considered to have been 'solely' separated due to refusal to be vaccinated." Ex. 4 at 1-2. And the May 7, 2026 guidance recognizes that the Department "must not penalize those who separated under coercive conditions" and that such separations "were . . . unjust discharges." Ex. 5 at 1.

160. Consistent with these presumptions adopted to provide broad relief and eliminating or reducing procedural and evidentiary barriers to relief, an April 2026 advisory opinion recommended that the Board grant a member who had voluntarily separated because of the Mandate full relief—reinstatement, backpay, and constructive service—and change his discharge characterization "from voluntary to involuntary." ECF 103-6 at 3. That recommendation confirms that the voluntary/involuntary line the Government once drew has collapsed, and that Plaintiffs Gutierrez and Musgrave, as Covered Service Members who sought religious exemption, are entitled to the same relief.

161. Following the April 10, 2026 *Jackson* settlement and the May 11, 2026 issuance of ALCOAST 126/26, Plaintiffs' counsel reported at the June 23, 2026 status conference that proceeding "informally is not working so well for us," and the Court observed that the remand had "been going on for some 14 months" and stated that it was "a bit disappointed" in a delay "of the Coast Guard's own making." June 23, 2026 Hearing Tr. at 4, 20.

162. On July 7, 2026, the parties filed a joint status report (ECF 103) addressing the remand, the *Jackson* settlement, ALCOAST 126/26, the potential joinder of more than 200 additional members, the failure of the informal process, and the Government's stated position that it might pay represented members directly. That report confirmed that, fourteen months after the remand, "not a single Plaintiff has received an individualized decision, a records-correction estimate, a pay computation, or a dollar of relief." ECF 103 at 6. At the August 5, 2026 conference, counsel likewise reported that "[n]othing's been accomplished, no one's been paid," despite the Government's written promise, more than a year earlier, that the named Plaintiffs "were set and going to be paid." Aug. 5, 2026 Hearing Tr. at 17-18.

163. On August 3, 2026, Plaintiffs moved to lift the stay (ECF 107) and for joinder and a formal remand (ECF 108), seeking to join approximately 215 current and former Coast Guard members who had responded to the Court-approved notice and opted in through counsel, and asserting that the informal claim process had failed and that the United States had admitted the Mandate was unlawful as implemented.

164. On August 5, 2026, the Court lifted the stay and granted in part the motion for joinder (ECF 109), directing Plaintiffs to file this Third Amended Complaint on or before August 21, 2026 with a summary chart of all Plaintiffs, and authorizing Plaintiffs to add claims arising from the *Jackson* settlement. The Court directed the parties to file a joint status report on or before September 11, 2026, and kept in effect the remaining deadlines under the March 13, 2025 remand order, as amended, with the remand period set to expire on September 9, 2026.

## VII. JOINDER ALLEGATIONS

165. Plaintiffs and the Joined Plaintiffs comprise a group of current and former Coast Guard members (the "Wrongfully Discharged Group") who were discharged, separated, constructively discharged, or transferred to inactive status because of their unvaccinated status or non-compliance with the Mandate, and who as a result lost pay, benefits, retirement points, training, promotion, or other emoluments to which they were entitled by law.

166. A subset of that group—those who submitted a request for religious accommodation or exemption from the Mandate that was denied (the "Religious Accommodation Subgroup")—corresponds to the "Covered Service Members" who are intended third-party beneficiaries of the *Jackson* Settlement. Approximately 185 of the Joined Plaintiffs fall within the Religious Accommodation Subgroup.

167. On October 14, 2025, the Court denied Plaintiffs' motion to certify a class under RCFC 23, concluding that the individualized, "to the person" inquiry that RFRA requires defeated the commonality, typicality, general-applicability, predominance, and superiority requirements, and that permissive joinder is the preferable procedural vehicle. ECF 81 at 6-13. Plaintiffs accordingly do not seek class certification in this

Complaint and proceed instead by permissive joinder under RCFC 20, as the Court directed.

168. Joinder of the Joined Plaintiffs is proper under RCFC 20(a) because their claims arise out of the same series of transactions and occurrences as those of the named Plaintiffs—the same unlawful Mandate, the same emergency-use-vaccine conflation the Court held violated 10 U.S.C. § 1107a, the same systematic denial of religious accommodation the Court held violated RFRA, and the same failed remedial program—and present questions of law and fact common to all Plaintiffs.

169. The individualized information demonstrating each Joined Plaintiff's entitlement to relief is set forth in the summary chart appended as Exhibit 1, satisfying RCFC 10.

170. Consistent with the model this Court applied in *Wolfing v. United States*, 163 Fed. Cl. 135 (2022), and 144 Fed. Cl. 516 (2019), Plaintiffs will continue to request leave to file successive amended complaints or supplemental charts joining additional similarly situated Coast Guard members during the pendency of this action and any remand, in order to protect those members' claims against the running of the six-year limitations period of 28 U.S.C. § 2501.

**FIRST CAUSE OF ACTION**

**<u>WRONGFUL DISCHARGE IN VIOLATION OF REQUIRED PROCEDURES</u>**

171. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth in this count.

172. Defendant summarily and illegally discharged each Plaintiff in violation of the due process and other procedural requirements set forth in the U.S. Constitution, federal law, and governing Coast Guard regulations, procedures, and policy manuals.

173. The Coast Guard's systematic violations of Plaintiffs' due process rights and the specific procedural requirements set forth below renders their discharges legally void and of no effect. Accordingly, each plaintiff must be deemed to have continued in service until lawfully discharged, must be awarded constructive service, and is entitled to any basic pay, points, benefits, special pays, separation pay, and/or retirement pay to which they are or would be entitled by law for such constructive service. *See, e.g., Runkle v. United States*, 122 U.S. 543 (1887); *Clackum v. United States*, 148 Ct.Cl. 404 (Fed.Cir.1960); *Garner v. United States*, 161 Ct.Cl. 73 (1963); *Shapiro v. United States*, 107 Ct.Cl. 650 (1947); *Dodson v. Army*, 988 F.2d 1199, 1208 (Fed.Cir.1993); *Groves v. United States*, 47 F.3d 1140, 1145 (Fed.Cir.1995).

**37 U.S.C. § 204 and § 206 Are Money-Mandating Statutes**

174. Under 37 U.S.C. § 204(a)(1), a service member is "entitled to the basic pay of their ..., in accordance with their years of service" if they are "a member of a uniformed service on active duty".

175. Each Plaintiff was "a member of a uniformed service on active duty" when the Mandate was issued up until the time that they were wrongfully discharged, constructively discharged, separated, involuntarily transferred to inactive status, had their orders curtailed, and/or were denied pay and benefits.

**Due Process and Procedural Violations**

176. In Title 10 of the U.S. Code, the terms "armed forces" and "uniformed services" include the Coast Guard. 10 U.S.C. § 101(a)(4) ("armed forces") and § 101(a)(5) ("uniformed services").

177. Defendant illegally discharged Coast Guard members, including each Plaintiff, prior to the expiration of their term of service, in violation of 10 U.S.C. § 1169.

178. Defendant illegally discharged and denied reenlistment of Coast Guard members in "sanctuary" status, including Plaintiffs Harkins and Nolan who were each within two years of qualifying for retirement when they were involuntarily separated, in violation of 10 U.S.C. § 1176.

179. Defendant illegally discharged and denied reenlistment to Coast Guard members more than eight years of service without convening an administrative discharge board, including each Plaintiff, in violation of express requirements set forth in governing Coast Guard regulations and depriving them of due process rights guaranteed by the Fifth Amendment of the U.S. Constitution. ECF 17-5, COMDTINST M1000.4, Arts. 1.B.17, 1.B.22. and 1.B.23; ECF 17-6, PSCINST M1910.1, ¶ 1.B.1 (June 1, 2014).

180. Defendant illegally discharged Coast Guard members, including Plaintiffs, before the discharge certificate was ready for delivery, in violation of 10 U.S.C. § 1168. ECF 17-5, COMDTINST M1000.4, Arts. 1.B.33 & 1.B.34.

181. Defendant illegally discharged Coast Guard members, including each Plaintiff, without providing a complete physical and medical examination prior to discharge, in violation of 10 U.S.C. § 1145 and 14 U.S.C. § 2313. Instead, Plaintiffs received at best a cursory interview with a military healthcare provider that failed to address any serious medical conditions that required treatment.

182. Defendant illegally discharged Coast Guard members, including each Plaintiff, without providing benefits and services required by federal law and Coast Guard regulations, in violation of 10 U.S.C. §§ 1141-1155. ECF 17-5, COMDTINST M1000.4, Ch. 1.B ("Separating Active-Duty Enlisted Members") & Ch. 1.C ("Retirement"). In the rush to illegally discharge Plaintiffs in 30 days or less, the Coast Guard failed to provide legally required vocational training and counseling on post-discharge benefits for Plaintiffs and their spouses, and in most cases failed to permit Plaintiffs to apply for VA benefits and to receive their VA disability ratings.

183. Defendant illegally discharged Coast Guard members who had completed at least six years but less than 20 years of service, including each Plaintiff, without providing separation pay, in violation of 10 U.S.C. § 1174.

184. Defendant illegally discharged Coast Guard members who had completed 20 years of service, who were in "sanctuary" status, or who would have completed 20 years of service or entered sanctuary status at the expiration of their terms of service, including Plaintiffs Harkins and Nolan, without permitting them to request retirement or denying their approved retirement dates, in violation of 14 U.S.C. § 2306.

185. Defendant punished unvaccinated Coast Guard members through wrongful discharges that are categorized as "misconduct" that prevent reenlistment and significantly harm their ability to seek future employment in the private or public sectors.

186. Each Plaintiff has a claim for Backpay for the full period from that date on which they were wrongfully discharged, constructively discharged, separated, or involuntarily transferred to inactive status through the end of the term of service during which the discharge occurred and any subsequent terms of reenlistment for which they would have been eligible absent the now-rescinded Mandate.

187. The Coast Guard's systematic violations of Plaintiffs' due process rights and the specific procedural requirements set forth below renders their discharges legally void and of no effect. Accordingly, each plaintiff must be deemed to have continued in service until lawfully discharged, must be awarded constructive service, and is entitled to any basic pay, points, benefits, special pays, separation pay, and/or retirement pay to which they are or would be entitled by law for such constructive service.

**SECOND CAUSE OF ACTION**

**WRONGFUL DISCHARGE IN VIOLATION OF 10 U.S.C. § 1107A**

188. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth in this count.

189. The Military Pay Act, in conjunction with 10 U.S.C. § 1107a and the other money-mandating sources of federal law enumerated herein, *see supra* ¶ 22, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs.

190. 10 U.S.C. § 1107a expressly prohibits the military from mandating any service member to take an unlicensed EUA product, absent an express Presidential authorization on the grounds of national security.

191. There has not been a Presidential authorization to mandate an unlicensed EUA product from the issuance of the Mandate through the present.

192. The August 24, 2021 Mandate permits only COVID-19 mRNA gene therapy "vaccines" with "full licensure from the [FDA], in accordance with FDA-approved labeling and guidance." ECF 1-2, Aug. 24, 2021 Secretary Austin Mandate Memo, at 1

193. The Defendant Agencies have mandated unlicensed, EUA COVID-19 gene therapies from the issuance of the Mandate on August 24, 2021, until at least the 2023

NDAA Rescission of the Mandate was partially implemented by the DoD on January 10, 2023.

194. No FDA-licensed COVID-19 vaccines were available at all at the time that the August 24, 2021 Mandate was issued. ECF 115.

195. In related litigation, Defendant Agencies have admitted that they have mandated unlicensed EUA vaccines from the date the mandate was issued and extending through the discharge date of each Plaintiff.

196. Defendant Agencies' consistent and generally applicable policy—as reflected in the September 14, 2021 Pfizer Interchangeability Directive, the May 3, 2022 Moderna Interchangeability Directive, and their litigation position in all related litigation—is that unlicensed EUA COVID-19 vaccines are legally interchange with FDA-licensed vaccines and that the unlicensed EUA vaccines should be mandated "as if" they were the FDA-licensed product for the purposes of the Mandate. *See supra* Section II.

197. Compliance with the Coast Guard Mandate was both legally and physically impossible when the Mandate was issued and for several months thereafter.

198. Each Plaintiff specifically inquired as the availability of FDA-licensed vaccines, confirmed that no FDA-licensed vaccine was available, informed their commands that no FDA-licensed vaccines were available, and formally or informally objected that it was not possible to comply with the vaccination order due to the unavailability of FDA-licensed vaccines.

199. Despite the impossibility of compliance, the Coast Guard illegally punished and illegally discharged each Plaintiff for failing to comply with the Coast Guard Mandate's requirement to take an FDA-licensed vaccine.

200. All Plaintiffs' harms, financial and otherwise, described above are a direct result of the Defendant Agencies' unlawful order mandating an unlicensed EUA product in violation of 10 U.S.C. § 1107a and express requirements of the Secretary Austin's August 24, 2021 Mandate Memo that permitted only FDA-licensed products to be mandated.

**THIRD CAUSE OF ACTION**

**WRONGFUL DISCHARGE IN VIOLATION 42 U.S.C. §§ 2000BB-1, ET SEQ.**

201. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth in this count.

202. RFRA is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs.

203. RFRA, in conjunction with the Military Pay Act and the other money-mandating sources of federal law enumerated herein, *see supra* ¶ 22, is fairly interpreted as a "money-mandating" source of federal law that confers substantive rights to monetary damages for Plaintiffs.

204. RFRA applies to Defendant Agencies, each of which is a "branch, department, agency, instrumentality, and official of the United States." 42 U.S.C. § 2000bb-2(1).

205. RFRA expressly creates a remedy in district court, granting any "person whose religious exercise has been burdened in violation of" RFRA to "assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the government." 42 U.S.C. § 2000bb-1(c).

206. RFRA states that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a).

207. The Mandate and other challenged Defendant Agency actions substantially burdened the free exercise of religion in violation of RFRA.

208. The Defendant Agencies each adopted a policy of systematically denying Religious Accommodation Requests using form letters, without providing the "to the person" individualized determinations required by RFRA, DoDI 1300.17, and COMDTINST 1000.15.

209. The Mandate and Defendant Agencies' religious accommodation policies substantially burdened and unlawfully discriminated against religious exercise by treating comparable secular activities, *i.e.*, medical and administrative exemptions, more favorably than comparable religious exercise, *i.e.*, religious accommodations, by granting thousands of medical and administrative exemptions, while granting zero or only a handful of Religious Accommodation Requests. *See supra* ¶¶ 125-134.

210. Each named Plaintiff and most Joined Plaintiffs submitted a Religious Accommodation Request, which was denied. Each Plaintiff appealed the denial, which was also denied.

211. Each Plaintiff's request and each Plaintiff's appeal was denied using a nearly identical, computer-generated form letter that did not address their religious objections, the requirements of their positions, proposed accommodations, or otherwise provide the "to the person" analysis required by RFRA.

212. Following the denial of their respective appeals, each Plaintiff was ordered to receive the injection or else face further punishment followed by discharge and the deprivations of rights, procedures, pay, benefits, and services to which they were entitled by law as set forth below, despite the unavailability of any FDA-licensed vaccines and the

consequent impossibility of compliance with the Secretary's Mandate, which required only FDA-licensed vaccines.

213. Plaintiffs have carried their burden, thereby shifting to the government the burden to demonstrate that its policy satisfy strict scrutiny with respect "to the person" seeking religious accommodation. *See O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

214. The rescission of the Mandate and the United States' subsequent admissions that it was unlawful and unnecessary remove any compelling governmental interest in mandating vaccination against COVID-19 of service members over their religious objections.

215. In all events, as this Court has already held, the Coast Guard failed to employ the least restrictive means of furthering any compelling governmental interest when it denied religious accommodations without the individualized, "to the person" assessment RFRA requires.

216. Accordingly, the Government's policies necessarily fail strict scrutiny.

217. In addition to backpay, Plaintiffs may seek monetary damages for wrongful discharges due to RFRA violations. *See Klingenschmitt v. U.S.*, 119 Fed.Cl. 163 (Fed.Cl.2014).

**FOURTH CAUSE OF ACTION**

**<u>ILLEGAL EXACTION</u>**

218. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth in this count.

219. An illegal exaction claim involves money "improperly paid, exacted, or taken from the claimant." *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 372 F.2d

1002, 1007 (Ct. Cl. 1967). An illegal exaction occurs when "the Government has the citizen's money in its pocket," *Clapp v. United States*, 127 Ct. Cl. 505, 512, 117 F. Supp. 576, 580 (1954), and suit may be maintained under the Tucker Act to recover the money exacted, *id.* at 513; *Pan American World Airways v. United States*, 129 Ct. Cl. 53, 55, 122 F. Supp. 682, 683-84 (1954).

220. This count is limited to money that the Coast Guard recouped, collected, or withheld from Plaintiffs that had already been paid to or earned by them—specifically, the recoupment of already-paid reenlistment bonuses and the seizure of final paychecks applied to satisfy purported "debts" arising from those bonuses.

221. Plaintiffs do not assert as illegal exactions any unpaid pay, unpaid bonuses, forfeited or sold-back leave, or other unpaid amounts, all of which are encompassed within their backpay claim under the First Cause of Action.

222. The Coast Guard illegally exacted money from Plaintiff Powers by recouping his already-paid reenlistment bonus of $13,135.51. ECF 18-8, Powers Decl. ¶¶ 23-24.

223. The rescission of the Mandate and the United States' admissions that it was unlawful eliminated any legal basis for the recoupment of bonuses already paid to Plaintiffs on account of their service. "When a statute has been repealed, the regulations based on that statute automatically lose their vitality." *Aerolineas Argentinas v. U.S.*, 77 F.3d 1564, 1575 (Fed. Cir. 1996).

224. The amounts the Coast Guard so recouped, collected, or withheld are illegal exactions recoverable under the Tucker Act, 28 U.S.C. § 1491(a)(1).

**FIFTH CAUSE OF ACTION**

**ENFORCEMENT OF THE *JACKSON* SETTLEMENT AGREEMENT**

225. Plaintiffs reallege and incorporate by reference each of the foregoing paragraphs as if fully set forth in this count.

226. The *Jackson* Settlement Agreement is a valid and binding contract with the United States. A suit to enforce a settlement agreement with the government "is just that: a suit to enforce a contract with the government," and this Court has Tucker Act jurisdiction over such a claim. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011); *VanDesande v. United States*, 673 F.3d 1342, 1347-49 (Fed. Cir. 2012); *Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999).

227. Because the claim is founded upon a contract with the United States, the money-mandating requirement for Tucker Act jurisdiction is satisfied by the presumption that money damages are available for breach of contract, and no separate money-mandating statute need be identified. *Holmes*, 657 F.3d at 1314.

228. The Settlement Agreement contains no disavowal of money damages and can fairly be interpreted as contemplating money damages for its breach, because the records-correction and Board-directive obligations it imposes are the predicate to the back pay and constructive-service credit the affected members are owed.

229. Each plaintiff who sought a religious exemption or accommodation from the COVID-19 vaccine requirement is a Covered Service Member and intended third-party beneficiary.

230. Third-party beneficiaries of a contract to which the United States is a party may enforce it where the contract reflects the parties' intention to confer a direct benefit on them, and the beneficiary need not be individually named so long as it falls within a

class clearly intended to be benefited. *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001); *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997).

231. The United States has partially implemented the *Jackson* Settlement, ECF 103-1, including by issuing ALCOAST 126/26, ECF 103-2, to implement Section 2 of the agreement, and removing CG-3307 administrative remarks. But has refused to honor intended third party beneficiaries in this litigation after repeated requests by plaintiffs.

232. The United States' failure to honor Section 8, and the explicit terms of ALCOAST 126/26 for Named and Joined Plaintiffs is a breach of the Settlement Agreement that directly and materially harms Plaintiffs as intended third-party beneficiaries, because it withholds the records-correction relief and the Board direction to which they are entitled.

233. Plaintiffs are entitled to the damages for that breach and, in the alternative, to specific performance of the Settlement Agreement's unperformed obligations, including issuance of the Section 8 memorandum. The Settlement Agreement supplies the basis for records-correction and Section 8 relief; it is not the money-mandating source for Plaintiffs' back pay, which remains the Military Pay Act.

234. Should the Court conclude that this count is more properly treated as a request for relief than as a stand-alone claim, Plaintiffs incorporate the same relief into their Prayer as relief incident of and collateral to a money judgment. 28 U.S.C. § 1491(a)(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that this Court:

235. Award and enter a judgment for the military backpay and other financial compensation due to the Plaintiffs, in amounts to be determined for each Plaintiff;

236. Reinstate and correct the military records of Plaintiffs as necessary pursuant to 10 U.S.C. § 1552 as requested herein;

237. Award separation pay pursuant to 10 U.S.C. § 1174 to Plaintiffs who were qualified, entitled, but illegally refused;

238. Declare that the discharges, separations, and transfers to inactive status of Plaintiffs for non-compliance with the Mandate were unlawful and void, and order all procedural corrections necessary to restore them to the pre-Mandate status quo, including applicable constructive service credit;

239. Order the return of all reenlistment bonuses and other amounts already paid to or earned by Plaintiffs that the Coast Guard recouped, collected, or withheld, and the cancellation of any related indebtedness;

240. Award damages for the United States' breach of the *Jackson v. Mullin* Settlement Agreement and, in the alternative and as relief incident of and collateral to any money judgment under 28 U.S.C. § 1491(a)(2), order specific performance of the Settlement Agreement, performance of the obligations required by Section 8, directing the Coast Guard Board for Correction of Military Records to exercise broad discretion in correcting the records of service members and former service members who suffered harms resulting from the Mandate;

241. Sustain the permissive joinder of the Joined Plaintiffs identified in Exhibit 1, and grant Plaintiffs leave to file successive amended complaints or supplemental charts joining additional similarly situated Coast Guard members during the pendency of this action to protect their claims against the running of the limitations period of 28 U.S.C. § 2501;

242. Remand the correction of Plaintiffs' military records and the computation of the pay and benefits owed to them to the Coast Guard Board for Correction of Military Records under RCFC 52.2, retaining jurisdiction and requiring periodic status reports, consistent with *Wolfing v. United States*, 163 Fed. Cl. 135 (2022);

243. Award Plaintiffs the above monetary judgment, plus interest, costs, and attorney's fees, as a result of the improper actions of the Defendant and Defendant Agencies; and

244. Grant such other relief as the Court may deem just and proper to provide Plaintiffs "full and fitting relief."

Date: August 21, 2026

Respectfully submitted,

*<u>/s/ Dale Saran</u>*
Dale Saran, Esq.
19744 W. 116th Terr.
Olathe, KS 66061
Tel. (727) 709-7668
E-mail: dale.saran@militarybackpay.com

*<u>/s/ Barry Steinberg</u>*
Barry Steinberg, Esq.
Kutak Rock LLP
1625 Eye Street, NW, Suite 800
Washington, DC 20006-4099
Tel. (202) 828-2316
Email: barry.steinberg@kutakrock.com

*<u>/s/ Brandon Johnson</u>*
Brandon Johnson, Esq.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
brandon.johnson@militarybackpay.com

*<u>/s/ J. Andrew Meyer</u>*
J. Andrew Meyer, Esq.
8380 Bay Pines Blvd.,
St. Petersburg, FL 33709
Tel. (727) 709-7668
Email: a.meyer@militarybackpay.com